4

# TOGUT, SEGAL & SEGAL LLP

ATTORNEYS AT LAW

ALBERT TOGUT
FRANK A. OSWALD *
NEIL BERGER *
SCOTT E. RATNER *
SIDNEY SEGAL (1935-1968)
BERNARD SEGAL (1932-1983)

OF COUNSEL
HOWARD P. MAGALIFF °

DANIEL F.X. GEOGHAN *
VALERIE KARASZ
RICHARD K. MILIN °
JAYME T. GOLDSTEIN
JONATHAN HOOK *
TALLY M. WIENER
SEAN P. McGRATH
ANTHONY M. VASSALLO
MARY JANE E. WAGG

*MEMBER NY AND NJ BAR
°MEMBER NY AND CT BAR
°MEMBER NY AND MA BAR

ONE PENN PLAZA
NEW YORK, NEW YORK 10119

(212) 594-5000

FACSIMILE
(212) 967-4258

INTERNET
eMail@TeamTogut.com

May 12, 2005

Honorable Arthur J. Gonzalez
United States Bankruptcy Court
Southern District of New York
One Bowling Green
Room 528
New York, NY 10004-1408

> Re:   Enron v. International Finance Corp., et al.
>       Adv. Pro. No. 03-93370 _____

Dear Judge Gonzalez:

We represent plaintiff Enron Corp. in the above-referenced adversary proceeding. On April 29, 2005, we filed our memorandum of law in opposition to the motion to dismiss of defendant Caisse de Depot et Placement du Quebec ("CDP"). CDP argued in its motion that before Enron could recover under a fraudulent transfer under § 550(a) of the Bankruptcy Code from CDP, a subsequent transferee, Enron first had to avoid the transfer against the initial transferee. Enron argued in its response that the initial transfer must only be "avoidable" before recovery could be had from a subsequent transferee.

On May 3, 2005, the Eleventh Circuit Court of Appeals, further validating Enron's argument, affirmed the district and bankruptcy courts in holding that a trustee in bankruptcy does not have to avoid the initial transfer before the trustee can recover under § 550(a) from the subsequent transferee. *See IBT International, Inc. et al. v. Northen (In re International Administrative Services, Inc.)*, No. 04-11829 (11th Cir. May 3, 2005), a copy of which is enclosed. The Eleventh Circuit noted that a strict interpretation of § 550(a) "produces a harsh and inflexible result that runs counterintuitive to the nature of avoidance actions." (Decision, ¶ 66). "The more tenable result in this case is that the Trustee may simultaneously avoid a transfer under

TOGUT, SEGAL & SEGAL LLP

Hon. Arthur J. Gonzalez
May 12, 2005
Page 2

§ 544 and seek recovery under § 550. (Internal citations omitted.)  This approach allows a plaintiff to recover property from those considered to be 'mediate' transferees of the initial transferee.  In short, once the plaintiff proves that an avoidable transfer exists he can then skip over the initial transfer and recover from those next in line."  (Decision, ¶ 73).

Thank you for your consideration.

Respectfully,

TOGUT, SEGAL & SEGAL LLP
By:

Howard P. Magaliff

HPMpdq
enclosure

cc:   Stephen Shimshak, Esq.
      Erica Weinberger, Esq.
      Frank A. Oswald, Esq.

In re International Administrative Services, Inc., No. 04-11829 (11th Cir. 05/03/2005)

[1] IN THE UNITED STATES COURT OF APPEALS FOR THE ELEVENTH CIRCUIT

[2] No. 04-11829

[3] Keywords: mediate transferee, initial transferee, 546(a), equitable tollling

[4] May 3, 2005

[5] IN RE: INTERNATIONAL ADMINISTRATIVE SERVICES, INC., DEBTOR.
IBT INTERNATIONAL, INC., SOUTHERN CALIFORNIA SUNBELT DEVELOPERS, INC.,
DEFENDANTS-APPELLANTS,
V.
JOHN A. NORTHEN, PLAINTIFF-APPELLEE.

[6] Appeal from the United States District Court for the Middle District of Florida D. C. Docket
No. 03-00765-CV-ORL-19-KRS; BKCY No. 96-03950-6J-1

[7] The opinion of the court was delivered by: Fay, Circuit Judge

[8] [PUBLISH]

[9] Before MARCUS, FAY and SILER*fn1 , Circuit Judges.

[10] This appeal stems from the bankruptcy of International Administrative Services, Inc. ("IAS"
or the "Debtor"). The Debtor's stock trustee (the "Trustee"), acting on behalf of the Official
Committee of Unsecured Creditors (the "Committee") filed an adversary proceeding against IBT
International, Inc. ("IBT") and Southern California Sunbelt Developers, Inc. ("SCSD") to recover
assets that had been fraudulently transferred from the Debtor to IBT and SCSD. The bankruptcy
court entered judgment in the adversary proceeding in favor of the Trustee. IBT and SCSD
appealed to the district court, which affirmed the judgment, and the Defendants then appealed to
this Court. IBT and SCSD raise four grounds for error that would require reversal: (1) that the
statute of limitations prevented an extension of the time for bringing the action by either court
order or equitable tolling; (2) that the avoidance action was improperly brought because the
Trustee did not first avoid the transfer to the initial transferees; (3) that the Trustee improperly
traced the funds sought to be recovered; and (4) that the bankruptcy court incorrectly calculated

pre-judgment interest against the Defendants. For the reasons set forth below, we disagree with the Defendants' assignments of error, and affirm the judgment of the bankruptcy court.

[11] I. Facts

[12] IAS specialized in marketing financial advice to unsophisticated consumers through a barrage of seminars and late night infomercials. A leviathan in the world of get-rich-quick schemes, IAS guaranteed customers increased wealth, provided they followed the company's financial strategies, which were contained in IAS publications. The trap, however, was that to be privy to this valuable information, a customer had to first purchase a membership and then pay a substantial amount in annual dues. Essentially, IAS promoted a gamble-free method of getting rich, once, of course, customers paid IAS, received the publications, and meticulously followed the instructions.

[13] Charles Givens founded IAS in 1986, and was the company's sole shareholder. He served as an officer and director until 1991 or 1992, although management continued to look to Givens for guidance after his departure. As the visible voice of IAS, Givens traveled extensively, promoting his "wealth without risk" plan. A dynamic and compelling speaker, Givens persuaded audiences to buy expensive memberships in IAS, and those numbers swelled to over 250,000.

[14] Sheer numbers, however, do not validate a theory absent empirical evidence, and doubt soon fell upon the legitimacy of the IAS financial advice. A majority of the information was neither novel nor covert -most of it was readily available and comprised common-sense business practices. Other advice, such as encouraging customers to cancel uninsured motorist coverage on their vehicles, raised more red flags.

