7

Case 1:07-cv-06597-AKH   Document 24-9   Filed 11/27/2007   Page 1 of 13

| | |
|---|---|
| UNITED STATES BANKRUPTCY COURT<br>SOUTHERN DISTRICT OF NEW YORK<br>------------------------------------------------------------x<br>In re:<br><br>ENRON CORP., *et al.,*<br><br>               Reorganized Debtors.<br>------------------------------------------------------------x<br>ENRON CORP.,<br><br>               Plaintiff,<br><br>             - against -<br><br>INTERNATIONAL FINANCE CORP, *et al.,*<br><br>             Defendants.<br>------------------------------------------------------------x | Hearing Date: TBD<br><br><br>Chapter 11<br>Case No. 01-16034 (AJG)<br>(Post Confirmation)<br><br>Jointly Administered<br><br><br><br>Adv. Pro. No. 03-93370 (AJG) |

**MEMORANDUM OF LAW OF ENRON CORP.,
PLAINTIFF, IN OPPOSITION TO MOTION OF
<u>NATIONAL AUSTRALIA BANK TO DISMISS COMPLAINT</u>**

TOGUT, SEGAL & SEGAL LLP
Bankruptcy Co-Counsel for the Reorganized Debtors
One Penn Plaza, Suite 3335
New York, New York 10119
(212) 594-5000
Frank A. Oswald (FAO-1223)
Howard P. Magaliff (HPM-2189)

Plaintiff Enron Corp. ("Enron"), by its attorneys, Togut, Segal & Segal LLP, opposes the Motion to Dismiss the complaint (the "Complaint") filed by National Australia Bank ("NAB") in this action.[1]

## INTRODUCTION

This case involves fraudulent transfer claims pertaining to Enron's payment of more than $98 million during the year preceding bankruptcy to the holders of privately placed notes, where Enron made the payments contrary to the terms of the CLO Trust transaction documents. The defendants in this Adversary Proceeding (the "Defendants"), cognizant that the true value of their investments was significantly below par and knowing that the governing agreements prohibited payment by third parties, nonetheless willingly accepted Enron's payments. These payments permitted the Defendants to recoup the entire principal amount of their investments, plus interest, while Enron received a virtually worthless portfolio of assets for its payments solely to help the CLO Trust maintain its credit rating.

Enron is entitled to recover the transfer from NAB as a mediate transferee under § 550 of the Bankruptcy Code. NAB's argument that Enron must first avoid the transfer against Holding I LP[2], the initial transferee of the January Put Payment, is misplaced. Enron can prove that the January Put Payment is avoidable under § 548(a)(1)(B) of the Bankruptcy Code and recover the transfer from NAB under § 550

---

[1] Bear, Stearns & Co., Inc., ("Bear Stearns") Banque Générale du Luxembourg, S.A. ("BGL"), Ensign Peak Advisors ("EPA"), Investkredit Bank A.G. ("Investkredit"), Natexis Banques Populaires ("Natexis"), Dexia Bank ("Dexia"), Nationwide Life Insurance Co. ("Nationwide") Protective Life Corporation ("Protective Life") and Caisse de Depot et Placement du Quebec ("CDP") also filed motions to dismiss the Complaint. Enron has settled with BGL and Investkredit, and their motions, accordingly, are being withdrawn. Enron is filing a separate memorandum of law opposing the Motions to Dismiss of the other Defendants, which are based upon a different legal theory.

[2] Capitalized terms are defined in the Statement of Facts, *infra*.

without naming Holding I LP as a party. Therefore, NAB's Motion to Dismiss should be denied.

## STATEMENT OF FACTS

Enron's transactions with the ENA CLO I Trust (the "CLO Trust") were investigated by the independent Examiner appointed in Enron's chapter 11 case, and discussed in independent reports (collectively, the "Examiner's Report") that the Examiner issued. Among other things, the Examiner concluded that Enron could avoid and recover several transactions or transfers pertaining to the CLO Trust under the Bankruptcy Code. The facts alleged in the Complaint, based upon those discovered by the Examiner and reported in the Examiner's Report, and based upon facts otherwise known to Enron, are straightforward.

Enron alleges that in or about December 1999, Enron caused Enron North America Corp. ("ENA") and LJM2 to engage in a transaction known as a "collateralized loan obligation", or "CLO", to securitize a portfolio of loan facilities (the "CLO Assets") owned by ENA and other affiliates of Enron. In connection with the CLO transaction, Enron caused LJM2 to establish the CLO Trust. The CLO Trust issued seven classes of notes with maturities in 2014 (the "CLO Notes") for total proceeds exceeding $307 million. The CLO Notes were rated by two credit rating agencies and separated into seven tranches based upon their ratings. (Compl. at 5, ¶ 26).

