9

1

2    UNITED STATES BANKRUPTCY COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------x    Case Nos.
     In re                              01-16034(AJG)
4                                       (03-03370)
     ENRON CORP., et al,                New York, New York
5                                       April 27, 2006
            Reorganized Debtors.        11:16 a.m.
6    ------------------------------x
                          CORRECTED TRANSCRIPT
7               DIGITALLY RECORDED PROCEEDINGS
                          (E X C E R P T)
8

9    10:10 01-16034 ENRON CORP., et al
     (03-03370) Enron Corp. v. International Finance CORP.,
     et al
10   Amended Motion by Caisse de Depot et Placement du
     Quebec to Dismiss Adversary Proceeding.
11

12   Motion by National Australia Bank to Dismiss.
     Opposition filed.

13   B E F O R E:

14      THE HONORABLE ARTHUR J. GONZALEZ
        United States Bankruptcy Judge
15

     A P P E A R A N C E S:
16

        TOGUT, SEGAL & SEGAL LLP
17      Co-Counsel for Reorganized Debtors
            One Penn Plaza
18          New York, New York   10119

19      BY:  HOWARD P. MAGALIFF, ESQ.
                  -and-
20          DANIEL F.X. GEOGHAN, ESQ.
     (continued on page 2)

21

22              DEBORAH HUNTSMAN, Court Reporter
                   198 Broadway, Suite 903
23               New York, New York   10038
                 (212) 608-9053     (917) 723-9898
24      Proceedings Recorded by Electronic Sound Recording,
                Transcript Produced by Court Reporter
25

A P P E A R A N C E S:

PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
Attorneys for Caisse de Depot et Placement du
Quebec
    1285 Avenue of the Americas
    New York, New York    10019-6064

BY:   STEPHEN J. SHIMSHAK, ESQ.
          -and-
      1615 L Street, N.W.
      Washington, D.C.    20003

BY:   CLAUDIA TOBLER, ESQ.

WILLIAMS & CONNOLLY LLP
Attorneys for National Australia Bank
    725 Twelfth Street, N.W.
    Washington, D.C.    20005

BY:   J. ANDREW KEYES, ESQ.
          -and-
      JOHN L. CUDDIHY, ESQ.

                *       *       *       *

        (Whereupon, the following is an excerpt from

4/27/2006 in In re Enron Corp., et al, Case No.

01-16034.)

        JUDGE GONZALEZ:  We will then proceed to the

matter that was scheduled for 10:10, and that is the

various motions to dismiss.  One is an amended motion

filed to dismiss the adversary proceeding, and the

other is a motion by the National Australia Bank to

dismiss.

        I am going to take a very brief recess.  If you

haven't given your appearances, please do so.  I will

return in a few minutes to hear the arguments.

1          (Whereupon, from 10:21 a.m. to 10:23 a.m. a

2  recess was taken.)

3          JUDGE GONZALEZ:  Please be seated.

4          Let's commence then with the argument on the

5  motion to dismiss.

