9

Westlaw.

Slip Copy
Slip Copy, 2007 WL 2670307 (E.D.Wis.)
(Cite as: Slip Copy)

Page 1

**H**In re Art Unlimited, LLC
E.D.Wis.,2007.
Only the Westlaw citation is currently available.
United States District Court,E.D. Wisconsin.
In re ART UNLIMITED, LLC, Debtor.
Neil McCloskey, Trustee, Plaintiff/Appellant/Cross-Appellee,
v.
Wells Fargo Bank Wisconsin, NA f/k/a Norwest Bank Wisconsin, NA, Defendant/Appellee/Cross-Appellant.
No. 07-C-54.

Sept. 6, 2007.

Jessica J. King, Paul G. Swanson, Steinhilber Swanson Mares Marone & McDermott, Oshkosh, WI, for Plaintiff/Appellant/Cross-Appellee.
Michael J. Bennett, Lichtsinn & Haensel SC, Milwaukee, WI, for Appellees.
Roy L. Prange, Jr., Quarles & Brady LLP, Madison, WI, for Defendant/Appellee/Cross-Appellant.

### DECISION AND ORDER

WILLIAM C. GRIESBACH, United States District Judge.

*1 This is an appeal and cross-appeal from a decision of the bankruptcy court. Through a complicated series of transactions, Walter L. Nocito, the president of Galva Foundry, Inc. ("Galva"), a holding company that owned 87.5% of Art Unlimited, LLC ("AU"), the debtor, managed to clear $1.1 million of personal debt to Wells Fargo Bank Wisconsin, NA ("Wells Fargo") in the course of selling off most of the assets of AU. Less than a year later, AU filed for chapter 7 bankruptcy relief. Following his review of the transactions that allowed Nocito to pay off his personal debt, the chapter 7 trustee filed a complaint alleging that payment of Nocito's personal debt constituted a fraudulent conveyance and seeking recovery of the $1.1 million from Nocito, Galva and Wells Fargo. In a decision the trustee does not challenge, the bankruptcy court held that AU had no interest in a $500,000 component of the pay-off and partially granted Wells Fargo's motion for summary judgment. The motion was denied, however, as to the remaining $600,000, and the matter proceeded to trial. Following a three-day trial, the bankruptcy court found that Nocito, controlling AU as president of the shell corporation Galva, had engaged in a fraudulent transfer, diverting $600,000 from the sale of AU's assets to pay down his personal debt to Wells Fargo and ordered judgment against Nocito and Galva for the amount of the transfer. However, the bankruptcy court dismissed the trustee's claim against Wells Fargo, concluding that it was not the "initial transferee" of those funds and could therefore avail itself of the statutory safe harbor for good-faith transferees who take for value and without knowledge of the avoidability of the transfer. See 11 U.S.C. § 550(a)-(b). Finding that Wells Fargo had in fact acted in good faith and without knowledge of the avoidability of the transfer, the bankruptcy court concluded the bank was not liable.

The trustee appeals claiming that the bankruptcy court erred in concluding that Wells Fargo was not an "initial transferee" or, alternatively, that its finding that Wells Fargo received the proceeds in good faith and without knowledge of the voidability of the transfer was clearly erroneous. Wells Fargo has filed a cross-appeal, arguing there was no constructively fraudulent transfer. Wells Fargo claims that the trustee failed to show that AU had any interest in the $600,000 that reduced Nocito's personal indebtedness and, in any event, as it turned out, the amount AU owed Wells Fargo substantially exceeded the value of all the AU assets that secured it. Thus, Wells Fargo argues, even if the $600,000 was diverted by Nocito, it did not diminish the estate available to the other creditors.

For the reasons that follow, I agree with Wells Fargo that, despite the questionable nature of the transaction, the diversion of funds to pay off Nocito's personal debt did not diminish the estate available to the other creditors and, thus, no fraudulent transfer occurred. Since this conclusion renders moot the trustee's claim that the bankruptcy court erred in ruling that Wells Fargo was not liable under § 550, I affirm the bankruptcy court's judgment without reaching that issue.

### FACTUAL AND PROCEDURAL BACKGROUND

*2 In May 1996, Nocito and two other persons, Tom and Dan Butterbrodt, formed a limited liability

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy
Slip Copy, 2007 WL 2670307 (E.D.Wis.)
(Cite as: Slip Copy)

Page 2

company that acquired a majority interest in the assets of AU, a Wisconsin corporation which manufactured artistically decorated sports apparel such as tee shirts, sweatshirts, and fleece items. In March 1997, the Butterbrodts and Nocito transferred their interests in the limited liability company to Galva, formerly an operating entity but at that time simply a shell holding company.