[15] In 1991, several members initiated lawsuits against IAS and Givens, challenging the practicality of their advice. On the advice of IAS, several customers dropped their uninsured motorist coverage, only to be involved in serious car crashes with uninsured drivers, and leaving them with uncompensated losses. The customers sued IAS for giving them the detrimental advice. Eventually, eleven similar lawsuits were filed throughout the country, seeking a large amount in damages.

[16] Another layer was added to IAS' troubles when the SEC targeted Givens and IAS as part of a securities fraud investigation in connection to a real estate venture. IAS' problems grew when the attorney generals of several states launched major investigations involving IAS' failure to pay the state sales tax generated at seminars around the country. Finally, the Federal Trade Commission aimed its sights at the company's business practices.

[17] IAS vigorously defended the lawsuits and government investigations, but it was clear that IAS' exposure to liability in these cases exceeded $10 million. As a preemptive method of preserving both his and IAS' wealth, Givens retained the services of attorney David H. Tedder ("Tedder"), his law firm, and his company, The Institute for Asset & Lawsuit Protection, to formulate a plan that would shield the assets from creditors.*fn2

[18] Tedder moved to Florida in order to implement the IAS/Givens asset protection plan. First, assets were transferred to various Tedder-owned foreign and domestic entities. Tedder then recycled the assets through a tangled and complex web of multi-step international transactions. In total, Tedder transferred assets more than one hundred times among twenty-three different entities. Between January 1992 and 1996, Givens removed a treasure chest in excess of $50 million from IAS' coffers; putting it out of the direct reach of IAS' creditors.

[19] On June 20, 1996, IAS filed a voluntary Chapter 11 bankruptcy petition, no doubt due in part to Givens and Tedder's purge and plunder scheme. The U.S. Trustee appointed the Official Committee of Unsecured Creditors (the "Committee") to facilitate the IAS reorganization, which would seem plausible because Givens no longer managed the day-to-day affairs of the debtor.

[20] Unfortunately for the Debtor, Givens still played an active role in the company, which crippled IAS' ability to investigate the suspect transfers without bias or influence.

[21] The Committee soon discovered the existence of the Givens-IAS transfers, and with the goal of reorganization in mind, the Debtor assigned its right and duty to pursue any fraudulent transfer actions or avoidance claims to the Committee.*fn3 By September of 1996, the Trustee then began the unenviable task of unraveling the knotted trail of transfers. The Trustee's ability to investigate the transfers was hampered by Givens and his associates, who, among other things, delayed document production, withheld discovery responses, and simply "lost" records of the asset transfers. As a result, the Trustee filed a motion to hold Givens, and the professionals assisting him in covering the tracks, in contempt of court. The bankruptcy court appointed a Special Master to oversee and administer discovery compliance.

[22] The problems associated with discovery led to the Trustee's inability to timely identify the long chain of transferees, and thus initiate any proceeding to avoid the transfers within the limitation period, which expired on June 20, 1998, two years after IAS filed for bankruptcy. The bankruptcy court granted the Committee's request to extend the time to file avoidance actions through the time of a hearing by the Special Master on July 29, 1998, when the court would again consider any extensions based upon the progression of discovery.

[23] As seems par for this case, discovery disputes continued, and the hearing in which the

Special Master delivered his report was not concluded until September 3, 1998, more than one month after the deadline of the initial extension. At this hearing, the Special Master determined that the all-important transfer documents did not appear to have been "misplaced," but, rather, that the items had been "deliberately and intentionally secreted" from the Trustee. Based upon these findings, the Trustee moved in open court to further extend the time to file avoidance actions. The oral motion was granted, and the bankruptcy court entered a written order memorializing its ruling on September 17, 1998. That order extended the time period for the Trustee to file avoidance actions until February 10, 1999.

[24] On February 10, 1999, the Trustee filed this adversary proceeding against a list of defendants, including John Does. IBT and SCSD were not named parties until August 17, 1999, once the Trustee had traced IAS assets to them, and filed a first amended complaint. Count I of the complaint sought to avoid any transfer of an interest of the Debtor in property pursuant to 11 U.S.C. § 544(b) and Florida Statutes §§ 726.105, 726.106, and 726.108, which permit avoidance of transfer made with the actual intent to hinder, delay, or defraud creditors. In Count II, the Trustee sought turnover of the property improperly transferred from the Debtor under 11 U.S.C. § 542(a).

[25] The Trustee targeted IBT and SCSD because they received $1,050,000 from IAS, through several of Tedder's intricate transfer devices. The exact route the money took, and the various stops it made, is a difficult road to follow. After essentially being laundered through the Tedder mechanisms, the IAS money trickled down to the Van Dan Limited Partnership ("Van Dan"), which was a Nevada entity owned by Tedder. Van Dan transferred $50,000 of IAS money to IBT on May 11, 1993. Two days later, a Netherlands company, Eurokredit Finance S.A. ("Eurokredit"), transferred another $3,500,000 of IAS funds to an account held by H.D., Inc., an Isle of Mann corporation. On May 26, 1993, Eurokredit transferred an additional $3,350,000 of the Debtor's funds to a second HD-held account. Tedder himself transferred $999,975 from the two HD accounts to a Van Dan account on July 1, 1993. Finally, on July 7, 1993, Tedder transferred $1,000,000 from Van Dan to IBT and SCSD. Consequently, between the May 11 and July 7, 1993, transfers, IBT and SCSD received $1,050,000 in Debtor-derived funds.

[26] The money trail does not end there, however. On August 20, 1993, IBT transferred its share of the $1,050,000 to SCSD. IBT and SCSD are related construction/real estate development companies owned by Dan Baer, one of Tedder's business associates. SCSD used the money to purchase a commercial office condominium development known as the John Wayne Office Guild (the "Guild"), in Orange County, California. As to the Guild property, the Trustee alleged that the monies which bought the property were fraudulent transfers originating from IAS, and were subject to avoidance. The Trustee sought recovery of IBT and SCSD's interest in the Guild as property of the Debtor's bankruptcy estate, not just the money judgment.

[27] The bankruptcy court held a three-day trial on the issues. At the trial, the Trustee presented a thorough tracing analysis, highlighting that the assets obtained by IBT and SCSD had

originated with IAS and were then transferred to Tedder's entities under the auspices of his asset protection plan. The evidence at trial demonstrated the complex and intentionally insidious nature of the plan, and illustrated the difficulty the Trustee experienced in investigating the multi-transaction scheme.

[28] The removal of IAS' funds was not accomplished in one fell swoop. Rather, the Trustee identified several different avenues used by IAS, Givens, and his professional advisors to extract company funds. Millions of dollars filtered through a collection of foreign jurisdictions, allowing Tedder to invest monies for Givens without the hassle of company creditors or the relevant taxing authorities. The detours that the IAS funds took ranged from "leasing" Givens' services to IAS for a paltry annual sum of $4.8 million to converting $19 million of IAS' non-exempt liquid assets into creditor-proof exempt assets via the purchase of phony annuities to simply giving $3.5 million to a Tedder company that promised to stabilize IAS' income, but instead canceled the contract without returning the funds. Eventually, between the siphoning of the funds and blanket liens that Tedder's companies acquired on IAS' assets and future income, all of IAS' resources were encumbered and beyond the reach of creditors.