In connection with this transaction, Enron formed three entities, ENA CLO I Holding Company GP L.L.C. ("Holding GP"), ENA CLO I Holding Company I L.P. ("Holding I LP"), and ENA CLO I Holding Company II L.P. ("Holding II LP"). Enron was the sole member of Holding GP and the sole limited partner of both Holding I LP and Holding II LP. Holding GP was the general partner of both Holding I LP and

Holding II LP. (Compl. at 5, ¶ 27). Enron caused ENA and other affiliates of Enron to transfer the CLO Assets to Holding I LP. (Compl. at 6, ¶ 28).

The CLO Trust was the sole limited partner of Holding I LP. Enron alleges that the source of funds from which the CLO Trust could make payments to holders of the CLO Notes was Holding I LP. (Compl. at 6, ¶ 29). Thus, Enron believes that repayment of the CLO Notes was dependent upon payment to Holding I LP by the obligors of the collateralized loans included in the CLO Assets. *Id.*

The CLO Notes were offered with recourse limited solely to funds and other assets of the CLO Trust. Therefore, if distributions to the CLO Trust from Holding I LP were insufficient to make payments to the holders of the CLO Notes, no other person or entity, including Enron, was obligated to pay any deficiency. (Compl. at 6, ¶ 30).

Between December 1999 and September 2000, the market value of the CLO Assets declined. On or about September 1, 2000, with the portfolio value declining, Enron granted a put option (the "Put Option") to Holding I LP. The purpose of the Put Option was to protect the credit rating of the CLO Trust for the benefit of the Defendant-investors. Under the Put Option, Holding I LP could require Enron to purchase interests in CLO Assets whose obligors had defaulted in making payments to the CLO Trust, in an amount up to $113 million. Enron did not receive a premium payment for the Put Option. (Compl. at 6, ¶ 32). Because the CLO Trust was the sole limited partner of Holding I LP, any payment that Enron made to Holding I LP under the Put Option would be distributed by Holding I LP to the CLO Trust. (Compl. at 7, ¶ 33).

Between September 2000 and April 2001, the market value of the CLO Assets continued to decline, and the obligors of the collateralized loans included in the

3

CLO Assets did not make payments sufficient to cover the obligations of the CLO Trust to the holders of CLO Notes. (Compl. at 7, ¶ 34).

Enron alleges that on or about December 29, 2000, Holding I LP exercised its rights under the Put Option, and on or about January 12, 2001, Enron paid $63,109,023.64 to Holding I LP (the "January Put Payment"). (Compl. at 9, ¶ 47). Holding I LP transferred the funds received from the January Put Payment to the CLO Trust, which transferred these funds to certain holders of CLO Notes in January 2001 (the "January Transfers") (Compl. at 9, ¶ 48), including Defendants Dexia, CDP and NAB, as well as CDC Investment Management who has not filed a motion to dismiss as of yet. The Complaint alleges that the January Transfers were avoidable fraudulent conveyances that could be recovered for the benefit of the estate's creditors.

The Complaint further alleges that on or about May 1, 2001, Enron transferred $81,696,158.76 by wire to Chase Manhattan Bank ("Chase"), as indenture trustee for the benefit of holders of CLO Notes. (Compl. at 7, ¶ 37). On or about May 1, 2001, Chase made payments to certain Defendants (the "May 1 Transfers"), including Bear Stearns, EPA, Natexis and Protective Life. In exchange for the May 1 Transfers, each such Defendant transferred its CLO Notes to Enron and/or ENA.[3] (Compl. at 7, ¶ 38). On or about May 3, 2001 Enron transferred an additional $17,298,838.27 by wire to Chase, as indenture trustee for the benefit of holders of CLO Notes, and Chase made payment to certain other Defendants (the "May 3 Transfers"). (Compl. at 7-8, ¶¶ 39-40).

---

[3] Some of the Defendants have alleged that they transferred their CLO Notes to Bear Stearns, not Enron or ENA. To the extent the Defendants are able to substantiate those assertions, Enron's claims against Bear Stearns may increase.