6          MR. SHIMSHAK:  Good morning, Your Honor.

7  Stephen Shimshak of Paul, Weiss, Rifkind, Wharton &

8  Garrison.  I appear this morning in support of the

9  motion of Caisse de Depot de Placement du Quebec to

10  dismiss the Second Cause of Action as to it in the

11  adversary proceeding of Enron Corp. v. International

12  Finance Corp., et al.

13          CDP, which is the denomination that I will use

14  to refer to the client, is an instrument of the

15  government of the Provence of Quebec created to manage

16  provincial pension funds.  Your Honor, also moving to

17  dismiss on grounds identical to CDP is National

18  Australian Bank.  Mr. Keyes of William & Connolly and

19  I discussed the procedure this morning, and we agreed

20  that I would proceed with the argument.  Of course, he

21  has reserved his right to make any additional points

22  that he wishes.  I would suggest that, if he has some

23  additional comments, they should follow mine and then,

24  of course, Mr. Magaliff can respond on behalf of

25  Enron.

4

1    Your Honor, this motion concerns the Second

2    Cause of Action in this adversary proceeding, and I

3    would like to outline for the Court's benefit the

4    elements of that cause of action and give some

5    background facts, all, of course, drawn from the

6    Complaint. For ease of discussion, I did prepare one

7    demonstrative, which I would like to provide to the

8    Court. It helps to follow the transaction.

9        JUDGE GONZALEZ:  Thank you.

10       MR. SHIMSHAK:  Your Honor, in essence the

11   Complaint concerns aspects of an Asset Securitization

12   Program, and that is laid out in the chart. As the

13   structure worked, ENA contributed so-called $CLO$ assets

14   to a partnership, Holding I LP. An Enron entity

15   served as the general partnership of that partnership,

16   and the Complaint alleges the Trust on the left hand

17   side of the chart served as the limited partnership.

18       In consideration of its interest in the limited

19   partnership, proceeds of a note issuance by the Trust

20   flowed into the partnership and up to Enron, and then

21   the cash flowed from the assets which had been

22   contributed to the partnership was used to retire the

23   note obligations.

24       The Complaint alleges in paragraph 32 that in

25   September of 2000 Enron granted a Put Option to the

1 partnership Holding I LP enabling the partnership to
2 put the CLO assets to Enron up to an amount of $113
3 million under circumstances that were specified in the
4 put.  Count II further alleges that Holding 1 LP
5 exercised the Put Option, and on or about January 12,
6 2001, Enron paid $63 million to Holding LP.  It
7 further alleges that Holding I then transferred the
8 funds received in the January Put Payment to the CLO
9 Trust, and the Trust, in turn, transferred these funds
10 to the parties identified on Exhibit 3 to the
11 Complaint.  Exhibit 3 contains a list of mediate
12 transferees, including CDP.  It does not set forth the
13 amount that each transferee received, but my
14 understanding is that CDP received approximately $11
15 million.

16      Enron alleges that the January Put Payment to
17 Holdings LLP constituted a fraudulent conveyance, and
18 that Enron may recover the fraudulent conveyance from
19 CDP and others identified solely as mediate
20 transferees under section 550(a)(2) of the Bankruptcy
21 Code.  So the Second Cause of Action states a cause of
22 action under section 550(a)(2).

23      The parties are in agreement on what Enron did
24 not do in its Second Cause of Action and that is that
25 it did not sue and identify as a Defendant Holding I

1   LP, the party that Enron alleges received the

2   fraudulent transfer and it, thus, does not seek to

3   avoid as against Holding I LP, the fraudulent transfer

4   alleged in count II.

5       CDP and National have moved to dismiss the

6   Complaint based on the interplay between section 550,

7   548, and 546(a) of the Bankruptcy Code.  Specifically,

8   CDP maintains that under section 550(a) of the

9   Bankruptcy Code, Enron cannot proceed on a 550(a)

10  recovery cause of action against CDP as a mediate

11  transferee without first avoiding the transfers to

12  Holding I LP.

13      We further maintain that though nothing

14  prevented Enron from proceeding against Holding I LP,

15  it cannot do so now due to the operation of section

16  546(a).  The time to avoid to create avoidance actions

17  against Holding I LP expired on the second anniversary

18  of the filing of the case, December 2, 2003.

19      Finally, we will respond to an argument made in

20  Enron's reply in which it went outside the letter of

21  the Complaint and essentially asked this Court to take

22  judicial notice of the fact that Enron has caused the

23  dissolution of Holding I LP and that it no longer

24  exists.  While CDP does not believe that the fact of

25  the dissolution proceeding should have any bearing on

1    its motion to dismiss, a review of the docket in this
2    case in public filings in Delaware makes clear that
3    the decision to proceed, as Enron did, was consciously
4    made and that Enron should bear the consequences of
5    that decision relating to the dissolution of Holding I
6    LP.

7         At the heart of this motion, Your Honor, lies
8    the issue of the construction and application of
9    section 550(a) of the Bankruptcy Code.  That
10   provision, we maintain, is straightforward.  It
11   states, except as otherwise provided in this section,
12   to the extent that a transfer is avoided under
13   sections 544, 545, 547, 548, 549, 553(b), or 724(a) of
14   this title, the Trustee may recover the property or
15   the value transferred from the initial transferee for
16   any immediate or mediate transferee.