AU's cash problems, which had begun in late 1996, continued after this transfer of interest. In November 2000, Nocito and the Butterbrodts recapitalized AU through a series of agreements whereby roughly $750,000 of cash was infused into the company and approximately $2.7 million of debt was forgiven by the principals. Wells Fargo provided the replacement financing, and Nocito and the Butterbrodts guaranteed the Wells Fargo debt. Even though Wells Fargo calculated that, after the recapitalization, AU had positive net worth of roughly $3.2 million, the recapitalization agreement indicated that AU had no value at that time. (Ex. 3, Tab A1, ¶ 1.6.) Under the recapitalization, AU's assets secured its debt to Wells Fargo. Nocito also personally borrowed $950,000 from Wells Fargo to inject into AU. (Ex. 3, Tab B1, ¶ 1.25.) This note was secured by marketable securities owned by Nocito and then valued at about $1.2 million. In the recapitalization agreement, AU's officers acknowledged that despite several years of effort they could find no buyer willing to offer enough to retire the outstanding indebtedness. (Ex. 3, Tab A1, ¶ 1.5.) They also admitted that under a purchase offer proposed in the summer of 2000, they would have to contribute some, or possibly all, of the amount guaranteed in order to cover the bank debt. (Id.)

Shortly after the recapitalization, the Butterbrodts became disenchanted with the business, and open hostility developed between them and Nocito. The Butterbrodts exited the business, paying the bank $750,000 in cash on their guaranties in order to have them released. These events, coupled with the recapitalization, left Nocito as the sole owner of Galva, and Galva as 85.5% owner of AU.[FN1]

> FN1. The remaining interest in AU was held by Robert Genisot, who was not a party to the bankruptcy court litigation. (Nocito Dep. at 2.)

Although Nocito had forgiven the obligations owed him by AU, he was not relieved of his personal obligation to Wells Fargo, which stood at $1.1 million ($950,000 personal note plus $150,000 taken out on a line of credit). (Ex. 3, Tab B1, ¶¶ 1.25, 3.6; Ex. 102.) Nocito had also guaranteed all of AU's obligations to Wells Fargo up to $1.15 million,[FN2] and that guaranty was secured by any and all collateral, i.e., by AU's assets and by Nocito's marketable securities held by the bank. Nocito's marketable securities were thus primary collateral on his personal obligation of $1.1 million, and secondary collateral on AU's debt with Wells Fargo (up to $1.15 million). (Neary Dep. at 14-15, 19-20.)

> FN2. The guaranty became unlimited when AU sold most of its assets in April 2001, as described infra.(Ex. 114.)

Wells Fargo initially became involved in AU's finances by providing loans to Nocito and the Butterbrodts in 1997 or 1998 to help them buttress AU's operations. (Tr. at 428-29.) About a year later, Wells Fargo extended a line of credit to AU directly. (Id. at 429-30.)Through Phil Neary, the only Wells Fargo loan officer to work with AU (id. at 424), Wells Fargo was kept aware of AU's financial status and the unsuccessful attempts to sell the company. In fact, Wells Fargo told AU to obtain refinancing elsewhere by no later than April 30, 2000. (Id. at 446.)However, AU remained with Wells Fargo beyond this date, even though its financial situation failed to improve. In February 2001, AU (and Nocito, as guarantor) and the bank entered into a forbearance agreement, under which Wells Fargo required financial statements from AU and daily borrowing base certificates. (Ex. 105.) At that time, AU was out of compliance with its borrowing base obligations by $768,000 (Ex. 5), and Neary described AU's financial situation as "pretty ugly." (Tr. at 463-65.)

*3 According to Stephen Wald, president of Naturally Knits, a long-time supplier of AU and one of its trade creditors, AU was dysfunctional from its inception, and continued to experience difficulty paying creditors after the Butterbrodts exited. As a key trade creditor, Wald received periodic financial reports from AU, and these showed the company's finances were not improving. Wald believed that AU's inventories (of unsold items and raw materials) were too large and were perpetually carried at cost even though they were dated and probably worth only a small percentage of the value ascribed to them in AU's books. He considered about 85% of the inventory to be obsolete or seriously compromised on

Slip Copy
Slip Copy, 2007 WL 2670307 (E.D.Wis.)
(Cite as: Slip Copy)

Page 3

account of poor storage in an inadequate facility. (Tr. at 269-275.) Wald testified that he discussed with other creditors the possibility of bringing an involuntary bankruptcy petition against AU.[FN3](Tr. at 285-90.)

> FN3. Charles Hertel, an attorney for eventual buyer Stephen Scharpf, testified that he drafted an involuntary bankruptcy petition against AU, that Scharpf circulated it, and that Nocito's attorney and an attorney representing Wells Fargo (Jerome Smyth) knew about its existence prior to closing. (Tr. at 351-52.) Neary testified that the only threatened involuntary bankruptcy petition he became aware of was the one threatened by Wald, and that he learned of it only in the summer of 2001, via Nocito. (Tr. at 485.)