[29] Based upon the evidence, the bankruptcy court entered a money judgment for the Trustee, and against IBT and SCSD in the amount of $1,679,251.30, which included interest.*fn4 IBT and SCSD appealed to the district court, which affirmed the bankruptcy court's ruling. The Defendants then filed the instant appeal.

[30] II. Discussion

[31] A. Standard of Review

[32] Our Court has jurisdiction over this matter under 28 U.S.C. § 158(d). "As the 'second court of review of a bankruptcy court's judgment,'" we independently examine the factual and legal determinations of the bankruptcy court and employ the same standards of review as the district court. In re Issac Leaseco, Inc., 389 F.3d 1205, 1209 (11th Cir. 2004) (quoting In re Club Assoc., 951 F.2d 1223, 1228 (11th Cir. 1992)). As the district court made no factual findings in its function as an appellate court, our review is de novo. In re Sublett, 895 F.2d 1381, 1384 (11th Cir.1990). We review the findings of fact made by the bankruptcy court for clear error. In re JLJ Inc., 988 F.2d 1112, 1116 (11th Cir.1993). A factual finding is not clearly erroneous unless "this court, after reviewing all of the evidence, [is] left with the definite and firm conviction that a mistake has been committed." Lykes Bros., Inc. v. United States Army Corps of Engr's, 64 F.3d 630, 634 (11th Cir. 1995) (internal quotation marks omitted). This Court conducts a de novo review of "determinations of law, whether from the bankruptcy court or the district court."

[33] In re Bilzerian, 100 F.3d 886, 889 (11th Cir.1996) (per curiam); In re Sublett, 895 F.2d at 1383 (11th Cir.1990).

[34] B. Statute of Limitations and the Filing of the Complaint

[35] One of the primary issues of the appeal concerns whether the Trustee let the limitations period run prior to filing suit. IBT and SCSD argue that the statute of limitations set forth in 11 U.S.C. § 546(a)(1) had lapsed before the Trustee filed this adversary proceeding on February 10, 1999. Count I of the complaint seeks avoidance of the transfer to IBT and SCSD under § 544(b), and is limited by 11 U.S.C. § 546(a), which provides that:

[36] An action or proceeding under section 544, 545, 545, 547, 548, or 553of this title may not be commenced after the earlier of -                                                             ••

[37] (1) the later of --

[38] (A) 2 years after the entry of the order of relief; or

[39] (B) 1 year after the appointment of election of the first trustee... Because there was no statutory trustee*fn5 appointed in this case, the statute of limitations would have run two years after the filing of the bankruptcy case - June 20, 1998. Three days before the limitations was set to run, the bankruptcy court entered an order extending the time until a hearing by the Special Master on July 29, 1998. Due to the ongoing discovery disputes, that hearing was not held until September 3, 1998. On September 17, 1998, the bankruptcy court entered a second order, granting a further extension of the time for filing an adversary action through February 10, 1999.

[40] The Defendants' four-pronged attack on the extension of the statute of limitations consists of: (1) that the bankruptcy court did not have the power to extend the § 546(a) period; (2) that the bankruptcy court's extension of the § 546(a) period was inoperative because of the "gap" period between the orders extending the limitations period;*fn6 (3) that the doctrine of equitable tolling should not apply to the adversary proceeding; and (4) that the § 546(a) enlargement orders were ineffective against IBT and SCSD.

[41] There is the threshold matter of whether the bankruptcy court had any authority - either by its own order or the doctrine of equitable tolling - to enlarge the § 546(a) period for commencing avoidance actions. The Defendants suggest that rather than a statute of limitations, § 546(a) operates as a jurisdictional bar, and point to Bankruptcy Rule 9006(b), which does not

specifically provide for enlargement of time period created by statute, as opposed to those created by the Federal Rules of Bankruptcy Procedure or a court order. We find no merit in this argument. Rule 9006(b) states:

[42] [W]hen an act is required or allowed to be done at or within a specified period by these rules or by a notice given thereunder or by order of court, the court for cause may at any time in its discretion...order the period enlarged.

[43] Although "by these rules...or by order of court" does not explicitly encompass statutory timeframes, it does bring all of the Federal Rules of Bankruptcy Procedure under its umbrella. Not surprisingly, this would include Rule 7001, which defines an adversary proceeding as one "to recover money or property" and Rule 7003, which governs the commencement of adversary proceedings. To read a jurisdictional bar into § 546 would lead to absurd results, and the Defendants did not cite any authority for such a proposition. Therefore, § 546 is indeed a statute of limitations, subject to waiver, equitable tolling, and equitable estoppel. See In re Rodriguez, 283 B.R. 112, 116-18 (Bankr. E.D.N.Y. 2001) (finding § 546 to be a true statute of limitations, subject to enlargement by court order, rather than a statute of repose or jurisdictional bar).

[44] While we think a bankruptcy court has the discretion to extend the filing period for an adversary proceeding, that resolution is only the tip of the iceberg. It is undisputed that the Trustee filed the adversary proceeding within the § 546(a) period, as extended by the bankruptcy court's second order. The controversy lies with the so-called "gaps" between the orders that extended the time period, and whether the extension was fixed by date or reference to a hearing. Namely, the ambiguity arose out the June 17 enlargement order, which provided for an extension of the § 546(a) limitations period "through the time of the hearing by the Special Master on July 29, 1998." This hearing was then continued until September 3 due to the protracted discovery disagreements. At the September 3 hearing, the judge granted an oral motion to extend the § 546(a) period through February 10, 1999. The bankruptcy court memorialized this extension by written order on September 17, 1998.

[45] The Defendants maintain that the effective words of the bankruptcy court's first enlargement order were "July 29, 1999" rather than the reference to the "hearing set before the special master." Further, the second order was docketed fifteen days after the oral ruling, and was not entered nunc pro tunc. Given these inherent ambiguities, the bankruptcy court declined to rest its opinion solely on its own orders, although it eventually determined that the Trustee timely filed the complaint.

[46] We think that the bankruptcy court's orders did indeed extend the limitations period, albeit not in a seamless fashion. In its Findings of Fact and Conclusions of Law, the bankruptcy court noted that "[w]ithout question, [it] intended the limitations period of Section 546(a) to extend through February 10, 1999." Such a statement demonstrates the clear purpose of the bankruptcy

court, even where an order does not. Where an order is ambiguous, "its extent must be determined by what preceded it and what it was intended to execute." Union Pacific Railroad Co. v. Mason City & Fort Dodge Railroad Co., 222 U.S. 237, 247 (1911). Moreover, we may use a memorandum opinion to determine the intent of the court in issuing that order. United States v. Taylor, 544 F.2d 347, 349 (8th Cir. 1976). Consequently, the language "hearing set before the Special Master" controls, and the limitations period was continued in conjunction with the hearing.