4

## ARGUMENT

I. **The Legal Standard**

Motions to dismiss are viewed with disfavor. *See Jewel Recovery, L.P. v. Gordon*, 196 B.R. 348, 355 (N.D. Tex. 1996); *In re Gorin*, 18 B.R. 151, 152 (Bankr. D. Conn. 1982). A complaint should not be dismissed pursuant to Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Cooper v. Parsky*, 140 F.3d 433, 440 (2d Cir. 1998) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)); *AmBase Corp. v. City Investing Co. Liquidating Trust*, 326 F.3d 63, 71-72 (2d Cir. 2003) (same); *Official Comm. of the Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand, LLP*, 322 F.3d 147, 158 (2d Cir. 2003). "At the 12(b)(6) stage, the issue is not whether a plaintiff is likely to prevail ultimately, but whether the claimant is entitled to offer evidence to support the claims. Indeed it may appear on the face of the pleading that a recovery is very remote and unlikely but that is not the test." *Chance v. Armstrong*, 143 F.3d 698, 701 (2d Cir. 1998) (internal quotation marks and citations omitted); *see also In re Sunbeam Corp.*, 284 B.R. at 355, 361 (S.D.N.Y. 2002) ("Finally, to survive a motion to dismiss, a plaintiff only has to allege sufficient facts, not prove them."); *Mizuho Corporate Bank, Ltd. v. Enron Corp. (In re Enron Corp.)*, 302 B.R. 463, 470 (Bankr. S.D.N.Y. 2003) (same); *Mishkin v. Ensminger (In re Adler, Coleman Clearing Corp.)*, 218 B.R. 689, 696 (Bankr. S.D.N.Y. 1998) ("We will not grant the motion [to dismiss] unless it appears with certainty that no set of facts could be established at trial that would enable the trustee to any relief."). The Court, therefore, must read the complaint generously and make all reasonable inferences in favor of the non-moving party. *Id.* Likewise, "all well pleaded factual allegations contained in [a] complaint are to be taken as true and construed in a light most favorable to [the non-movant]." *See*

5

*SIPC v. Stratton Oakmont, Inc.,* 234 B.R. 293, 309 (Bankr. S.D.N.Y. 1999) (internal citations omitted).

As discussed below, the Complaint meets this test, and thus NAB's Motion to Dismiss must be denied.

## II.    Actual Avoidance of the Transfer is Not Required Under § 550

NAB's Motion to Dismiss is based solely on the flawed theory that before Enron can recover from an immediate or mediate transferee under § 550(a) of the Bankruptcy Code, Enron must sue Holding I L.P. to avoid the initial fraudulent transfer. NAB Mem. at 5-7.  NAB contends that Enron is not able to avoid the transfer in the absence of the initial transferee.  Relevant case law dispels this argument, holding that all Enron need do is demonstrate that the initial transfer is avoidable.

Section 550 does not require that Enron actually obtain a judgment avoiding the January Put Payment to Holding I LP as a predicate to recovery.  Section 550(a) provides that a transfer may be recovered from any immediate or mediate transferee "to the extent that a transfer is avoided" under § 548.  Courts that have considered this issue have held that avoidance of a transfer that was made to the initial transferee is not required to recover from a subsequent transferee.  *See, e.g., Kendall v. Sorani (In re Richmond Produce Co., Inc.)*, 195 B.R. 455, 463  (N.D. Cal. 1996) (holding that there is no language in § 550 "that suggests recovery from immediate transferees is in any way dependent upon a prior action or recovery against the initial transferee."); *Advanced Telecomm. Network, Inc. v. Allen (In re Advanced Telecomm. Network, Inc.)*, 2005 WL 434422, No. 603BK0299KSJ, at *13 (Bankr. M.D. Fla. February 18, 2005) ("Nothing in the language of Section 550 requires a plaintiff in a fraudulent transfer adversary proceeding to avoid the transfer received by the initial transferee before continuing with the avoidance actions down the line of transfers."); *In re IBT Int'l, Inc. v. Northern*

6

*(In re Int'l Admin. Servs., Inc.)*, 408 F.3d 689, 707-708 (11th Cir. May 3, 2005) (same); *In re Crafts Plus, Inc.*, 220 B.R. 331, 335 (Bankr. W.D. Tex. 1998) ("Section 550 does not require that the transfer be avoided in a temporally antecedent and separate procedure, but simply recognizes the limitations placed on recovery by the safe harbors for certain transfers found in provisions such as 548(c).").