17        As Colliers puts it in its explanation of
18   section 550, the Bankruptcy Code permits a trustee or
19   a debtor-in-possession after avoidance of a transfer
20   under the trustee's avoiding powers, to recover the
21   property transferred or the value of the property
22   transferred.

23        The legislative history of section 550(a) is
24   also informative.  It begins, section 550 prescribes
25   the liability of a transferee of an avoided transfer

1    and annunciates the separation between the concepts of

2    avoiding a transfer and recovering from the

3    transferee.   Subsection (a) permits the trustee to

4    recover from the initial transferee of an avoided

5    transfer -- note that word -- or from any immediate or

6    mediate transferee of the initial transferee.

7         The plain meaning of the statute makes clear

8    that avoidance must perceive the ability to recover

9    under section 550.  Cases adopting this construction,

10   which I will discuss in a moment, point to another

11   feature of section 550 to bolster this conclusion and

12   that is subsection 550(f).  That provision creates a

13   separate statute of limitations for the recovery of an

14   avoided transfer consistent with the notion of a

15   separation between avoidance and recovery.   That

16   provision provides for a one-year statute of

17   limitation after the avoidance of the transfer for

18   which recovery is sought.

19        The briefs make clear that the caselaw on the

20   construction of 550(a) devise with no law squarely on

21   point in this jurisdiction.   There are two circuit

22   level decisions.   One is a decision of the Tenth

23   Circuit, the Slack-Horner Foundries decision, which

24   goes our way; and an Eleventh Circuit decision IBT

25   International, which goes Enron's way.

1    The decisions in our favor, and they are

2    identified in our brief, particularly Slack-Horner and

3    Trans-End Tech, treat this matter straightforwardly

4    finding in the plain meaning of the statute and the

5    supporting structure, including section 550(f), the

6    outcome that requires the avoidance of the transfer

7    against the initial transferee as a precursor to suing

8    subsequent transferee.

9    Let me address the rationale of the decisions

10   on the other side, and what I believe are their

11   analytical infirmities when measured against the plain

12   meaning of the statute and the analysis that construes

13   the cases as we urge.

14   First, there are a group of cases and the most

15   representative is Erin Food Services, which simply

16   says that in an ipsi dixit fashion that the word

17   avoided means voidable without so much as any

18   analysis.  This Court recently addressed the very

19   distinction between the words avoided and avoidable in

20   its March 31, 2006 decision in Enron Corp. v. Avenue

21   Special Situations Fund II, L.P., et al, noting that

22   section 502(d) explicitly referred to a transfer that

23   is avoidable, rather than an avoided transfer, and

24   rejected any argument that 502(d) could not be

25   asserted until an underlying transfer had been avoided

10

1   given the letter of the statute.

2       We submit that the cases that do not even

3   address the letter of the statute, as Erin Food, but

4   simply misread it to achieve a desired outcome, hardly

5   merit serious consideration, given the express

6   statutory language.

7       Other cases combine a dismissive rejection of

8   the statutory text. Cases like Crafts Plus, Richmond

9   Produce, and Advanced Telecomm, simply recognizes that

10  transfers may be avoided only in part and that only

11  the avoided portion of a transfer is recoverable or

12  that the statute contains no language that suggest

13  that recovery from a mediate transferee is in any way

14  dependent upon prior action or recovery against the

15  initial transferee, essentially disregarding the plain

16  meaning or, alternatively, they revert to a further

17  passage of legislative history. That legislative

18  history is, at least on those courts that attempt an

19  analysis of section 55(a), what they all hang their

20  hat on, there is a sentence following the passage that

21  I read earlier, which says the words to the extent

22  that and that lead to this subsection are designed to

23  incorporate the protections of transferees found in 11

24  U.S.C. sections 549(b) and 548(c). In that language,

25  they find some limitation on application or a plain

1   meaning and reading of section 550(a) that permits the

2   notion that an avoidable transfer suffices for

3   purposes of imposing liability on subsequent

4   transferees.

5       That logical leap is, in fact, a complete

6   nonsecretor.  Each of 549(b) and 548(c) imposed a

7   limit on the avoidance powers.  For example, in

8   548(c), to the extent that a transferee gave value and

9   in good faith, the transfer can't be avoided.