Concerned that he would not get paid as a trade creditor, Wald was eager to find a buyer for AU. In February 2001 he brought Stephen Scharpf to the table, and negotiated a proposed deal whereby Scharpf was to purchase virtually all of AU's assets. The actual buyer was to be Art Unlimited Sportswear, LLC ("AUS"), the company Scharpf and his wife formed in anticipation of the purchase. This deal never went through, however, and neither did a proposal, drafted several days later, that again envisioned AUS purchasing basically all of AU's assets. (Ex. 103.)

In his last letter of intent, dated March 21, 2001, Scharpf envisioned purchasing most of AU's assets, and capped his offer at $4.8 million. (Ex. 132.) At that time, AU's capital structure consisted of about $3.6 million in senior debt to Wells Fargo, $300,000 debt on a real estate mortgage to Associated, somewhere between $800,000 and $1 million in trade debt, and $1.3 million in equity. (Ex. 104; Tr.at 143, 199-201.) Under the terms of Scharpf's March 21 offer, then, there would be nothing left over to liberate Nocito's securities after the other debts were retired. As Nocito would not agree to any buyout arrangement that failed to liberate his securities, the deal as proposed in the March 21 letter of intent also fell through. (Tr. 290.)

The structure of the final deal emerged shortly thereafter, in early April 2001, and the deal was closed April 9 and 10, 2001. The parties understood that Wells Fargo's approval was necessary in order to complete the transaction, and Neary and Jerome Smyth, Wells Fargo's attorney, were kept apprised of the negotiation meetings and attended at least some of them. As Neary was not an attorney, Wells Fargo apparently called in Smyth to review documents comprising the deal, and Smyth also drafted the amended forbearance agreement. (Tr. at 562.)

The final deal involved several agreements, and its terms differed somewhat from those of the previous letters of intent. AU agreed to surrender voluntarily to Wells Fargo certain assets selected by Scharpf. Wells Fargo then entered into a purchase agreement with Scharpf/AUS for these assets-primarily real estate, leases, samples, raw materials, work in process, and finished goods. At the last minute, Nocito insisted on being paid a substantial portion of the purchase price via a consulting agreement. In return for the right-but not the requirement-to obtain consulting advice from Galva (through its president, Nocito), Scharpf/AUS would pay Galva $600,000 at closing and 2.5% of net receipts for up to two years thereafter (up to a maximum of an additional $600,000). As to the latter, Scharpf/AUS eventually paid $245,000. Galva assigned to Associated Bank ("Associated") the right to all payments Galva received under the consulting agreement, as collateral for a $500,000 loan Galva had taken out with Associated. Galva took out that loan in order to generate some of the $1.1 million demanded by Wells Fargo up front under the amended forbearance agreement.[FN4] In order to allow Galva to obtain this loan, Associated, Wells Fargo, and Nocito entered into an intercreditor agreement, under which Wells Fargo subordinated $500,000 of its interest in Nocito's securities to Associated. As the "percentage of net receipt" funds came in, Associated proportionally released its interest in Nocito's securities, which again became available to Wells Fargo.

> FN4. This agreement amended the existing forbearance agreement, entered into on February 20, 2001. (Ex. 105.)

*4 Conceived and drafted by Nocito's attorney, John Gaebler, the consulting agreement initially puzzled Scharpf and Wells Fargo. Scharpf had no intention of consulting Galva/Nocito (although he never expressed this intention).[FN5] Nevertheless, he reasoned that he did not care how Nocito and Wells Fargo allocated the purchase money, since such formalities would neither affect the total purchase price nor change the fact that Wells Fargo would

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

(ultimately) receive the $600,000 due under the consulting agreement. (Tr. at 168-69.) Similarly, Wells Fargo did not object to the consulting agreement, for it knew it would be receiving, one way or another, the $600,000, and regaining its senior interest in Nocito's securities as the "net receipt" proceeds flowed in.

> FN5. The relationship between Scharpf and Nocito appeared to be strained almost from the start, and grew progressively worse. Their relationship was so "explosive" during the February 2001 negotiations mediated by Wald that the two men remained in separate rooms. (Tr. at 276.) According to Charles Hertel, Scharpf's attorney, the two men also had their "moments" during the April 2001 negotiations for the final deal. (Tr. at 331.) In any event, as described *infra,* their relationship deteriorated in the summer of 2001 after Scharpf discovered Nocito was undercutting him by selling old AU inventory at reduced prices to original customers of AU.

Though of no concern to Scharpf, the consulting agreement made economic sense from Nocito's perspective.[FN6] By funneling the consulting fee through Galva, Nocito gained a tax benefit, as he could take advantage of Galva's operating loss carry-forwards rather than declare the entire amount as earned income. Nevertheless, Scharpf's attorney in the matter, Charles Hertel, testified that he expressed a concern that the consulting agreement might be a fraudulent conveyance. (Tr. at 350-53). Smyth testified, however, that talk of a possible fraudulent conveyance arose only in late 2001, months after the deal was closed. (Tr. at 576-77.)