[47] There is also the matter of the alleged gap between September 3 and September 17, where the bankruptcy court orally granted a second extension at the hearing of the Special Master, but did not enter a written order until September 17. In this instance, the time at which the written order was entered by the court and file-stamped by the clerk is irrelevant to the time of its effectiveness. "A judgment is not what is entered but what was directed by the court... In the very nature of things, the act must be perfect before its history can be so; and the imperfection or neglect of its history fails to modify or obliterate the act." In re Ackermann, 82 F.2d 971, 973 (6th Cir.1936) (citation omitted). Other courts have treated oral orders similarly. See; e.g., Noli v. Commissioner, 860 F.2d 1521, 1525 (9th Cir.1988) (holding a bankruptcy's court oral order binding and effective despite the court's failure to enter it on the docket). Thus, a court's order is complete when made, not when it is reduced to paper and entered on the docket. See also Dalton v. Bowers, 53 F.2d 373, 374 (2d Cir.1931) ("Entry is for most purposes not necessary to the validity of an order.").

[48] In an abundance of caution, we will not limit our analysis of the limitations period to the bankruptcy court's orders. Rather, we will also reach the question of whether the Trustee demonstrated an equitable basis for extending the limitations period. Where, despite the exercise of due diligence, a trustee fails to timely bring an avoidance action due to fraud or extraordinary circumstances beyond the trustee's control, equitable tolling prevents the expiration of § 546(a)'s limitations period. In re Levy, 185 B.R. 378 (Bankr. S.D. Fla. 1995). See Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363, 111 S.Ct. 2773, 2782, 115 L.Ed.2d 321 (1991) ("where the party injured by the fraud remains in ignorance of it without any fault or want of diligence or care on his part, the bar of the statute does not begin to run until the fraud is discovered, though there be no special circumstances or efforts on the part of the party committing the fraud to conceal it from the knowledge of the other party.") (quoting Bailey v. Glover, 21 Wall. 342, 348, 22 L.Ed. 636 (1875)).

[49] The equitable tolling doctrine most often applied is that enunciated in Holmberg v. Armbrecht, 327 U.S. 392, 397, 66S.Ct. 582, 585, 90 L.Ed. 743 (1946). When a defendant's fraudulent deceptions leave a plaintiff ignorant of the facts or even existence of his claim, the limitations period is tolled until discovery of the fraud. Id. at 396-97, 66 S.Ct. at 584-85. Equity does not lend itself to fraud of any kind. Id. at 396, 66 S.Ct. at 584. While this doctrine is not applicable to the time limitation imposed by every federal statute, it does apply to all federal statutes where the time limits are in the character of a true statute of limitations. In re M&L;Bus. Mach. Co. Co., Inc., 75 F.3d 586 (10th Cir. 1996); In re United Ins. Mgmt., Inc., 14 F.3d 1380

(9th Cir. 1994). In such a case, the statute is simply an affirmative defense, and, consequently, subject to equitable considerations such as estoppel and waiver. Smith v. Mark Twain Nat'l Bank, 805 F.2d 278, 293-94 (8th Cir.1986) (applying equitable estoppel to section 549(d)). Equitable considerations are inapplicable, however, where time limits are jurisdictional in nature and are to be strictly construed. Id. Our Circuit's precedent holds that § 546(a) is a statute of limitation that can be waived. In re Pugh, 158 F.3d 530, 537 (11th Cir. 1998) We think the same principles apply to equitably toll the statute as well. See In re Klayman, 228 B.R. 805 (Bankr. M.D. Fla. 1999); In re United Ins. Management, Inc., 14 F.3d 1380, 1385 (9th Cir.1994) (noting that "[e]very court that has considered the issue has held that equitable tolling applies to § 546(a)(1).").*fn7

[50] Generally, two types of cases give rise to the equitable principles of tolling where the plaintiff cannot timely commence an action because of a defendant's affirmative or negligent conduct. In re Pomaville, 190 B.R. 632 (Bankr. D. Minn. 1995). First, when the fraud goes undiscovered because the defendant has taken positive steps after the commission of the fraud to keep it concealed, then the statute of limitations is tolled until the plaintiff actually discovers the fraud. Id. at 636-37. In re Lyons, 130 B.R. 272, 280, (Bankr. N.D. Ill. 1991). "Fraudulent concealment must consist of affirmative acts or representations which are calculated to, and in fact do, prevent the discovery of the cause of action." Lyons, 130 B.R. at 280. The identity of the party concealing the fraud is immaterial, the critical factor is whether any of the parties involved concealed property of the estate. Id. The second instance is the more mundane circumstance where the defendant has not actively concealed the fraud, and the plaintiff must then exercise due diligence in an attempt to discover the fraud. Id. The limitations clock starts ticking when the plaintiff obtains - or should have obtained - knowledge of the underlying fraud. Id. Again, the inquiry is whether assets of estate have been concealed. Id. Because the applicability of equitable tolling is a fact-based decision, the bankruptcy court determines whether equitable tolling governs on a case-by-case basis. Pomaville, 190 B.R. at 636.

[51] Thus, in the instant case, the Trustee must demonstrate either that he acted with due diligence to discover the negligently concealed fraud or that one of the parties involved in the alleged fraud took positive steps to conceal the transfers. In re Naturally Beautiful Nails, Inc., 243 B.R. 827, 829 (Bankr. M.D. Fla. 1999). The statute of limitations in the former situation begins when the Trustee either acquired, or should have acquired, actual knowledge of the existence of a cause of action. Id. The latter scenario, however, overlooks the Trustee's diligence, and the statute begins to run only when the Trustee gains actual knowledge. Id.

[52] The bankruptcy court found that the Trustee succeeded under both tests, observing that the Trustee "worked long and hard to discover all the intricacies of IAS' and Givens' asset diversion plan." We agree. The Trustee hired a forensic accountant to assist in piecing together the jigsaw puzzle of transfers. Although the Trustee identified some of the initial transfers early in the case, it took months to assemble and ascertain the different mechanisms at work behind the IAS transfers.

[53] To further complicate the Trustee's attempts to ferret out the details of the asset diversion plan. the Debtor and Givens went to extreme lengths to hide their activities. The case was replete with discovery violations. mostly in the form of the Debtor and its associates' refusals to supply the Trustee with critical and important documentation. The appointment of a Special Master and his concluding report demonstrate the deliberate and intentional attempts to obscure the true nature of the asset transfers. The documents that evidenced a money trail from 1AS to 1BT and SCSD were not produced until after September 3. 1998. Without that information. it would have been careless. and perhaps malpractice. for the Trustee to file this adversary proceeding prior to the delivery of these documents.