In *In re Richmond Produce Co.*, the court held that the immediate transferee was liable for the amount of the transfer without the debtor having named the initial transferee as a party or pursuing the initial transferee in a separate lawsuit. 195 B.R. at 461, 463. The court observed that "avoidability is an attribute of the transfer rather than that of the creditor." Once the defendant was found to be a mediate transferee of the fraudulent transfer, the court held the defendant was liable for the transfer "notwithstanding the absence of a suit or recovery against" the initial (*i.e.*, immediate) transferee. *Id.*

NAB relies on *CEPA Consulting, Ltd. v. New York Nat'l Bank (In re Wedtech Corp.)*, 165 B.R. 140 (Bankr. S.D.N.Y. 1994), and similar cases, to support its argument that Enron must first avoid the transfer to Holding I LP. The language in *Wedtech* that NAB relies on is dicta, the meaning of which was diminished when the district court reversed in part the bankruptcy court's holding. *Wedtech* was subsequently distinguished by *In re Crafts Plus, Inc.*, 220 B.R. at 335, where the court noted that "the treatment of *Wedtech* on appeal in the district court may have blunted its holding" and "it is not clear how critical the presence or absence of certain entities in the adversary matter was to its final disposition." No other case in the Second Circuit has adopted the language in *Wedtech* that NAB cites. In fact, cases from this Court that have addressed recovery of transfers under § 550 since *Wedtech* was decided suggest that a transfer

7

must only be "avoidable" for it to be recovered from a subsequent transferee.[4] *See In re Teligent, Inc.*, 307 B.R. 744, 749 (Bankr. S.D.N.Y. 2004) ("*Once the grounds for setting aside a transfer have been shown*, the Trustee faces the second hurdle of establishing a means of recovery under § 550(a), the remedies section, which requires the Trustee to identify a specific category of persons from who recovery of the fraudulent transfer may be had.") (citing *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 312 (Bankr. S.D.N.Y. 1999)) (emphasis added); *In re Trace Intern. Holdings, Inc.*, 287 B.R. 98, 105-06 (Bankr. S.D.N.Y. 2002) ("If the trustee *proves a fraudulent transfer claim*, he can then recover the value of the transfer from the transferee or from any subsequent transferee.") (emphasis added).

NAB also relies on *In re Trans-End Tech., Inc.*, 230 B.R. 101 (Bankr. N.D. Ohio 1998) and *Weinman v. Simons (In re Slack-Horner Foundries Co.)*, 971 F.2d 577 (10th Cir. 1993), neither of which are controlling in this Court, and both of which are distinguishable. Here, the initial transferee – Holding I L.P. – is an entity that was created and controlled by Enron and no longer exists, unlike the initial transferee in *In re Trans-End Tech.*, who was the debtor's parent corporation. *Id.* at 102.

*In re Slack-Horner* involved the avoidance of a tax lien. In holding that the trustee must avoid the transfer against the initial transferee first, the court cited the state's fundamental interest in collecting taxes, a concern that is clearly not an issue in this case. *Id.* at 581. In the dissent in *In re Slack-Horner*, Judge Seymour stated that if the majority's view were followed, "the trustee's ability to recover a transfer could always be defeated simply by a transfer from the initial transferee to another." *Id.*; *see also In re*

---

[4] Any distinction between "avoided" and "avoidable" is even less significant in this case where the initial transferee is a defunct Enron affiliate, not an unrelated third party. Enron was the sole member of the general partner of Holding I LP and also the sole limited partner of Holding I LP and controlled that entity completely.

*Richmond Produce Co.*, 195 B.R. at 463, n.6 (finding *In re Slack-Horner* unpersuasive because of contrary holdings in the circuit and "Judge Seymour's telling dissent.")

The legislative history of § 550 indicates that the language stating "to the extent that the transfer was first avoided" only serves as a limit on recovery based on the safe harbor provisions of the Bankruptcy Code. S. Rep. No. 95-989, at 90 (1978), reprinted in 1978 U.S.C.C.A.N. 5787 (the words "to the extent that" were "designed to incorporate the protection of the transferees found in [] 11 U.S.C. §§ 549(b) and 548(c)."). *See also In re Advanced Telecomm. Network*, 2005 WL 434422, at *12; *In re Crafts Plus*, 195 B.R. at 335. Section 550 clearly allows for recovery from the initial transferee <u>or</u> a mediate transferee. 11 U.S.C. §§ 550(a)(1) and (2).