10      JUDGE GONZALEZ:  Go back for a moment.  If you

11  did not have to avoid it first and it was read as

12  voidable, when under those circumstances would the

13  statute of limitations ever run on recovery?

14      MR. SHIMSHAK:  This is precisely the argument

15  that is made under section 550(f), that that

16  construction of the statute, one which said it was

17  avoidable, would render 550(f) superfluous and the

18  existence of 550(f) and the existence of the need to

19  have a transaction avoided and then the statute of

20  limitations commence is further evidence of Congress'

21  interpretation or objective in 550(a).  It would have

22  precisely the effect Your Honor indicated rendering

23  550(b) nugatory.

24      But let me go back to this 548(c) argument and

25  our language from the legislative history, the fact

1   that a certain portion of a transaction may be

2   insulated carries with it the converse, that the

3   unprotected portion of the transfer must be avoided

4   before it can be sought from a subsequent transferee.

5   The attempt to use this language to get out from under

6   section 550 is simply unavailing and the decisions

7   that rely on it carry no logical weight.

8         Finally, there is I think at least a bit of

9   intellectual honesty when one finally reaches the

10  level of the Eleventh Circuit decision in

11  International Administrative Services.  There the

12  Court, I think, is straining to produce a

13  result-oriented decision and to undo a scheme in which

14  an individual had arranged a series of transfers to

15  try to move assets farther and farther away from the

16  estate and said, quote, we are mindful that our

17  construction of 550(a) does not embrace us a strict

18  construction, but it went on to say that strict

19  interpretation of the statute would, quote, produce a

20  harsh and inflexible result that runs counterintuitive

21  to the nature of avoidance actions.  The Court then

22  went to postulate as a harm a series of transfers

23  would insulate a transferee from liability.  This

24  analysis falls apart at several levels.

25        First, the Court offers no explanation for why

1   a result which conforms with the letter of the

2   Bankruptcy Code produces a harsh or inflexible result.

3   One could just as readily argue that the assertion of

4   546(a) statute of limitations eliminating avoidance

5   causes of action for the failure to bring them within

6   the two-year period specified by the statute would

7   produce a harsh and inflexible result and that it

8   would be a better world if avoidance actions could be

9   brought any time, but that is simply not the case.

10  Congress has imposed a structure that imposes time

11  limits and procedures under which avoidance actions

12  should be brought.

13      Second, the parade of horribles concerning a

14  string of subsequent transferees hardly makes sense.

15  Section 550 imposes, after all, strict liability on

16  the initial transferee, and subsequent transferees are

17  only insulated from attack to the extent that they

18  gave value and gave value in good faith.  The kind of

19  scheme that the Eleventh Circuit postulated, frankly,

20  would not work in the real world.

21      Finally, Enron argues that it can maintain this

22  cause of action even without a Defendant, even without

23  the initial transferee as a Defendant, because, as

24  Enron says, it can establish the requisite elements of

25  section 548 of the Bankruptcy Code without Holding I

1   LP being a part to this action.  This amounts to the

2   contention that no section 548 cause of action needs

3   to be brought at all, and that to recover under

4   section 550 Enron only needs to establish the elements

5   of a fraudulent transfer as an evidentiary fact, not

6   as a cause of action brought against a defendant.

7       How would this work in practice?  Without the

8   initial transferee, for example, without a defendant,

9   who would challenge the fraudulent conveyance

10  allegations asserted in section 548?  Who would have

11  the ability to assert the protective provisions of

12  section 548(c)?  The media transferees?  Certainly

13  there are practical and potentially substantive

14  questions about the abilities of these parties, who

15  are liable, after all, only on a separate cause of

16  action under section 550, to determine whether or not

17  the debtor has satisfied the elements of a fraudulent

18  conveyance claim.