> FN6. Nocito testified that besides the economic benefit, he expected to do consulting work for Scharpf, and believed, in retrospect, that he in fact did some (Tr. at 126) although Scharpf never asked him to provide any. (Nocito Dep. at 18-21.) Scharpf testified that he never utilized Nocito for any consulting-that is, Nocito's efforts after closing did not constitute "consultation" in his view. (Tr. at 168-69.)

Under a separate component of the final deal, Wells Fargo agreed to forbear from closing on AU until July 15, 2001, in return for a lump sum payment of $1.1 million, which was to be applied first to Nocito's personal note (of $950,000) and thereafter to the AU note guaranteed by Nocito. (Ex. 110, ¶ 3b.) This amended forbearance agreement was designed to give AU additional time to liquidate its remaining assets and wind down its on-going business. Again, AU/Nocito came up with the $1.1 million through a combination of the $600,000 consulting fee paid at closing plus all proceeds from the $500,000 loan Galva had obtained from Associated.

Provisions in the intercreditor agreement required that all of Galva's consulting agreement proceeds go to Associated, with Wells Fargo acting as Associated's agent for these (collection) purposes. (Ex. 112, ¶¶ 2, 4.) Nevertheless, Neary, in keeping with the bank's policy, wanted to have on file some documentation authorizing the transfer of funds from Galva's account. (Tr. at 538.) Neary therefore asked Nocito to prepare a memo authorizing Wells Fargo to transfer the $1.1 million from Galva's account to his personal account and to apply the funds as agreed. (Tr. at 90, 120-21.) Nocito complied in a memo dated April 9, 2001. (Ex. 113.) According to Nocito, Neary asked him for this authorization *after* Wells Fargo had moved the funds from Galva's account, and instructed him to backdate the memo. (Nocito Dep. at 23-24.)

If Scharpf wanted to buy (on the open market) inventory of the kind AU had remaining, he was obligated, under the terms of the deal, to buy it from AU. Although Scharpf was not required to purchase more inventory from AU, he anticipated buying a significant portion of it in the months after closing. (Tr. at 196-97.) For any AU inventory that he subsequently bought, the purchase agreement required him to pay dollar for dollar. After Scharpf learned that Nocito was undercutting him by selling inventory to original AU customers at reduced rates (as he was contractually free to do), Scharpf became upset and refused to buy any more inventory (as he was free to do).[FN7](*Id.* at 183, 197.) Without the expected proceeds from sales of inventory, AU was unable to pay its debts to Wells Fargo in timely fashion. Nocito's securities were then liquidated and applied to AU's debt in accordance with his personal guaranty, leaving Wells Fargo about $400,000 short on the AU debt.[FN8] AU filed for Chapter 7 bankruptcy relief on April 5, 2002.

> FN7. Nevertheless, Scharpf/AUS did pay the 2.5% of profits required under the

Slip Copy
Slip Copy, 2007 WL 2670307 (E.D.Wis.)
(Cite as: Slip Copy)

Page 5

> consulting agreement, which Galva had assigned to Associated, in order to complete payment of the purchase price.
>
> FN8. Nocito's securities were liquidated after the terrorist attacks of September 11, 2001, and so had fallen in value, to a little under $1 million. The first $255,000 were applied to Galva's outstanding debt with Associated, and Wells Fargo received the balance. (Tr. at 536-38.)

*5 Before I proceed further with the background of the case, it would be helpful to lay out the portions of the bankruptcy code most central to the bankruptcy court's decision and to the instant appeal. Section 548 of the bankruptcy code confers broad authority on the trustee to avoid transfers of value from the debtor prior to a bankruptcy filing, covering instances of both actual fraud and constructive fraud. The version of § 548 applicable here [FN9] provides:

> FN9. The applicable version of § 548 was effective from June 19, 1998, to April 19, 2005.

The trustee may avoid any transfer of an interest of the debtor in property, or any obligation incurred by the debtor, that was made or incurred on or within one year before the date of the filing of the petition, if the debtor voluntarily or involuntarily-
(A) made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted; or

(B)(i) received less than a reasonably equivalent value in exchange for such transfer or obligation; and(ii)(I) was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation;

11 U.S.C. § 548(a)(1)(A)-(B)(ii)(I) (1999). Once the voidability of a transfer is established under § 548, § 550 sets forth the authority of the trustee to recover the property that was fraudulently transferred, or its value.(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section ... 548... of this title, the trustee may recover, for the benefit of the estate, the property transferred, or, if the court so orders, the value of such property, from-
(1) the initial transferee of such transfer or the entity for whose benefit such transfer was made; or
(2) any immediate or mediate transferee of such initial transferee.
(b) The trustee may not recover under section (a)(2) of this section from-
(1) a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith, and without knowledge of the voidability of the transfer avoided; or
(2) any immediate or mediate good faith transferee of such transferee.