[54] As such. we conclude that the Trustee did not obtain actual knowledge of the cause of action until after September 3. 1998. at which time the limitation period of Section 546 began to run. The February 10. 1999 complaint was timely filed. Moreover. even if the concealment was negligent or inadvertent. and we are not in the least convinced that it was. the bankruptcy court was right to find that the Trustee "acted with exemplary diligence given the complexities of this case."

[55] As a final challenge to the enlargement of the § 546(a) statute of limitations. the Defendants argue that the bankruptcy court's orders do not apply to them. The second enlargement order encompassed potential adversary proceedings against certain limited partnerships and "any other entity (including individuals) which holds or held. either directly or indirectly. assets for the benefit of Charles J. Givens or members of his family." 1BT and SCSD contend that the order could not apply to them because they do not hold any such interests. The record. however. demonstrates otherwise.

[56] The evidence at trial established that Tedder and Givens orchestrated an elaborate operation that filtered money directly from 1AS to 1BT and SCSD. Tedder and Dan Baer - the owner of both Defendants -initiated various business ventures together and collaborated on a variety of investment programs and seminars. In their business dealings. Baer managed the day-to-day activities and Tedder arranged for financing. Moreover. the Guild project. where the Defendants eventually put the 1AS funds. was one of many investments Tedder made within the confines of the asset dissipation plan. Finally. evidence demonstrated that Baer knew that Guild funding originated with 1AS and Givens.

[57] The second enlargement order pertained to those that held assets either "directly or indirectly." The Defendants' possession of 1AS funds falls squarely within that description. The money moved through a chain from 1AS and Givens to Tedder and his entities to Baer and his entities. the Defendants. As joint venture partners. Baer was to renovate and manage the Guild project. while Tedder secured and supplied financing. Tedder clearly knew the source of the funds. and the bankruptcy court charged Baer with this knowledge as well. 1BT unquestioningly accepted the money. no strings attached. Baer knew that 1AS was not an equity participant in the

project, but no one signed a promissory note. Rather, Tedder incredibly supplied $1.050 million free and clear of any debt. IBT and SCSD cannot escape liability on the notion that Charles Givens did not directly hand them a fist full of cash or write a million-dollar check. Simply put, the Defendants were subject to the terms of the bankruptcy court's second enlargement order.

[58] C. Avoidance of the Initial Transfer

[59] Defendants argue next that the Bankruptcy Code requires that the Trustee first avoid the transfers to the initial transferees before he has a cause of action against the subsequent transferees. In fraudulent transfer actions, there is a distinction between avoiding the transaction and actually recovering the property or the value thereof. In re Burns, 322 F.3d 421 (6th Cir. 2003). By its language, 11 U.S.C. § 544(b)indicates that the transaction must first be avoided before a plaintiff can recover under 11 U.S.C. § 550. In re H & S Transp. Co., 939 F.2d 355 (6th Cir. 1991); In re Richmond Produce Co., 195 B.R. 455 (N.D. Cal. 1996); In re DLC, Ltd., 295 B.R. 593 (8th Cir. B.A.P. 2003), aff'd, 376 F.3d 819 (8th Cir. 2004). This demarcation between avoidance and recovery is underscored by § 550(f), which places a separate statute of limitations on recovery actions; it provides that a suit for recovery must be commenced within one year of the time that a transaction is avoided or by the time the case is closed or dismissed, whichever occurs first. In re Carpenter, 266 B.R. 671 (Bankr. E.D. Tenn. 2001), subsequently aff'd, 79 Fed. Appx. 749 (6th Cir. 2003).

[60] Title 11 U.S.C. § 550(a) details the scope of recovery: to the extent that a transfer is avoided under section 544...the trustee may recover for the benefit of the estate property transferred, or if the court so order, the value of such property, from -

[61] (1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or

[62] (2) any immediate or mediate transferee of such initial transferee As § 550(a) indicates, once a transaction has been avoided, the bankruptcy estate may recover from: (a) the initial transferee; (b) the party for whose benefit the initial transfer was made; and/or (c) any subsequent transferee. In re Int'l Mgmt. Assoc., 399 F.3d 1288 (11th Cir. 2005); In re Teligent, Inc. 307 B.R. 744 (Bankr. S.D.N.Y. 2004). Obviously, a plaintiff in an avoidance action may recover from the initial transferee. In re Model Imperial, Inc., 250 B.R. 776 (Bankr. S.D. Fla. 2000); In re Red Dot Scenic, Inc., 293 B.R. 116 (S.D.N.Y.), aff'd, 351 F.3d 57 (2d Cir. 2003). If there is not an affirmative good faith defense, then § 550(a) allows recovery from subsequent transferees as well. In re Willaert, 944 F.2d 463, 464 (8th Cir.1991). The question that lingers, however, is whether an action must first be brought against the initial transferee as a prerequisite to seeking recovery against other parties who may be liable. In re Richmond Produce Co., 195 B.R. 455 (N.D. Cal. 1996); In re Resource, Recycling & Remediation, Inc., 314 B.R. 62 (Bankr. W.D. Pa. 2004).

[63] The crux of the Defendants' argument is that the Trustee failed to first sue the initial transferees, Tedder's law firm and a Tedder entity named Texas International Personnel Corporation ("TIPCO"), before asserting the claims against IBT and SCSD, the subsequent transferees. If, as the Defendants contend, the money first filtered from IAS to Tedder and TIPCO, then the Trustee must first avoid this initial transfer. Accordingly, and as the Defendants' argument goes, pursuant to Section 550 of the Bankruptcy Code, the Trustee cannot pursue subsequent transferees without avoiding that initial transfer.

[64] Section 550(a) plainly states that "to the extent that a transfer is avoided under section 544...of this title." (emphasis added). Defendants primarily rely upon In re Trans-End Technology, Inc., 230 B.R. 101 (Bankr.N.D.Ohio 1998), which interpreted this provision as requiring the actual avoidance of an initial transfer before recovery is sought from subsequent transferees. The Defendants contend that by allowing the Trustee to recover from them, the bankruptcy court improperly read the word "avoidable" (rather than "avoided") into § 550(a). While Trans-End characterizes the language of § 550(a) as "unarguably...unambiguous and plain," a review of relevant case law demonstrates an array of interpretations. 230 B.R. at 104. See In re Richmond Produce Co., Inc., 195 B.R. 455 (N.D. Cal. 1996) (finding that "once the trustee proves that a transfer is avoidable...he may seek to recover against any transferee, initial or immediate, or an entity for whose benefit the transfer is made"); Imperial Corp. of America v. Shields, 1997 WL 808628 (S.D.Cal. 1997) (same); In re Advanced Telecomm. Network, Inc., 321 B.R. 308, 328 (Bankr. M.D. Fla. 2005) (same). But see In re Slack-Horner Foundries Co., 971 F.2d 577 (10th Cir. 1992) (holding that where a debtor-in-possession or a trustee has brought an adversary proceeding to set aside a transfer after a tax sale, the plaintiff must first seek recovery from the governmental entity that had sold the property for taxes).