NAB's argument that Enron must sue Holding I LP in order to show the transfer is "avoidable" is also without merit. The avoidability of a transfer can be determined without the initial transferee being a party to the action. *See In re Erin Food Servs., Inc.*, 980 F.2d 792 (1st Cir. 1992) (determining avoidability of a transfer when entity for whose benefit the transfer was made was not party to the action); *In re Advanced Telecomm. Network, Inc.*, 2005 WL 434422, at *13 (adopting the holding in *Richmond Produce* that a transfer must only be "avoidable" and noting that plaintiff is not obligated to pursue the initial transferee); *In re Cassandra*, 312 B.R. 491, 497 (Bankr. S.D.N.Y. 2004) (holding that the trustee established a *prima facie* fraudulent conveyance case against the initial transferee who was not party to the action). Courts have also allowed recovery from a subsequent transferee where the initial transferee was not a party to the action or otherwise involved. *See e.g., Louis L. Lasser & Stanley M. Kahn v. Robins Nest Dev. Corp. (In re Louis L. Lasser & Stanely M. Kahn)*, 68 B.R. 492 (Bankr. E.D.N.Y. 1986) (allowing debtor to avoid transfer of title and recover property from subsequent transferees who purchased debtor's property at a foreclosure sale without

pursuing the county that foreclosed on the property). Enron is not required to avoid the transfer as to Holding I LP, its defunct affiliate, in order to recover from NAB.

### III.    Holding I LP Does Not Need to Be Sued or Joined in the Action

Assuming *arguendo* that Enron was required to pursue Holding I LP to recover the transfer from NAB, such a requirement would be futile. Holding I LP was formed specifically in conjunction with the CLO Trust, and no longer exists. Enron can establish the requisite elements of § 548 of the Bankruptcy Code without Holding I LP being a party to this action.

If the Court were nevertheless to conclude that Holding I LP is a necessary party to this action, under Rule 19 of the Federal Rules of Civil Procedure, if it is not feasible to join a necessary party, the Court must determine whether the party is "indispensable," *i.e.*, whether the action should be allowed to proceed in the absence of the necessary party. FED. R. CIV. PRO. 19(b); *In re Cambridge Biotech Corp.*, 212 B.R. 10, 18 (D. Mass. 1997). In *Cambridge Biotech*, the court held that a party not joined in an adversary proceeding may have been necessary to the action, but was not indispensable so as to prevent the action to continue in the party's absence. *Id.* at 18. Applying the factors of Rule 19(b), the court held that based on principles of "equity and good conscience", the action should proceed without the missing party because it would be more prejudicial to the debtor if the action did not proceed. *Id.*

Similarly, in *Gen. Elec. Capital Corp. v. Sheffield Sys., Inc.*, No. 01 C 6342 01, 2002 WL 1759823 (N.D. Ill. July 29, 2002), the plaintiff failed to join a co-lessee because the co-lessee had filed for bankruptcy, thereby precluding joinder. *Id.* at *2. In determining whether the case should proceed without the missing bankrupt party, the court applied the factors of Rule 19(b) and found that the case should not be dismissed in "equity and good conscience." *Id.* The Court in *Gen. Elec. Capital* held that the case

10

should continue without the missing party because (i) the plaintiff would be left without any remedy if the case were dismissed; (ii) the missing party would not be prejudiced by continuance of the action; and (iii) the plaintiff could obtain complete relief without joinder of the bankrupt party. *Id.*

Applying the same reasoning as the court in *Gen. Elec. Capital*, Holding I LP is not prejudiced by the action, Enron can obtain complete relief without joining Holding I LP, and Enron would otherwise be left without any remedy against NAB if the adversary proceeding were dismissed. This action can and should proceed without the defunct Holding I LP.

### IV. NAB's Request to Dismiss The Third Cause Of Action Should Likewise Be Denied

As set forth above, NAB's Motion to Dismiss the second cause of action should be denied. Consequently, its claim that the third cause of action should be dismissed as derivative to the second cause of action should likewise be denied.

### CONCLUSION

For the foregoing reasons, the Motion to Dismiss filed by NAB should be denied.

Dated:   New York, New York            ENRON CORP.,
         August 5, 2005                  Reorganized Debtor and Plaintiff,
                                          By its Bankruptcy Co-Counsel,
                                          TOGUT, SEGAL & SEGAL LLP
                                          By,

                                          /s/ Frank A. Oswald
                                          FRANK A. OSWALD (FAO-1223)
                                          A Member of the Firm
                                          One Penn Plaza, Suite 3335
                                          New York, New York 10119
                                          (212) 594-5000