19      In the absence of an initial transferee, what

20  would be the result?  Would there always be a default

21  in which the fraudulent conveyance claim was

22  established by default for want of a defendant?  It

23  seems doubtful that Congress intended such an unequal

24  process.  While certainly the result might occur in

25  some circumstances and conceivably even in this

1  circumstance, given that the partnership is a defunct

2  enterprise, it is one thing to have that outcome under

3  the peculiar facts of a particular circumstance and

4  quite another to establish a legal principle that in

5  essence a trustee or debtor-in-possession has the

6  option of proceeding under the statute and the letter

7  of the statute against a defendant or, alternatively,

8  establishing the claim as an evidentiary fact and a

9  cause of action against a subsequent transferee.  I

10  submit that such an outcome is wholly inconsistent

11  with section 546(a), section 548, and section 7001 of

12  the Bankruptcy Code, which contemplates an adversary

13  proceeding to avoid a transfer, which means a

14  plaintiff and a defendant.

15        Let's talk, finally, about what really happened

16  here and why Enron did not sue Holding I LP.  I kept

17  going over this in my mind as I read the concluding

18  portion of Enron's reply in which they raise the issue

19  of the dissolved entity and the fact that the

20  Defendant doesn't exist.  I kept going over it in my

21  mind because of my experience.  As the Court knows, in

22  another capacity, my firm represents Citigroup in the

23  Mega Complaint.  In the Mega Complaint Enron has

24  scrupulously named every defendant and every initial

25  transferee in every transaction, including entities

1    that were subject to Enron's control.  In the first

2    cause of action in this very complaint, Enron brought

3    a 548 cause of action against the initial transferee.

4         So what was special about this circumstance?

5    Why was Holding I LP left out?  So I went back to the

6    docket in this case and the reason became apparent.

7    Enron did not name Holding I LP, because a week before

8    the filing of the adversary proceeding on November 14,

9    2003, Enron filed a motion in this Court seeking

10   authority under section C-363 of the Bankruptcy Code

11   to dissolve Holding I LP in connection with the

12   disposition of certain assets.  So at the time that

13   Enron filed the Complaint, it knew that this entity

14   that was the proper defendant to the adversary

15   proceeding was going to be the subject of dissolution

16   procedures.

17        This Court approved the sale of a participation

18   interest of certain other assets to Special Situations

19   Investing Group on December 18, 2003, two weeks after

20   the statutory deadline for filing a claim against

21   Holding I LP as initial transferee.  Paragraph 8 of

22   the sale order authorized the dissolution of Holding I

23   LP, and some two weeks later Enron filed in Delaware a

24   certificate of cancellation which terminated the

25   existence of the partnership.  I should add that

1    cancellation, which does have the effect of

2    terminating the existence of the entity, did not even

3    appear to be a requirement of the order which only

4    directed dissolution; and under Delaware law, as in

5    most jurisdictions, a limited partnership in

6    dissolution goes into a winding-up phase, a period in

7    which it can continue to sue and to be sued.  For Your

8    Honor's benefit, I cite you to chapter 17/803 of the

9    Delaware statutes, which specifies the procedures and

10   the powers of an entity in dissolution.  Cancellation,

11   not dissolution, terminates the partnership's

12   existence.

13       Thus, Enron could have complied with paragraph

14   8 of the order without cancelling the limited

15   partnership's existence and without eliminating the

16   limited partnership as the Defendant for 548 purposes.

17   Though certainly, I would add, the absence of a

18   pending claim against a partnership in dissolution

19   must have had the effect of easing the fiduciary

20   burden of whoever was in charge of the dissolution of

21   that partnership, because a provision must be made for

22   all claims in a partnership in dissolution and the

23   absence of the claim seemingly eliminated that burden.

24       These facts regarding the dissolution of the

25   partnership are all derived from documents on file

1   with this Court or otherwise publicly available.   What
2   is their significance?  They make clear that the
3   decision not to pursue Holding I LP under section 548
4   was a conscious one, one made through the exercise of
5   Enron's business judgment and not the result of
6   inadvertence, excusable neglect, or hardship.  While
7   we believe that section 550 and its relationship to
8   548 and 546 are clear on their face, no justification
9   here exists for any equitable exception or loss on the
10  statute under these facts.

11       For all of these reasons, Your Honor, we
12  believe that count II of the Complaint should be
13  dismissed as to CDP, and we ask this Court to enter an
14  order accordingly.