11 U.S.C. § 550(a)-(b).Section 550(b) provides subsequent transferees with a defense to recovery of a debtor's property that is unavailable to initial transferees. The purpose of the defense is to protect creditors "from last-minute diminutions of the pool of assets in which they have interests," while at the same time to guard against "the waste that would result if people either had to inquire how their transferors obtained their property or to accept a risk that a commercial deal would be reversed for no reason they could perceive at the time."Bonded Fin. Servs., Inc. v. European Am. Bank, 838 F.2d 890, 892 (7th Cir.1988).Section 550 balances these two goals by imposing on the initial transferee the "burden of inquiry and the risk if the conveyance is fraudulent."Id. While the initial transferee is in the best position to monitor the transaction, "subsequent transferees usually do not know where the assets came from and would be ineffectual monitors if they did."Id. at 892-93

*6 Relying on these provisions, the trustee claimed that Nocito structured the deal in order to get paid ahead of unsecured trade creditors, and that Wells Fargo either knowingly participated in the scheme or should have known of it. In partially granting Wells Fargo's motion for summary judgment, the bankruptcy court rejected the trustee's claim with respect to the $500,000 payment that was made with the proceeds of the loan from Associated. The court concluded that AU had no interest in those funds and thus using them to pay down Nocito's note could not be considered a fraudulent transfer. (*See* Bankr.Ct. Dec. of 10/12/05 at 10.) As to the initial $600,000 that was paid under the consulting agreement, however, the court found that Nocito had diverted this amount from the purchase price that Scharpf/AUS was willing to pay for the AUS assets. The court concluded that in doing so, Nocito intended

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

to hinder and delay unsecured trade creditors and that he had benefitted from the transfer by having his personal debt to Wells Fargo satisfied. Based upon these findings, the bankruptcy court further concluded that Nocito was not entitled to the protections afforded a subsequent good-faith transferee under 11 U.S.C. § 550(b) and that the trustee was entitled to judgment of $600,000 against him. And because Nocito's intent to hinder and delay creditors was imputed to his holding company, the bankruptcy court concluded that the trustee was entitled to this same judgment against Galva. (Bankr.Ct. Dec. of 12/6/06 at 12.)

The trustee also sought to recover from Wells Fargo, the ultimate recipient of the $600,000. However, because the bankruptcy court determined that Wells Fargo, in the person of Neary, did not intend to defraud trade creditors and had reason to believe at the time of the transfer that circumstances could result in everyone being paid, the trustee could recover from Wells Fargo only under a theory of constructive fraud, that is, under § 548(a)(1)(B). Although the court found that there was a constructively fraudulent transfer, it concluded that the amount of the transfer could not be recovered from Wells Fargo. In so ruling, the bankruptcy court concluded that Galva was the initial transferee of the $600,000 and that Wells Fargo was protected under § 550(b) as a subsequent good-faith transferee.[FN10] According to the bankruptcy court, Neary had no reason to know, at the time the deal was closed, that AU's inventory was worth far less than Nocito had claimed or that Nocito's projections of Scharpf's inventory purchases would fall short of expectation on account of growing hostility between the two men. The court also saw, in Neary's efforts to salvage the parties' business relationship, an attempt to obtain the greatest possible recovery of the debtor's assets and an indication that he was not complicit in any avoidable transfer concocted by Nocito or Galva. (Bankr.Ct. Dec. of 12/6/06 at 20.)

> FN10. The bankruptcy court determined that Wells Fargo was a subsequent good-faith transferee whether it was considered an immediate transferee (i.e., the transfer was deemed to go from Galva to Wells Fargo by virtue of the withdrawal from Galva's account) or a mediate transferee (i.e., the transfer was deemed to go from Galva to Nocito to Wells Fargo). (Bankr.Ct. Dec. of 12/6/06 at 18.)

On this appeal, the trustee challenges both the bankruptcy court's conclusion that Galva, as opposed to Wells Fargo, was the initial transferee and its finding that Wells Fargo acted in good faith and without knowledge of the voidability of the transfer. Wells Fargo contends that the bankruptcy court's determination of these issues was correct, but claims in its cross appeal that the court erred in finding a fraudulent transfer occurred at all.