[65] Although the Defendants also rely on the Slack-Horner decision, we must mention what the dissenting judge so neatly pointed out. Namely, that there were no other cases to support the majority's decision, and instead listed several cases that did not preclude recovery from the subsequent transferee because the trustee did not go against the initial transferee. 971 F.2d at 583 (Seymour, J., dissenting) (citing In re Hall, 131 B.R. 213 (Bankr. N.D. Fla. 1991); In re Allegheny Int'l Credit Corp., 128 B.R. 125 (Bankr. W.D. Pa. 1991); In re War Eagle Floats, 104 B.R. 398 (Bankr. E.D. Okl. 1989); In re Louis L. Lasser & Stanley M. Kahn, 68 B.R. 492 (Bankr. E.D.N.Y. 1986)). It seems as though Trans-End is the only case since Slack-Horner to endorse the Defendants' argument in this case. We will not, however, be the third court to echo that holding.

[66] The strict interpretation of § 550(a) produces a harsh and inflexible result that runs counterintuitive to the nature of avoidance actions. If the initial transaction must be avoided in the first instance, then any streetwise transferee would simply re-transfer the money or asset in order to escape liability. The chain of transfers would be endless. Nevertheless, this result presents a bit of a quandary. There are two approaches that achieve the end, and we must determine which is the most sound, both legally and logically, for this case.

[67] Several courts, including a bankruptcy court from this Circuit, have advocated the "avoidable" view of § 550(a). See In re Advanced Telecomm. Network, Inc., 321 B.R. 308, 328 (Bankr. M.D. Fla. 2005) On the other hand, other courts, including this Court, have applied the "mere conduit" concept. In re Chase & Sanborn Corp., 904 F.2d 588 (11th Cir. 1990); Nordberg v. Societe Generale, 848 F.2d 1196 (11th Cir. 1988). We will evaluate each in turn.

[68] Since the conduit notion is the law in this Circuit, we will address it first. As with the instant case, a plaintiff's ability to make a case under § 550, may be compromised by the characterization of a potential defendant as an initial, immediate, or mediate transferee. In re Advanced Telecomm. Network, Inc., 321 B.R. 308 (Bankr. M.D. Fla. 2005) The determination whether a particular party is an "initial transferee" within the meaning of § 550(a)(1) has not been as straightforward as the language itself might suggest. Id. A strictly literal interpretation of the statutory term would suggest that the "initial transferee" of a transfer is the first party which received possession of the property in question after it left the hands of the debtor. In re Ogden, 314 F.3d 1190 (10th Cir. 2002). Generally, courts are disinclined to construe the statute in such a rigid manner because in many instances the initial recipient may have nothing to do with the debtor's property other than facilitating its transfer. In re Jet Florida System, Inc., 69 B.R. 83 (Bankr. S.D. Fla. 1987).

[69] Thus, courts have created a more malleable approach to § 550(a), recognizing that such a "mere conduit" cannot be considered an "initial recipient" for purposes of an avoidance action. In re Chase & Sanborn Corp., 904 F.2d 588 (11th Cir. 1990); In re Columbia Data Products, Inc., 892 F.2d 26, 28 (4th Cir.1989) ("a party cannot be an initial transferee if he is a mere conduit for the party who had a direct business relationship with the debtor").

[70] Thus, a legal fiction is created, and the logical flow of the "mere conduit" rule is that the party who receives the property from the conduit is likely to be considered the "initial transferee," albeit several steps removed. The mere conduit rule is used most frequently in situations where banks act as an intermediary in transferring assets. See In re Erie Marine Enterprises, Inc., 216 B.R. 529 (Bankr. W.D. Pa. 1998); In re Coutee, 984 F.2d 138 (5th Cir. 1993); Bonded Financial Services, Inc. v European American Bank, 838 F.2d 890 (7th Cir. 1988). Where a bank receives a check, wire transfer, etc., from the debtor, with instructions to pass it along to another transferee, courts tend to immunize the bank from liability under § 550 as an "initial transferee" because it never exercised any control over the Debtor's funds. See In re Auto-Pak, Inc., 63 BR 321 (Bankr. D.D.C. 1986), rev'd on other grounds,73 B.R. 52 (D.D.C.).

[71] In order for this exception to apply, then, we must determine whether Givens, Tedder, TIPCO and HAC are merely conduits of the IAS funds, and whether IBT and SCSD are the resulting "initial transferees." As we read it, the conduit rule presumes that the facilitator of funds acts without bad faith, and is simply an innocent participant to the underlying fraud. See In re Machinery & Steel Service, Inc., 112 B.R. 478 (Bankr. D. Mass. 1990) (finding that a union

was not an "initial transferee" of payments for benefit of employee welfare and pension funds because it neither received payments themselves nor any benefit from payments: the union only acted as a conduit of checks); see also Hooker Atlanta Corp. v. Hocker, 155 B.R. 332 (Bankr. S.D.N.Y. 1993). We cannot view Givens, Tedder, and company in that light.

[72] These initial transferees do not conjure images of well-intentioned, but gullible, parties who mistakenly fell victim to a massive conspiracy between the Debtor and the Defendants. To the contrary, these entities had intimate and thorough knowledge of the transactions and their desired effect. Money changed multiple hands, twenty-three entities filtered IAS funds away from creditors. Tedder and Givens were the architects of a masterful plan aimed at diluting IAS' coffers and lining their own pockets. To hold them to be innocent parties would contravene the character of a fraudulent transfer action, the purpose of which is to expose fraudulent dealings. As such, we cannot deem Givens, HAC, and TIPCO as "mere conduits" who naively transferred funds to Van Dam who then transferred the same funds to IBT and SCSD. This case does not merit the "mere conduit" distinction that we carved out in Chase & Sanborn or Nordberg.

[73] Notwithstanding our analysis of the application of the conduit rule, the Trustee's case does not fail. The more tenable result in this case is that the Trustee may simultaneously avoid a transfer under § 544 and seek recovery under § 550. Richmond Produce, 195 B.R. at 463; Advanced Telecomm., 321 B.R. at 328. This approach allows a plaintiff to recover property from those considered to be "mediate" transferees of the initial transferee. In short, once the plaintiff proves that an avoidable transfer exists he can then skip over the initial transferee and recover from those next in line.