15       JUDGE GONZALEZ:  Is there anyone else in
16  support of the motions to dismiss?

17       MR. KEYES:  Yes, Your Honor.  Andrew Keyes on
18  behalf of the Defendant National Australia Bank.

19       I would simply echo the argument of
20  Mr. Shimshak on behalf of the other Defendant that has
21  made the same motion to dismiss, and I would reserve
22  my right to respond to Mr. Magaliff in rebuttal.

23       JUDGE GONZALEZ:  All right.  Thank you.
24       The Debtor.
25       MR. MAGALIFF:  Good morning, Judge.  Howard

1    Magaliff from Togut, Segal & Segal on behalf of Enron.

2         You may recall that we were here about

3    two weeks ago on another series of motions to dismiss

4    brought in this same case on Monday, April 10th, by a

5    number of other Defendants on slightly different

6    theories.

7         The chart that Mr. Shimshak handed up is

8    actually very helpful, because what it shows is that

9    at the end of the day this is simply another one of

10   Enron's very, very convoluted deals.  All of the

11   entities were Enron entities.  We know what was done.

12   We don't know why it was done, but we do know that all

13   of these various entities were simply pass-through

14   entities to get the money from one place to another,

15   namely the Defendants in these actions.

16        To address a question that you raised in

17   Mr. Shimshak's presentation about the interplay of the

18   various statutes of limitations, I don't believe that

19   the 550(f) statute of limitations and the 546(a)

20   statute of limitations are in any way inconsistent,

21   nor is it necessary, as practice has demonstrated time

22   and again, that you first bring an adversary

23   proceeding to avoid a transfer and then once a

24   judgment has been rendered, bring a second adversary

25   proceeding against immediate or mediate transferee to

1    recover.

2         As an example analytically, if you are in the

3    middle of discovery in a 548 fraudulent conveyance

4    action and you learn about another transferee that you

5    didn't know at the time that you brought the action,

6    it is entirely appropriate to complete the first

7    action, obtain a judgment, and then commence another

8    action under 550 against the new transferee that you

9    had discovered.  But there are scores and scores of

10   cases, Your Honor, where Plaintiffs, including Enron,

11   seek to both avoid the transfer and recover from

12   initial and subsequent transferees.

13        The commercial paper case is a perfect example.

14   We sued almost 200 different Defendants, most of whom

15   have asserted that they were subsequent transferees,

16   or conduits, or had good faith defenses, or whatever,

17   and there has been no serious suggestion that we

18   bifurcate those actions to sue only the three dealers,

19   obtain judgments against them as initial transferees,

20   and then bring separate actions.

21        I think what 550 does is provide an outside

22   limitation in the event that you seek to bring two

23   actions.  It doesn't mandate it, and I think that they

24   are entirely consistent.

25        JUDGE GONZALEZ:  In the commercial paper are

1    there any of these Defendants that you refer to

2    recipients of payments from an entity that you also

3    didn't bring the action against?

4        MR. MAGALIFF:    Not to my knowledge.

5    Ultimately, Judge, as Mr. Shimshak has pointed out,

6    what these particular motions to dismiss turn on is

7    the distinction between avoided and avoidable as used

8    in section 548.    The briefing is very comprehensive.

9    Mr. Shimshak gave a very comprehensive presentation,

10   and I think for the most part has fairly extracted

11   from the pleadings the positions of Enron and the

12   positions of the Defendants.

13       Whether or not you ultimately decide to follow

14   the decisions in Slack-Horner and Trans-End or the

15   equally well reasoned decisions in International

16   Administrative Services, Advanced Telecomm, Richmond

17   Produce, and a number of the other decisions, such as

18   National Audit Defense Network, Imperial Corporation

19   of America v. Durkin -- I have citations, if you would

20   like them -- we do agree that it is necessary to

21   establish that you have an avoidable transfer.    We

22   pled that in the complaint in paragraphs 47, 49, and

23   51 through 54.    We pled all of the elements that are

24   necessary to establish that the transfer to Holding I

25   LP was constructively fraudulent.

1    Mr. Shimshak has analogized this case to the

2    hundreds of transfers in International Administrative

3    Services seeking to draw a difference, but I would

4    submit, Your Honor, that even though there were not

5    hundreds of transfers among 23 different entities,

6    when you look at this very graphic chart in particular

7    that Mr. Shimshak has handed up, what you see are

8    Enron entities all over the page and a flow of funds

9    from entity through entity.