## ANALYSIS

*7 Federal district courts have jurisdiction to hear appeals of bankruptcy court orders under 28 U.S.C. § 158(a). The reviewing court accepts the bankruptcy court's factual findings unless they are clearly erroneous. Fed. R. Bankr.P. 8013; In re Excalibur Auto. Corp., 859 F.2d 454, 457 n. 3 (7th Cir.1988). A finding of fact is clearly erroneous if it is without factual support or when the reviewing court, having considered all the evidence, is left with the definite and firm conviction that a mistake has been made. Connolly v. Harris Trust Co. of Cal. (In re Miniscribe Corp.), 309 F.3d 1234, 1240 (10th Cir.2002); In re Thirtyacre, 36 F.3d 697, 700 (7th Cir.1994) (quoting Anderson v. Bessemer City, N.C., 470 U.S. 564, 573 (1985)). Under the "clearly erroneous" standard, the reviewing court may not reverse the finding of the trier of fact where it is plausible in light of the record viewed in its entirety, even if the reviewing court is convinced that, had it been sitting as the trier of fact, it would have weighed the evidence differently. Anderson, 470 U.S. at 573-74. If the bankruptcy court's factual findings are silent or ambiguous as to an outcome-determinative factual question, the district court may not engage in its own fact-finding, but instead must remand the case to the bankruptcy court for the necessary factual determination. Wegner v. Grunewaldt, 821 F.2d 1317, 1320 (8th Cir.1987). Legal conclusions, as well as mixed questions of law and fact, are reviewed de novo. Mungo v. Taylor, 355 F.3d 969, 974 (7th Cir.2004).

The trustee argues that the bankruptcy court erred in finding (1) that Wells Fargo was not the initial transferee of the fraudulent conveyance; and (2) that Wells Fargo received the proceeds of the fraudulent conveyance in good faith and without knowledge of the voidability of the transfer. On cross-appeal, Wells Fargo argues there was no constructively fraudulent conveyance. If Wells Fargo is correct, the trustee's

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy  
Slip Copy, 2007 WL 2670307 (E.D.Wis.)  
(Cite as: Slip Copy)

Page 7

issues are moot, as they are directed to recovering property that was fraudulently transferred from the estate. I therefore will take up the cross-appeal issue first.

**Constructively Fraudulent Transfer**

Again, § 548 of the bankruptcy code allows a trustee to avoid any transfer of "an interest of the debtor in property" if the debtor voluntarily or involuntarily received less than a reasonably equivalent value in exchange, and was insolvent on the date of the transfer or became insolvent as a result of the transfer.[FN11] 11 U.S.C. § 548(a)(1)(B). The trustee carries the burden of establishing these conditions by a preponderance of the evidence. *In re McCook Metals, L.L. C.,* 319 B.R. 570, 587 (Bankr.N.D.Ill.2005). The standard of review applicable to the findings on these elements (e.g., whether there was a transfer, a property interest, or reasonably equivalent value in the exchange) varies, as discussed below.

> FN11. With respect to these elements, the current version of 11 U.S.C. § 548 does not differ from the version in effect at the time this case was filed.

Wells Fargo raises several issues related to § 548: (1) there was no "transfer"; (2) there was no evidence that AU had an interest in the contested $600,000; and (3) there was no evidence that AU received less than reasonably equivalent value in exchange.[FN12] Wells Fargo also argues that the bankruptcy court failed to analyze whether these three statutory conditions of constructively fraudulent transfer were met, opting instead-and improperly so-to "collapse the transaction to its essence" through a comparison of "what went out" of the estate with "what was received."[FN13] (*See* Bankr.Ct. Dec. of 12/6/06 at 9.)

> FN12. Wells Fargo does not contest the other relevant statutory conditions, namely, AU's insolvency and the timeliness of the trustee's petition.

> FN13. Wells Fargo also asserts the trustee has waived any argument directed to the cross-appeal by failing to respond to it. With respect to the cross-appeal, the trustee is the appellee, of course, and Wells Fargo is the appellant. The issue on cross-appeal-whether the bankruptcy court erred in determining the $600,000 payment was a constructively fraudulent transfer-is a legal question, subject to de novo review. Any factual finding that supports the bankruptcy court's legal conclusions is reviewed for clear error, as discussed *supra.* A failure by the trustee to address the legal question at issue on the cross-appeal does not mean that Wells Fargo's legal argument is automatically correct.

**Transfer of an Interest**[FN14]

> FN14. The bankruptcy court examined together the questions of whether there was a transfer under § 548 and whether AU had an interest in it. Such a conflation seems understandable, given the complexity of the underlying transactions.

*8 The bankruptcy code defines a "transfer" as including "each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or an interest in property." 11 U.S.C. § 101(54). Congress intended the term "transfer" to be construed as broadly as possible. *Besing v. Hawthorne (In re Besing),* 981 F.2d 1488, 1492 (5th Cir.1993) (citing S.Rep. No. 95-989, 95th Cong.2d Sess. 27 (1978); H.R.Rep. No. 95-595, 95th Cong. 1st Sess. 314 (1977)), *cert. denied,* 510 U.S. 821 (1993). A transfer does not have to be made directly by a debtor in order to fall within the ambit of § 548; in fact, "[t]he term 'transfer' as used in various bankruptcy statutes has been broad enough to cover ... indirect transfers and to catch various circuitous arrangements which have the effect of a fraudulent conveyance." *In re FBN Food Serv., Inc.,* 175 B.R. 671, 683 (Bankr.N.D.Ill.1994) (citing *In re Compton Corp.,* 831 F.2d 586, 591-92 (5th Cir.1987), *reh 'g,* 835 F.2d 584 (5th Cir.1988); *Katz v. First Nat'l Bank of Glen Head,* 568 F.2d 964, 969 n. 4 (2nd Cir.1977), *cert. denied,* 434 U.S. 1069 (1978); *In re Grambling,* 99 B.R. 515, 517-18 (Bankr.D.Conn.1989)). Whether a transfer involves the property of the debtor is a finding of fact that is subject to review only for clear error. *In re Int'l Pharmacy & Discount II, Inc.,* 443 F.3d 767, 771 (11th Cir.2005).