[74] The court in Richmond Produce affirmed the bankruptcy court's decision permitting the trustee to recover a fraudulent transfer from a mediate transferee, irrespective of whether the trustee had sued the initial transferee of the relevant property. In the case at bar, the bankruptcy court adopted the Richmond Produce analysis: Under § 550, "once a trustee proves that a transfer is avoidable...he may seek to recover against any transferee, initial or immediate, or an entity for whose benefit the transfer is made." Id. at 463. An interpretation of Section 550 mandating actual avoidance of initial transfers, "conflates Chapter 11's avoidance and recovery sections." Richmond Produce further clarified that the language "to the extent that" simply appreciates "that transfers sometimes may be avoided only in part, and that only the avoided portion of a transfer is recoverable." Id. (citing In re Sufolla, Inc., 2 F.3d 977, 982 (9th Cir.1993) (quoting In re Deprizio, 874 F.2d 1186, 1195-96 (7th Cir.1989))). The Richmond Produce court then looked to the legislative history of Section 550 to explain the operative language. The court observed that Congress took "to the extent" to mean that "liability is not imposed on a transferee to the extent that a transferee is protected under a provision...which grants a good faith transferee for value of the transfer that is avoided only as a fraudulent transfer, a lien on the property transferred to the extent of value given." 124 Cong. Rec. H. 11,097 (Sept. 28, 1978), S 17414 (Oct. 6, 1978).

[75] In the instant case, the bankruptcy court agreed with Richmond Produce, noting:

[76] Nothing in the language of Section 550 requires a plaintiff in a fraudulent transfer adversary proceeding to avoid the transfer received by the initial transferee before continuing with avoidance actions down the line of transfers. Certainly. the plaintiff can pursue the initial transferee, but the plaintiff is not obligated to do so. The plaintiff is free to pursue any of the immediate or mediate transferees, and nothing in the statute requires a different result.

[77] Although this interpretation treats IBT and SCSD as subsequent transferees. the distinction between initial transferee and mediate transferee for avoidance purposes is irrelevant. The Defendants need only be transferees. In order to incur liability as a transferee. a party must have exercised a degree of dominion and control over the property transferred. or held some sort of beneficial right in it. In re Paramount Citrus, Inc.. 268 B.R. 620 (M.D. Fla. 2001). Here. IBT and SCSD meet that test. The Defendants received $1.050 million of IAS' money and used it to invest in the Guild property. Only a controlling entity would be able to do so. and the Trustee may recover from the Defendants.

[78] We think this interpretation is correct. We emphasize that this ruling does not erode the conduit theory. Rather. it accommodates a case involving a multitude of patently fraudulent transfers. Not all cases can conveniently be characterized as involving a "conduit" in order to reach property from later transfers. Thus. the decision today allows a more pragmatic and flexible approach to avoiding transfers: for if the Bankruptcy Code conceives of a plaintiff suing independently to avoid and recover. then bringing the two actions together only advances the efficiency of the process and furthers the "protections and forgiveness inherent in the bankruptcy laws." In re Waldron. 785 F.2d 936. 941 (11th Cir. 1986). "The cornerstone of the bankruptcy courts has always been the doing of equity." and in situations such as this. where money is spread throughout the globe. fraudulent transferors should not be allowed to use § 550 as both a shield and a sword. Id. Not only would subsequent transferees avoid incurring liability. but they would also defeat recovery and further diminish the assets of the estate. An opposite result would foster the creation of similar enterprises. for creditors would design increasingly complex transactions. with the knowledge that more transfers decrease the likelihood of a successful avoidance action. Moreover. the increased cost in litigation and the delays associated with prolonged investigations would only contribute to a debtor's shrinking estate.

[79] We are mindful that our reading of § 550(a) does not embrace a strict construction. We believe. however. that it does address the ambiguity of the words "to the extent that a transfer is avoided." Because those words are ambiguous. it is appropriate to look beyond the plain language of the statute. See United States v. DBB. Inc.. 180 F.3d 1277. 1281 (11th Cir.1999) ("We do not look at one word or term in isolation. but instead we look to the entire statutory context.... We will only look beyond the plain language of a statute at extrinsic materials to determine the congressional intent if: (1) the statute's language is ambiguous: (2) applying it according to its plain meaning would lead to an absurd result: or (3) there is clear evidence of contrary legislative intent.") (citations omitted).*fn8

[80] The results here would be absurd, and, as the bankruptcy court put it, "a bizarre exercise in futility." After looking at the statute as a whole, we think Congress contemplated "to the extent that a transfer is avoided" to be a simultaneous as well as successive process. The Trustee here did not have to pursue litigation against Eurokredit, HAC, and TIPCO, or the other Tedder operations, to successfully avoid the transfers of assets to IBT and SCSD. Therefore, we hold that Section 550(a) does not mandate a plaintiff to first pursue recovery against the initial transferee and successfully avoid all prior transfers against a mediate transferee.

[81] D. Tracing of Funds

[82] IBT and SCSD also argue that the Trustee failed to trace every penny deposited into the Van Dan accounts and transferred to IBT. Because the transactions associated with this case are numerous and difficult, we find it necessary to re-examine the chain of IAS funds to IBT: As part of the deferred compensation scheme, whereby IAS leased Givens' services from two of Tedder's entities, HAC Administrative Finance, ("HAC") and TIPCO, IAS transferred funds to TIPCO and TIPCO then transferred monies to HAC. HAC, in turn, transferred the IAS funds to Eurokredit. Eurokredit then passed funds to Tedder's H.D., Inc. From H.D., Inc., the funds went to Van Dan, yet another of Tedder's companies. Finally, Tedder moved the funds from Van Dan to IBT. IBT and SCSD stipulated that IBT received $1,050,000 from these transfers, and admitted that IBT subsequently transferred the funds to an account held by SCSD to purchase units in the Guild. The Defendants contend that the monies sought by the Trustee have been commingled with unrecoverable monies. Furthermore, according to the Defendants, any funds included in the report for transfers occurring before June 20, 1992, are unreachable because of the Uniform Fraudulent Transfer Act's four-year statute of limitations. Finally, the Defendants point out that $659,000 of the money came from an entity called CJGO Canada, and not the Debtor.

[83] In an action seeking recovery, the plaintiff has the burden of tracing funds it claims to be property of the estate. First Fed. of Michigan v. Barrow, 878 F.2d 912 (6th Cir. 1989). Although we agree with this proposition, it is also true that proper tracing does not require dollar-for-dollar accounting. Id.; In re Fin. Federated Title & Trust, Inc., 273 B.R. 706 (Bankr. S.D. Fla. 2001); In re Bridge, 90 B.R. 839 (E.D. Mich. 1988). The bankruptcy court determined that the Trustee successfully proved by a preponderance of the evidence that the $1.050 million transferred to IBT from the Van Dan accounts, originated solely with IAS. We cannot find that conclusion clearly erroneous. Givens and Tedder perpetrated a fraud that can only be described as massive. It is not fatal to the Trustee's case that dollar for dollar, the exact funds cannot be traced.

[84] The evidence demonstrates that the funds used to purchase the Guild property originated in H.D., Inc. and Van Dan accounts, and the monies in those accounts originated with the Debtor. Tedder and Givens cycled substantial amounts of money through nearly two dozen entities on a regular basis. During that time, IAS' debt increased in lock-step with Givens' burgeoning treasure

chest, all in an effort to hide assets from creditors. That money eventually found its way to IBT and SCSD. "It is undeniable that equity will follow a fund through any number of transmutations, and preserve it for the owner as long as it can be identified." Bridge, 90 B.R. at 848 (citing Farmers & Mechanics National Bank v. King, 57 Pa. 202 (1868) (quoted in National Bank v. Insurance Co., 104 U.S. 54, 69, 26 L.Ed. 693 (1881))). The Trustee has identified relevant pathways and properly traced the funds.