10    I think that the decisions of the Court in

11    Richmond Produce and Advanced Telecomm and the cases

12    that Enron has cited to support the construction of

13    the statute that avoidable is more in line with the

14    policy of the Bankruptcy Code, rather than the more

15    restrictive reading of avoided, I think there is ample

16    authority for you to conclude that under these

17    particular circumstances in this particular fact

18    pattern it would not have been necessary for Enron to

19    sue its wholly-owned entity for the sole purpose of

20    being able to consent to the entry of a judgment that

21    the initial transfer was constructively fraudulent as

22    a precursor to suing the entities that got the money.

23    JUDGE GONZALEZ:  With respect to the entities

24    that you say got the money, what benefit did Holding 1

25    LP receive when the monies flowed to the Defendants

1   before me today?

2        MR. MAGALIFF:  To my knowledge, Your Honor,

3   absolutely nothing.  All the information that we have

4   been able to obtain to date -- and there has been no

5   discovery, by the way, with the Defendants, this is

6   all information that we have developed from Enron's

7   records in such condition as they exist -- that

8   Holding I LP was set up simply as a vehicle in which

9   to park the CLO assets.  I can't tell you why the

10  assets were not put directly into the Trust.  This

11  goes back to my initial comment that we don't know why

12  it was structured like this, but economically the

13  Trust was the limited partner of Holding I LP and had

14  all the economic interest, which is why all of the

15  money that came into Holding I LP immediately went out

16  to the Trust and thence to the Defendants in this

17  action.  We can trace the dollars in and the dollars

18  out.

19       I am fairly certain and, in fact, almost

20  positive, that should we go to trial on this, we will

21  be able to demonstrate that Holding I LP retained no

22  money for itself because there was no reason for it to

23  retain money.  It had no interest other than as a

24  vehicle to hold the portfolio assets.

25       JUDGE GONZALEZ:  All right.  Thank you.

1       MR. MAGALIFF:  If you have no further

2   questions, Your Honor, I believe that I am finished

3   with my presentation.

4       MS. SHIMSHAK:  I have a few brief remarks in

5   response.

6       JUDGE GONZALEZ:  All right.  Go ahead.

7       MR. SHIMSHAK:  First of all, Mr. Magaliff

8   recited that in a myriad of instances the avoidance

9   actions and the 550 actions are brought in a single

10  proceeding, rather in two separate proceedings.  I

11  certainly don't want to get metaphysical, but the

12  distinguishing feature between the circumstance that

13  he described and this case is that in those cases

14  there is an avoidance action against the initial

15  transferee as well as a cause of action under 550

16  stated against subsequent transferees.  That

17  possibility will never arise here, because the

18  Defendant by the very terms of Complaint, the

19  recipient of the 548 fraudulent conveyance is not a

20  party to this accident.

21      Second, Mr. Magaliff argued that these were all

22  pass-through structures and that money flowed to the

23  ultimate noteholders, but, again, there is no argument

24  that these entities are in essence the initial

25  transferees.  Quite the contrary.  The allegations of

 1  the Complaint accept the structure and accept the
 2  separateness of all of these entities and identify the
 3  ultimate recipients as subsequent transferees.

 4        Third, Mr. Magaliff postulates that what would
 5  have been the point; Holding I LP would have simply
 6  caused the entry of a judgment for fraudulent
 7  conveyance anyway.  This has been a dimension of the
 8  Complaint, which I haven't touched upon and about
 9  Enron conduct here, but I say in response to that, not
10  so fast.  Holding GP, the Enron creature that was
11  acting as the general partnership of that partnership,
12  owed a fiduciary duty to the limited partnership to
13  CLO Trust and ultimately to the beneficiaries of the
14  of the notes issued by CLO Trust.  CLO Trust was the
15  limited partner.

16        I wonder whether Enron, frankly, in the
17  discharge of its fiduciary duty could simply concede
18  that a fraudulent conveyance had taken place.  That is
19  one of the difficulties here without having a
20  defendant or any provision for a defendant to
21  safeguard the interests of the limited partner and
22  interests of the partnership in the fraudulent
23  conveyance claim that is alleged.