Although the bankruptcy code does not define what constitutes an "interest of the debtor in property," *In*

re Atchison, 925 F.2d 209, 210 (7th Cir.1991), guidance is available from judicial interpretation of the related phrase "property of the estate." Section 541(a)(1) provides that the "property of the estate" includes "all legal or equitable interests of the debtor in property as of the commencement of the case."11 U.S.C. § 541(a)(1).Section 541(d) further provides: Property in which the debtor holds, as of the commencement of the case, only legal title and not an equitable interest ... becomes property of the estate under subsection (a)(1) or (2) of this section only to the extent of the debtor's legal title to such property, but not to the extent of any equitable interest in such property that the debtor does not hold.

11 U.S.C. § 541(d). The Supreme Court has interpreted these statutes as including in a debtor's estate "that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings."*Begier v.. IRS*, 496 U.S. 53, 58 (1990). The phrase "interest of the debtor in property" is likewise best understood in exactly the same way, that is, as "that property that would have been part of the estate had it not been transferred before the commencement of the bankruptcy proceedings."*In re Merchants Grain, Inc.*, 93 F.3d 1347, 1352 (7th Cir.1996) (quoting *Begier*, 496 U.S. at 58 (1990)). A debtor's interest in property is governed by state law, absent a federal provision to the contrary. *Frierdich v. Mottaz*, 294 F.3d 864, 867 (7th Cir.2002) (citations omitted); *Atchison*, 925 F.2d at 210-11. Whether the debtor's interest is property of the bankruptcy estate is a question of law, subject to de novo review. *In re Witko*, 374 F.3d 1040, 1042 (11th Cir.2004).

*9 Wells Fargo argues that under the "diminution of estate" doctrine, AU had no interest in the transferred property. Under this doctrine, a transfer is not avoidable unless it "diminish[es] directly or indirectly the fund to which creditors of the same class can legally resort for the payment of their debts, to such an extent that it is impossible for other creditors of the same class to obtain as great a percentage as the favored one."*In re Kemp Pacific Fisheries, Inc.*, 16 F.3d 313, 316 (9th Cir.1994) (quoting 4 Collier on Bankruptcy ¶ 547.03, at 547-26 (15th ed.1993) (footnote omitted)). Neither the bankruptcy code nor the old Bankruptcy Act (under which the doctrine arose) contains an explicit diminution of estate requirement. *Deel Rent-A-Car, Inc. v. Levine*, 721 F.2d 750, 756 (11th Cir.1983). Nevertheless, courts have "long held that to be avoidable, transfers must result in a depletion or diminution of the debtor's estate."*In re Smith*, 966 F.2d 1527, 1535 (7th Cir.1992) (citation omitted). Thus, creditors are not harmed by a transfer of property not belonging to the debtor, because the amount they would share in the distribution of the debtor's estate would not be diminished. *In re Ausman Jewelers, Inc.*, 177 B.R. 282, 284 (Bankr.W.D.Wis.1995) (citing *In re Hartley*, 825 F.2d 1067, 1070 (6th Cir.1987)). The principal factor in determining if the estate has been diminished is the extent the debtor owned or controlled the transferred property. *Id.*

Wells Fargo argues that AU had no interest in the assets because they were fully encumbered by bank liens, which would make the assets unavailable to unsecured creditors in a subsequent liquidation. (Appellee's Br. at 24.) The trustee does not dispute Wells Fargo's contention that AU's assets were fully encumbered by valid, recorded bank liens and thus would not have been available to the general creditors in any event; instead, the trustee argues that the court should examine the transaction and the parties' knowledge and intent at that time the transfer occurred. (Appellant's Combined Response Br. at 7-8.) Drawing an analogy from criminal law, the trustee also argues that Nocito "attempted" to implement a scheme in which unsecured trade creditors would likely be damaged. (*Id.* at 8.) By way of an example, the trustee compares the transaction to the robbery of a convenience store. If the robber enters the store, pulls out his gun and demands the cash, he can be charged with a crime even if it turns out that there is no cash in the drawer. Comparing Wells Fargo to the "getaway driver" in his example, the trustee argues that it should share in Nocito's liability. (*Id.* at 7-8.)