[85] Furthermore, we find no merit in the Defendants' argument that the monies the Trustee seeks to recover have been commingled with funds that are not recoverable due to the operation of Florida's fraudulent transfer law. Under 11 U.S.C. § 544, a transfer may only be avoided within four years of the filing of bankruptcy petition per Fla. Stat. § 726.110(1). What Defendants fail to recognize is that the second clause of Fla. Stat. § 726.110(1), provides an exception to the general limitations period, where the claimant could not reasonably have discovered the relevant transfers. In such a case, avoidance actions may be brought for one year from the time the plaintiff discovers or reasonably could have discovered the fraudulent transfers. The overwhelming evidence demonstrates the pervasive fraud that took place in this case, which essentially paralyzed the Trustee's attempts to undo the tangled mess of transfers. Given the situation, the exception applies, and all transfers relevant to the Guild purchase were properly avoidable.

[86] The Defendants' last stand with respect to challenging the avoidance of the transfers is the argument that some $659,000 of the funds that the Trustee sought for recovery came from a source other than the Debtor - CJGO Canada. Again, we harken back to the bankruptcy court's conclusion that "the funds involved in the fraudulent transfer...did not originate from any of Tedder's other clients or from Givens' other businesses. The money came from IAS alone." The Defendants have the burden of demonstrating clear error in this factual finding. In re JLJ, Inc., 988 F.2d 1112, 1116 (11th Cir.1993), but bring no support for this bare allegation. Hence, the bankruptcy court's finding stands.

[87] E. Prejudgment Interest

[88] As a final matter, we address whether the bankruptcy court improperly charged interest from the time of the transfers to the Appellants. August 20, 1993, rather than from the time the Appellants were actually named in the complaint. August 17, 1999. Ordinarily, the allowance of prejudgment interest and the fixing of the time from which interest shall accrue are discretionary with the court. Industrial Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH, 141 F.3d 1434, 1446 (11th Cir. 1998); see also In re Bellanca Aircraft Corp., 850 F.2d 1275 (8th Cir.1988); In re Industrial and Mun. Engineering, Inc., 127 B.R. 848, 851 (Bankr. C.D. Ill. 1990). In re Indep. Clearing House, Co., 41 B.R. 985, 1015 (Bankr. D. Utah 1984). The bankruptcy court may award interest from the date of demand, the institution of the suit, or from the point at which the transferee could be said to hold the transfer wrongfully. Indep. Clearing House, 41 B.R. at 1015; In re Model Imperial, Inc., 250 B.R. 776 (Bankr. S.D. Fla. 2000).

[89] Although the Bankruptcy Code does not explicitly provide for prejudgment interest, it has become a common practice, especially when transfers have been made with the actual intent to hinder, delay, or defraud creditors. See Matter of Texas Gen. Petroleum Corp., 52 F.3d 1330, 1339-40 (5th Cir. 1995); In re Cybermach, Inc., 13 F.3d 818, 822 (4th Cir. 1994); In re Investment Bankers, Inc., 4 F.3d 1556, 1566 (10th Cir. 1993);In re Agricultural Research and Technology Group, Inc., 916 F.2d 528, 541 (9th Cir. 1990). This case calls for the award of such interest.

[90] Our Circuit's precedent holds that "prejudgment interest is not a penalty, but compensation to the plaintiff for the use of funds that were rightfully his."

[91] Industrial Risk Insurers, 141 F.3d at 1446-47. We think that policy is appropriate here, to compensate "the debtor's entire estate for the use of the funds for the period of time in which they were wrongfully withheld..." In re HMH Motor Services, Inc., 259 B.R. 440, 453 (Bankr. S.D. Ga. 2000) (citations omitted). In the absence of a controlling statute, the choice of a rate at which to set the amount of prejudgment interest is also within the discretion of a federal court. Industrial Risk Insurers, 141 F.3d at 1447. That decision is "usually guided by principles of reasonableness and fairness, by relevant state law, and by the relevant fifty-two week United States Treasury bond rate, which is the rate that federal courts must use in awarding post-judgment interest." Id. (citing 28 U.S.C. § 1961). The bankruptcy court calculated the rate according to the Treasury bond rate. Fairness and equity mandate the assessment of prejudgment interest in this case, and the prejudgment interest should be calculated from the date of the loss, August 20, 1993.

[92] III. Conclusion

[93] Based upon the foregoing reasons, we find that the Trustee timely filed the adversary proceeding, that the Trustee simultaneously could avoid the transfer and recover from the mediate transferees, that the Trustee fully satisfied his burden of tracing the Debtor's funds, and that the bankruptcy court properly awarded prejudgment interest from the date the Defendants received the fraudulently transferred funds. Accordingly, we AFFIRM the decisions of the bankruptcy and district courts.

[94] AFFIRMED.

---------------------------------------------------------------------------------

Opinion Footnotes

-----------------------------------------------------------------------------

[95] *fn1 Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

[96] *fn2 Tedder held himself out as an expert in asset protection, and lectured on related strategies.

[97] *fn3 Ultimately, the Debtor's reorganization efforts failed, and IAS eventually filed a liquidating plan, which included a provision creating the Stock Trustee, the plaintiff in the adversary proceeding. The plan granted the Stock Trustee the power to investigate, commence, and prosecute all avoidance and fraudulent transfer adversary proceedings, such as this one.

[98] *fn4 The bankruptcy court also entered judgment against another defendant, Kevin McCarthy, in the amount of $1,288,534.30, but he neither attended trial nor presented any defense on his behalf. McCarthy is not a party to this appeal.

[99] *fn5 Although Northen is referred to as the "Trustee," his title is that of "stock trustee," which is not the statutory trustee described in § 546(a)(1)(B).

[100] *fn6 IBT and SCSD contend that there is a 57-day gap between the expiration of the first extension, July 29, and the hearing by the Special Master, on September 3. The Defendants further argue that another fourteen-day gap exists between the September 3 hearing and the day the final extension was actually ordered, September 17.

[101] *fn7 The issue here is not whether § 546(a) is a statute that is subject to equitable tolling. Instead our focus is whether there is evidence to equitably toll the statute of limitations.

[102] *fn8 As a reviewing court, we should not restrict ourselves to examining a particular statutory provision in isolation when determining whether Congress has specifically addressed the question at issue. The meaning, or lack thereof, of certain words or phrases may only come to light when placed in the appropriate context. It is a "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132-33, 120 S.Ct. 1291, 146 L.Ed.2d 121 (2000) (citations omitted). We must therefore interpret the statute "as a symmetrical and coherent regulatory scheme," ... and "fit, if possible, all parts into an harmonious whole." Id.