24        So I say it is by no means a foregone
25  conclusion that there would have been a mechanical

1    default or a confession to a default judgment, not if

2    those entities that were involved are discharging

3    their fiduciary responsibilities.

4          JUDGE GONZALEZ:  Is there anyone else?

5          (Whereupon, no response was heard.)

6          JUDGE GONZALEZ:  All right.  Thank you.  I do

7    want to ask one question that I think is obvious, but

8    I will ask it anyway and I will ask for a response.

9          Mr. Magaliff referenced a motion that was heard

10   a few weeks ago.  If that motion that was heard a few

11   weeks ago were granted, I presume that there is no

12   reason to reach any of the issues in this case?

13         MR. SHIMSHAK:  I am not familiar with that

14   motion, Your Honor, quite frankly.  We weren't covered

15   by it.

16         JUDGE GONZALEZ:  It is the safe harbor 546

17   issue with respect to the Defendants being the various

18   transferees, but if the motions were granted, I

19   presume for Holding I LP the argument would be, even

20   if it then were named, it would have the safe harbor

21   defense?

22         MR. SHIMSHAK:  Your Honor, I would say this,

23   not being familiar with it --

24         JUDGE GONZALEZ:  I will ask Mr. Magaliff,

25   because I think he is familiar with it:  what would

1   then be the Plaintiff's position, if that motion were

2   granted?

3        MR. MAGALIFF:  I think, Your Honor, if that

4   motion were granted, it would not affect these

5   Defendants and I will tell you why.  The issue that

6   was raised by that group of Defendants was that Enron,

7   in essence, repurchased notes, which, as you are very

8   well aware, is at the heart of the whole 546

9   settlement payment safe harbor defense that we have

10  argued in a number of cases.  They were saying that it

11  was the completion of a securities transaction or

12  settlement, if you will.

13       We didn't sue National Australia Bank and CDP

14  on the basis of buying back notes.  These were

15  straight, fraudulent transfers.  It was a fraudulent

16  transfer to Holding I LP, because Enron received no

17  consideration for the granting of put.

18       JUDGE GONZALEZ:  You have jumped ahead of what

19  I was focused on.  Would Holding LP in the context of

20  an avoidance action brought against Holding I LP been

21  able to raise the 546(e) safe harbor, obviously, as a

22  defense?

23       MR. MAGALIFF:  No.  There was no securities

24  type of transaction that occurred, to our knowledge,

25  between Enron Corp. and Holding I LP.  It was simply

1  the grant of a Put Option in return for no

2  consideration.  Then Holding I calling the put and

3  Enron transferring $63-some-odd million to the

4  partnership.

5        If you have no further questions, Your Honor,

6  we appreciate the time.

7        JUDGE GONZALEZ:  All right.  Thank you.

8        The next matter is a decision to be rendered at

9  11:00.  I think it is more likely that I will return

10  to the bench at approximately 11:15.  So with respect

11  to that matter, if the calendar is correct that I am

12  looking at, it would be the GE Capital matter.

13        Give your appearances and I expect that I

14  should return to the bench no sooner than 11:15.

15        (Whereupon, from 11:02 a.m. to 11:16 a.m. a

16  recess was taken.)

17

18

19

20

21

22

23

24

25

29

1           C E R T I F I C A T E

2    STATE OF NEW YORK        )
                              : SS:
3    COUNTY OF NEW YORK       )

4

5           I, DEBORAH HUNTSMAN, a Shorthand Reporter

6    and Notary Public within and for the State of New

7    York, do hereby certify:

8           That the within is a true and accurate

9    corrected transcript from the official electronic

10   sound recording of the proceedings held on the 27th

11   day of April, 2006.

12          I further certify that I am not related by

13   blood or marriage to any of the parties and that I am

14   not interested in the outcome of this matter.

15          IN WITNESS WHEREOF, I have hereunto set my

16   hand this 5th day of May, 2006.

17

18

19          *Deborah Huntsman*
            DEBORAH HUNTSMAN
20   _____
            DEBORAH HUNTSMAN

21   PROOFREAD BY HALLIE CANTOR

22   ORIGINAL TRANSCRIPT SENT VIA E-MAIL 4/28/2006

23

24

25