I find the trustee's argument unpersuasive. While it is true that the relevant time frame for ascertaining the nature of a debtor's interest in property is immediately prior to the transfer at issue, *In re Underground Storage Tank Tech. Servs. Group, Inc.*, 212 B.R. 564, 572 (Bankr.E.D.Mich.1997) (citing *Begier*, 496 U.S. at 58), application of that principle to these facts does not change the result. Wisconsin law makes clear that, at that time, AU had no equitable interest in the transferred property. Under Wisconsin law, "property" is defined as "anything that may be the subject of ownership."Wis. Stat. § 242.01(10). "Asset" is defined as "property of a debtor, but ... not ... to the extent it is encumbered by a valid lien."Wis. Stat. § 242.01(2). The term "valid

lien" is defined as "a lien that is effective against the holder of a judicial lien subsequently obtained by legal or equitable process or proceedings."Wis Stat. § 242.01(13). The word "lien" is defined as "a charge against or an interest in property to secure payment of a debt or performance of an obligation, and includes a security interest created by agreement, a judicial lien obtained by legal or equitable process or proceedings, a common-law lien or a statutory lien."Wis. Stat. § 242.01(8). Under Wisconsin law, the assets were not AU's "property" to the extent they were fully encumbered by valid bank liens. While AU held legal title to the assets, under Wisconsin law, ownership means "something substantially more in the way of enjoyment or the possession of other indicia of ownership than bare or paper title."*In re Stoffregen,* 206 B.R. 939, 942 (Bankr.E.D.Wis.1997)(quoting *Mitchell Aero, Inc. v. City of Milwaukee,* 168 N.W.2d 183, 184 (1969)). None of the assets would have been available to unsecured creditors in a subsequent liquidation, that is, they would not have been part of the bankruptcy estate.[FN15]

> FN15. It does not matter which assets the $600,000 were "taken from," so to speak, since all of AU's assets were encumbered by valid bank liens.

*10 As Wells Fargo's attorney explained, even if the $600,000 payment had not been diverted to Nocito, it still would not have gone to the unsecured creditors. Instead, it would have been applied to the more than $1.8 million that remained owing to Wells Fargo. At that point, without Nocito's cooperation, AU would have been liquidated, leaving no possibility of paying off Wells Fargo's secured debt, let alone the unsecured debt of the general creditors. In effect, Wells Fargo allowed Nocito to direct a portion of the proceeds of the sale to his personal loan in the belief that he would then use his best efforts to sell off the remaining assets of AU so that the outstanding balance it was owed, as well as the amount owed the unsecured creditors, could be paid in full. Nocito's incentive was the hope that he could walk away with the securities he had pledged as collateral for both his personal debt and his guaranty of AU's debt. Had he been successful and the unsecured creditors been left unpaid, the trustee's claim would have merit. But Nocito's scheme failed. After his dispute with Scharpf, he was unable to generate enough money even to pay off the balance of AU's debt to Wells Fargo. His securities were sold to satisfy the balance of the loan from Associated that had been used in partial payment of his personal debt and a portion of AU's debt to Wells Fargo. Nocito ended up with nothing. Even Wells Fargo was left with a $400,000 loss on its loan to AU. The value of AU's assets was simply insufficient to satisfy the amount of debt they secured.

Appellant's suggested analogy to criminal law is also unconvincing. Bankruptcy law falls in the category of civil law, whose purposes are quite different than those of the criminal law. "[C]riminal law is distinguished [from civil law] by its punitive purposes ... [and] its concern with the blameworthiness of the defendant.... In contrast, the civil law is defined as a compensatory scheme, focusing on damage rather than on blameworthiness...." Kenneth Mann, *Punitive Civil Sanctions: The Middleground Between Criminal and Civil Law,* 101 Yale L.J. 1795, 1799 (1992). Thus, the criminal law punishes the attempt to commit a crime even when it is thwarted and no harm results. *See, e.g.,*18 U.S.C. § 2111 ("Whoever ... takes or attempts to take ...") In civil law, by contrast, without a loss, no compensation is due and thus no action is allowed. That is the case here.

Since the trustee apparently concedes that Nocito's efforts resulted in no loss to the debtor's estate, I conclude that no fraudulent transfer occurred. Without a fraudulent transfer, no recovery against Wells Fargo is possible in any event. Accordingly, I need not decide whether under the facts of this case, Wells Fargo was an initial transferee, or acted in good faith and without notice. Even if the bankruptcy court erred in its application of § 550, the result is the same. The claim against Wells Fargo fails and must be dismissed. For this reason, the judgment of the bankruptcy court dismissing the trustees claim against Wells Fargo is **AFFIRMED.**

*11**SO ORDERED.**

E.D.Wis.,2007.
In re Art Unlimited, LLC
Slip Copy, 2007 WL 2670307 (E.D.Wis.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.