17

# Avoiding Powers in Bankruptcy

## Thomas H. Jackson*

Avoiding powers,[1] like much of bankruptcy law, have "grow'd" like Topsy. No critical systematic theory of bankruptcy law has existed within which to explore the precise role of avoiding powers. We have lacked not only a comprehensive normative theory to explain why the various avoiding powers exist in bankruptcy but also any particular theory to justify the present scope of avoiding powers and thus to examine whether that scope should be expanded or further limited. To the extent that theoretical work exists at all, it largely concerns the area of preference law.[2] Yet even there, the prevailing wisdom is that the two recognized "goals" embodied in the Bank-

---

* B.A., 1972, Williams College; J.D., 1975, Yale University. Professor of Law, Stanford University. I wish to thank Douglas Baird, David Carlson, Theodore Eisenberg, Robert Ellickson, Bonnie Jackson, Douglas Leslie, Roberta Romano, and Alan Schwartz for their comments on an earlier draft. This research was supported by the Stanford Legal Research Fund, made possible by a bequest from the Estate of Ira S. Lillick and by gifts from other friends of the Stanford Law School.

1. By "avoiding powers," I mean the common usage of that term. *See, e.g.,* H.R. REP. NO. 595, 95th Cong., 1st Sess. 177 (1977), *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5963, 6138; REPORT OF THE COMMISSION ON THE BANKRUPTCY LAWS OF THE UNITED STATES, H.R. DOC. NO. 137, 93rd Cong., 1st Sess., pt. I, at 18 (1973) (listing powers) [hereinafter cited as BANKRUPTCY REPORT]. Avoiding powers are the powers given a trustee in bankruptcy, *see* Bankruptcy Reform Act of 1978, 11 U.S.C. §§ 321–325 (Supp. III 1979) and Bankruptcy Amendments and Federal Judgeship Act of 1984, No. 98–882 (July 9, 1984) [hereinafter cited as Bankruptcy Code § —], to avoid property interests held by entities other than the debtor both in property that belonged to the debtor prior to bankruptcy but was transferred away and in property of the estate. *See* Bankruptcy Code § 541. These avoiding powers are set out in Bankruptcy Code §§ 544–548. After the trustee has avoided a property interest, *see* Bankruptcy Code § 550, the transfer that created that property interest is "preserved for the benefit of the estate," Bankruptcy Code § 551, and any interest in property so recovered becomes the property of the estate, Bankruptcy Code § 541(a)(3). A debtor who is an individual sometimes can avoid, for his own benefit, similar property interests held by other entities, *see* Bankruptcy Code § 522(f)–(h), although the reasons for these avoidance powers are quite different, *see* note 127 *infra*. The traditional definition of avoiding powers by no means captures the scope of the trustee's ability to upset nonbankruptcy entitlements. A number of these topics, such as the rules of Bankruptcy Code § 365 on executory contracts and of § 1124 on de-acceleration, are addressed in Jackson, *Bankruptcy, Non-Bankruptcy Entitlements, and the Creditors' Bargain*, 91 YALE L.J. 857 (1982). Because such powers are discussed there, I limit myself here to "conventional" avoiding powers, even though that conventional category may be underinclusive in describing a series of related upset powers of the trustee.

2. *See* McCoid, *Bankruptcy, Preferences, and Efficiency: An Expression of Doubt*, 67 VA. L.

725

ruptcy Code's preference section—preventing secret liens and preventing last-minute grabs—have nothing to do with one another.[3]

This article asserts that the role of, and the limitations on, avoiding powers can be understood and systematically examined only by focusing on the goals of the bankruptcy process. After offering a general account of what these goals should be, this article uses the framework of this account to divide the so-called avoiding powers into two separate groups, only one of which relates to the proper normative concerns of the bankruptcy process itself.

The first group, which comprises those powers that preserve the advantages associated with the collective nature of the bankruptcy proceeding, may best be thought of as arranging rights among the creditors *inter se*. These avoiding powers, most notably the "strong-arm" power of the trustee under section 544(a) of the Bankruptcy Code and the preference power embodied in section 547, are integral to bankruptcy because they allow it to preserve the benefits of a compulsory and collective proceeding that justify the process' creditor-oriented rules in the first place.

The second group of powers generally considered to be avoiding powers—those represented by fraudulent conveyance law—is of substantially different origin. Laws that strike down actions designed (or presumed designed) to hinder, delay, or defraud creditors are not an offspring of, nor particularly related to, the bankruptcy process itself. Whereas the avoiding powers in the first group adjust the rights of creditors vis-a-vis other creditors, fraudulent conveyance law adjusts the rights of creditors vis-a-vis the debtor. That the second group of avoiding powers does not spring from a need to implement bankruptcy's collective proceeding becomes evident when one observes that the fraudulent conveyance principle not only resides in Bankruptcy Code section 548, but also operates dehors bankruptcy,[4] as it has done for more than four hundred years,[5] and retains its force in bankruptcy, as do other nonbankruptcy rights, through section 544(b).[6] While no harm comes from calling fraudulent conveyance law an "avoiding power" of the trustee in bankruptcy, one must recognize its distinct, and less collectivist justification.

---

REV. 249 (1981); Note, *Preferential Transfers and the Value of the Insolvent Firm*, 87 YALE L.J. 1449, 1449–55 (1978).

3. *See* note 114 *infra*.
4. *See* UNIF. FRAUDULENT CONVEYANCE ACT (1919).
5. *See* Twyne's Case, 76 Eng. Rep. 809 (K.B. 1601); 13 Eliz., ch. 5 (1570).
6. *See* note 45 *infra*.

These two conceptually distinct categories provide a framework for examining the contours of avoiding powers, as well as for discovering their inherent limitations. This framework allows one to evaluate many of the recurring issues raised by the use of avoiding powers in bankruptcy and thus to observe that a number of long-standing problems associated with bankruptcy avoiding powers stem from a simple failure to identify the underlying purpose of each particular avoiding power in the context of bankruptcy's collective proceeding. Because of that failure, courts, legislatures, and commentators have not focused on the types of behavior that a particular avoiding power was designed to affect and, accordingly, have not appreciated the limits of the reach of each particular power.

## I. The Bankruptcy Framework for Analysis

Much of the bankruptcy process and most provisions of the Bankruptcy Code sort out rights among creditors.[7] These creditor-oriented distributional rules, which fulfill the primary aims of the bankruptcy process itself, have little to do with creditor rights vis-a-vis a debtor.[8] The principal advantage to creditors of bankruptcy is

---

7. Jackson, *supra* note 1. This paragraph and the next two summarize the thesis of that article. *Cf.* Radin, *The Nature of Bankruptcy*, 89 U. Pa. L. Rev. 1, 9 (1940) ("Whatever purposes bankruptcy attempts to carry out, it does by working on the creditors primarily"). The term "creditors" is actually a bit underinclusive. Problems similar to those raised by creditors exist with other people holding claims or entitlements to a debtor's assets. Nonetheless, thinking of "creditors" is a common way to discuss bankruptcy's provisions, and I shall follow the convention here.

8. *See* Jackson, *supra* note 1, at 857–59; *see also In re* Bouquet Invs., 32 Bankr. 988 (Bankr. C.D. Cal. 1983). Again, "debtor" is a slightly inaccurate term, particularly in the case of a corporation. It will nonetheless suffice. This is not to slight the role of bankruptcy in providing individuals with a "fresh start." Individual debtors may use the bankruptcy process to achieve a discharge. Indeed, modern bankruptcy law clearly embodies this social policy goal. However important the "fresh start" policy for individuals is to bankruptcy law, it is of little use in analyzing the trustee's avoiding powers. These powers come into play whether or not the debtor is an individual and apply to the pool of assets that are available for creditors. The fresh start policy may occasionally remove assets from the creditors and may, as does Bankruptcy Code § 522(f), override some property rights as well. This article does not address that policy, but rather assumes that the assets in question are available for distribution to the creditors of a debtor. Given this assumption, the fresh start policy is not implicated in the issues discussed here.

Assuming that the assets are available to creditors does not unduly limit the applicability of the article. Most of the substantive provisions of the Bankruptcy Code do not relate to the issues of discharge. Moreover, discharge policy applies only to individuals. *See* Bankruptcy Code § 727(a)(1). Corporations do not need a "fresh start" because state-law limited liability rules provide the equivalent. Posner, *The Rights of Creditors of Affiliated Corporations*, 43 U. Chi. L. Rev. 499 (1976). Because they do not dissolve under state law, reorganizing corporations may need a discharge. *See* Bankruptcy Code § 1141(c), (d). But the reasons for this do not relate to a fresh start. Rather, discharge allows for an optimal choice between piecemeal

to substitute a collective process of paying claims for the system of individualized remedies that exists outside of bankruptcy. Subject to certain devices, such as voidable preferences, and putting aside several categories of bankruptcy-created priorities, creditors generally share in assets of the estate ratably in accordance with the value of their nonbankruptcy entitlements.[9]

When a debtor does not have enough to pay everyone in full (and we would say the debtor is insolvent), this "collectivist" method of allocating assets is in the interest of the creditors as a group.[10] Bankruptcy, then, exists to constrain creditors (and others) from attempting to promote their individual interests when doing so would be detrimental to the group of claimants. A sole owner would not need bankruptcy because he could make a decision about what to do with his assets so as to maximize their value without concern that other claimants might thwart his plan. But diverse claimants (whose rights against assets make all of them species of "owners") have divergent interests and may use individual remedies in a fashion that reduces the value of the assets to the group as a whole. Bankruptcy is designed to assure that the asset "pie" is as large as possible, given a set of relative entitlements.

Bankruptcy's rules therefore can be seen as an attempt to implement the type of collective and compulsory system that rational creditors would privately agree to if they could bargain together before the fact.[11] This creditor-oriented justification for bankruptcy—the "creditors' bargain" theory—rests on the notion that with any given set of entitlements creditors would prefer a system that kept the size of the pool of assets as large as possible. In the face of known insolvency, and in light of that goal, the creditors' bargain would require that creditors not resort to individual advantage taking. Bankruptcy imposes such a scheme.

---

dissolution and continued operation. *See* Jackson, *supra* note 1, at 892–95. Finally, exemptions are not available to corporations or partnerships. *See* Bankruptcy Code § 522.

9. Bankruptcy Code § 726(a)(2), (b). Certain priorities among unsecured creditors are set out in § 507. The principle that unavoided property claims are paid ahead of unsecured creditors springs, inferentially at least, from § 725. *See* H.R. REP. NO. 595, 95th Cong., 1st Sess. 382 (1977) ("The purpose of the section is to give the court appropriate authority to ensure that collateral or its proceeds is returned to the proper secured creditor . . . ."), *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5963, 6138.

10. The advantages of a collectivist approach are discussed in Jackson, *supra* note 1, at 861–68. There, they are set forth in three categories: "reduction of strategic costs," "increased aggregate pool of assets," and "administrative efficiencies." The benefits of the collectivist approach stand wholly apart from the question of a debtor's fresh start.

11. *Id.*

February 1984]  *AVOIDING POWERS*  729

Whereas slicing the asset "pie" according to the size of claims when creditors hold the same set of entitlements is a proper bankruptcy concern, assigning (or ordering) the substantive entitlements ab initio is *not* inherently a proper bankruptcy function. Changing the relative entitlements of creditors does not serve to constrain individualistic actions that are collectively destructive within an initial set of entitlements. For example, security interests establish a set of relative entitlements that gives secured creditors first crack at their collateral. As creatures of state law, security interests exist apart from bankruptcy. Whether secured credit generally is a good or a bad thing may be a debatable question, but it is not a debatable *bankruptcy* question.[12] Much of bankruptcy law and analysis is flawed by the failure to separate the question of how the process can maximize the value of a given pool of assets from the question of how the law should divide entitlements to whatever pool exists.[13] This distinction makes clear the relationship between bankruptcy rules and state (or nonbankruptcy federal) rules and provides a principle of bankruptcy policy capable of identifying what nonbankruptcy rules may need to be supplanted.

From the perspective of the creditors' bargain theory, bankruptcy exists at its core to maximize the value of assets in the face of individualized pressures to ignore the collective weal for individual gain. Thus, we must weigh the damage a particular nonbankruptcy right would cause to collective action against the undesirability of any incentives potentially created by upsetting that right. Because the collective damage to adhering to a right may sometimes exceed any benefit, a bankruptcy statute sometimes *must* replace nonbankruptcy rights with bankruptcy rules. The justifications for the existence of a bankruptcy system, however, only carry the replacement as far as the collectivist principle.[14] This calls for a sensitive attention to what the right is and how it relates to the needs of a bankruptcy system. In a number of cases (such as security interests), the justification for interfering with the right does not likewise require interfering with the

---

12. See Baird & Jackson, *Corporate Reorganizations and the Treatment of Diverse Ownership Interests: A Comment on Adequate Protection of Secured Creditors in Bankruptcy*, 51 U. CHI. L. REV. 97 (1984), for a fuller treatment of the argument in text.

13. In other words, bankruptcy analysis must begin by keeping separate the question of recognizing nonbankruptcy *rights* and the question of respecting the *value* of those rights.

14. Professor Gilmore suggested that the core of bankruptcy was a procedural framework within which state substantive rights were implemented. 2 G. GILMORE, SECURITY INTERESTS IN PERSONAL PROPERTY 1284-89 (1965). This framework sometimes will require upsetting nonbankruptcy rights, however, even though at its core bankruptcy collectivizes a set of given rights.

value of the right. In other cases (such as preferences), where obtaining the right itself interferes with bankruptcy policy, the value of the right must be disregarded as well. In either case, if the preempting rule does not spring from the necessity of replacing an individual remedies system with a collective system, that preemption, however desirable in the abstract, is not justified by the concerns that inform a *bankruptcy* process. Instead, dissatisfaction with the normative wisdom of a certain system of relative entitlements, and not the effort to maximize the marshalling of assets to satisfy those entitlements, would motivate such a change.

The impact of this point on the problem at hand may now be considered. While recognizing that the value of nonbankruptcy entitlements, such as security interests, does not interfere with the integrity of the collective process, our theory of bankruptcy respects the *value* of such nonbankruptcy rights, even though a collective proceeding may justifiably call off a secured party's right to remove assets from the estate.[15] So stated, however, the point is too mild. Creating a different relative set of entitlements in bankruptcy from those that exist outside of bankruptcy is actually counterproductive. Fashioning a distinct bankruptcy rule that is not justified by the creditors' bargain theory for a collective proceeding or by notions relating to a "fresh start" for individuals[16] creates a perverse set of incentives for the creditors advantaged by the distinct bankruptcy rule to use the bankruptcy process when it is not in the collective interest of the creditors as a group to do so.[17] It is this problem that makes such

---

15. Jackson, *supra* note 1, at 868–71. The rights themselves may be disregarded when the costs to the asset pool of recognizing them are too high. *See, e.g.,* United States v. Whiting Pools, Inc., 103 S. Ct. 2309 (1983); Baird & Jackson, *supra* note 12.

16. Nothing more will be said in this article about the debtor-oriented "fresh start" policy (discharge and exemptions), which is also embodied in bankruptcy law and may justify overriding other nonbankruptcy-created rights. *See, e.g.,* Bankruptcy Code § 522(f). In § 522(f), the focus is plainly on debtor-protection—of individuals through, say, exemptions—whereas the avoiding powers generally relate to creditor rights; accordingly, the limitation on the scope of this article does not appear unwarranted. Moreover, the fresh start policy has nothing to say about business bankruptcies. *See* note 8 *supra*.

17. Jackson, *supra* note 1, at 875–77, 903–06. The Supreme Court recognized this aspect of redefining rights only in bankruptcy in Butner v. United States, 440 U.S. 48, 55 (1979) (uniform treatment serves, inter alia, "to discourage forum shopping"). For example, assume that Debtor has assets worth $20,000, two unsecured creditors, *A* and *B*, each with a claim of $10,000, and a third creditor, *C*, with a $10,000 claim and a perfected security interest in all of Debtor's assets. Outside of bankruptcy, *C* would get $10,000, and *A* and *B* would "race" to gain the remaining $10,000 (unless they were able to negotiate to split the $10,000 among themselves, thereby avoiding the costs of a bankruptcy proceeding). If, however, a bankruptcy rule rearranges the relative priorities among *A*, *B*, and *C*—by, say, not recognizing security interests—then *A* and *B* have an incentive to use bankruptcy in order to receive *pro*


rule changes normatively undesirable.

This point does not rest on an assertion that the nonbankruptcy rule is always substantively right. Instead, the point is normatively neutral in the selection of entitlements: The collectivist principle would impose the same limitation on altering *any* given set of nonbankruptcy entitlements. Thus while this view of bankruptcy policy is neutral about the initial selection of entitlements, it is not neutral about selective changes in those entitlements within bankruptcy. Even though a nonbankruptcy rule may suffer from infirmities such as inefficiency or unfairness, if the nonbankruptcy rule does not undermine the advantages of a collective proceeding (or sabotage the individual's "fresh start"), imposing a different bankruptcy rule is a second best, and perhaps a counterproductive, solution. At bottom, bankruptcy overrides nonbankruptcy rights *because* those rights interfere with the group advantages associated with creditors acting in concert. If the nonbankruptcy rule is thought undesirable for reasons other than its interference with a collective proceeding, the proper approach for Congress would be to face that issue squarely and to overturn the rule in general,[18] not just to undermine or reverse it in bankruptcy. The latter course is undesirable because it creates incentives for strategic "shopping" between the nonbankruptcy and bankruptcy forums.[19]

---

*rata* payment, even though the administrative costs of bankruptcy would waste, say, $2000 of the debtor's assets. *A* and *B* then would get $6000 each, instead of $5000 each, but creditors *A*, *B*, and *C* are collectively worse off (wholly apart from the separate question of whether security interests are a good thing or not) by $2000. Under this bankruptcy rule, *A*, *B*, and *C* would be better off negotiating a different outcome and avoiding the $2000 cost of bankruptcy. This negotiation, however, may be difficult to conclude. *See* J. HIRSHLEIFER, PRICE THEORY AND APPLICATIONS 537-38, 561-64 (2d ed. 1980); Jackson, *supra* note 1, at 864-65, 870-71. As a result, the different rule in bankruptcy may lead to nonoptimal uses of the bankruptcy process because creditors such as *A* and *B* will decide to use bankruptcy solely to rearrange priorities in their favor. *See generally* Muris, *Opportunistic Behavior and the Law of Contracts,* 65 MINN. L. REV. 521, 532-52 (1981) (a party to a contract has an incentive to engage in opportunism, behaving within the letter of the contract but contrary to the other's expectation; deterring such opportunism is costly). This problem is explored in somewhat greater detail in Baird & Jackson, *supra* note 12, with reference to adequate protection of secured creditors in bankruptcy.

　　18. This assertion, of course, rests on the premise that Congress has such power under the Constitution. Because this article is not focused on constitutional interpretation, it seems sufficient to note that prevailing constitutional doctrine gives Congress extreme latitude under the commerce clause. *See, e.g.,* Katzenbach v. McClung, 379 U.S. 294 (1964); Wickard v. Filburn, 317 U.S. 111 (1942).

　　19. Butner v. United States, 440 U.S. 48, 54-55 (1979); Eisenberg, *Bankruptcy Law in Perspective,* 28 UCLA L. REV. 953, 958, 971 (1981). For example, consider the case of security interests. Even if their existence were thought to be inefficient or inequitable, the proper solution would be to eliminate them or to elevate the status of claimants thought more deserv-

## II. THE TRUSTEE AS HYPOTHETICAL LIEN CREDITOR OR PURCHASER

Within this theoretical framework, the principal rationale for the trustee's avoiding powers, other than the power to upset fraudulent conveyances, comes into focus. The basis of those avoiding powers is to protect the advantages of bankruptcy's collective proceeding. Consider the trustee's power to assert the rights of a "hypothetical" lien creditor—the so-called "strong-arm" power.[20] The creditors' bargain rationale for bankruptcy's collective and compulsory pro-

---

ing in and out of bankruptcy. *See* note 29 *infra*; *see also* Note, *Tort Claimants in the Secured Credit System: Asbestos Times, the Worst of Times*, 36 STAN. L. REV. — (1984) (forthcoming); *cf.* Schwartz, *Security Interests and Bankruptcy Priorities: A Review of Current Theories*, 10 J. LEGAL STUD. 1 (1981).

Occasionally, a nonbankruptcy rule might be so uncertain or expensive to apply that changing it only in bankruptcy would be preferable to having that confusion or cost across the board. Similarly, a rule might be clear but inefficient or inequitable for reasons other than its interference with the goals of bankruptcy. Whether this is often the case, the rule change in bankruptcy is still only a partial response and one unrelated to the existence of a *bankruptcy* process. While changing the rule in bankruptcy might result in an overall improvement in efficiency and equity, even taking into account the strategic planning costs, this change would always be less preferable than a change in the rule across the board. For example, the use of a bona fide purchaser rule in bankruptcy, *see* notes 30-43 *infra* and accompanying text, may be preferable to no rule change at all because of ostensible ownership concerns. But that rule is not a *bankruptcy* rule at all, and to frame it in those terms may mask the real problem calling for a general rule change: ostensible ownership. The preferable route, which would not have the undesirable side effects of skewing the use of bankruptcy, would be for Congress to make a general rule change.

That Congress' enactment of a special rule applicable only in bankruptcy may have been unwise as compared to a general rule change is, of course, not a reason for disregarding Congress' mandate. If, on the other hand, Congress' command is ambiguous or uncertain, it would be proper to interpret it with a sensitivity to the relationship between bankruptcy and nonbankruptcy rules.

20. Bankruptcy Code § 544(a). That section provides:

The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—

(1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists;

(2) a creditor that extends credit to the debtor at the time of the commencement of the case, and obtains, at such time and with respect to such credit, an execution against the debtor that is returned unsatisfied at such time, whether or not such a creditor exists; or

(3) a bona fide purchaser of real property from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a purchaser exists.

ceeding clearly explains the basic role of that power. At its core, this power simply implements the collective proceeding. The trustee is able to "avoid" interests that creditors hold in property of the estate if such interests would be subordinate to an execution lien creditor's interest outside bankruptcy. This enables the trustee to preserve the equality in value that existed among these creditors' rights at the moment before bankruptcy. Instead of changing relative entitlements, the lien creditor power does just the opposite: It provides that those similarly situated *outside* of bankruptcy will be treated equally *in* bankruptcy.

The best illustration of this preservation of the value of the creditor status quo is the ability of the trustee to avoid unperfected security interests, surely the property right most frequently avoided under the strong-arm power.[21] The assertion that the trustee must strike down these interests to preserve nonbankruptcy equality might seem odd at first to anyone having a basic familiarity with the nonbankruptcy rights of unperfected secured creditors. Outside bankruptcy, unperfected security interests prevail over the interests of unsecured creditors.[22] In order for an unsecured creditor to prevail over an unperfected security interest, he must perfect a property right (such as a security interest or an execution lien) in his own right, and he must do so before the competing security interest is perfected.[23]

Consequently, if one were to take a conceptual snapshot at the

---

21. Under Bankruptcy Code § 544(a)(1)–(2), the trustee, as of the date of bankruptcy, is given the power to avoid any transfer of property that is voidable by a creditor extending credit on that date and also acquiring, as of that date, a judicial lien or an execution lien. Under U.C.C. § 9-301(1)(b) (1972), an unperfected security interest is subordinate to "a person who becomes a lien creditor before the security interest is perfected," and under U.C.C. § 9-301(3), a lien creditor means not only "a creditor who has acquired a lien on the property involved by attachment, levy or the like" but also "a trustee in bankruptcy from the date of the filing of the petition." The effect of these sections is unmistakable, even if Bankruptcy Code § 544(a) uses the term "avoidable" and U.C.C. § 9-301 (1972) uses the term "subordinate."

22. A security interest which has attached but has not been given notoriety normally is unperfected. Attachment occurs (unless by explicit agreement it is postponed) when (a) "the collateral is in the possession of the secured party pursuant to agreement, or the debtor has signed a security agreement which contains a description of the collateral"; (b) "value has been given"; and (c) "the debtor has rights in the collateral." U.C.C. § 9-203(1)–(2) (1972). Until attachment, a security interest is not enforceable against the debtor or against third parties. *Id.* Perfection requires attachment plus "all of the applicable steps required for perfection." *Id.* § 9-303(1). These steps are set forth in U.C.C. §§ 9-302 to 9-306 and generally consist of the secured creditor filing a financing statement in the appropriate public files or taking possession of the collateral. *See generally* Baird & Jackson, *Possession and Ownership: An Examination of the Scope of Article 9*, 35 STAN. L. REV. 175 (1983); Baird, *Notice Filing and the Problem of Ostensible Ownership*, 12 J. LEGAL STUD. 53 (1983).

23. U.C.C. § 9-301(1)(b) (1972); *see* note 22 *supra*. Perfection is sometimes given with-

moment before bankruptcy, the picture might not appear to reflect presumptive equality between unsecured creditors and unperfected secured creditors. The unperfected secured creditor would, after all, prevail over the unsecured creditor if the "race" were to end right then and there. Why then should the trustee have the power to strike down, on behalf of the unsecured creditors, an unperfected security interest that none of them could defeat at that time?

The reason that the unperfected secured creditor loses his apparent priority relates to bankruptcy's notion of a collective proceeding. The relative position of the two classes of creditors is only partially, and misleadingly, depicted by a snapshot of their respective positions at the moment before bankruptcy. While the unperfected secured party is, to be sure, entitled to prevail over the unsecured party *if* no further action is taken, the more relevant point is that neither party has in fact taken the step that assures ultimate victory. Which party would have taken that final step first is unknown the moment before bankruptcy. Had he acted first, the secured creditor could have prevailed by taking possession of the collateral or by filing a notice of his interest.[24] The unsecured creditor, conversely, could have assured himself of priority by acting first, either by taking and perfecting a consensual security interest in the property or by obtaining a nonconsensual attachment or execution lien on the property.[25]

In a one-on-one race with any particular unsecured creditor, it may be possible to posit with a fair degree of confidence ultimate victory for the secured creditor. The secured creditor would likely find his remaining steps somewhat easier to complete than would any individual unsecured creditor.[26] This, however, does not accurately describe the normal position of an unperfected secured creditor, who would almost always face a *pool* of unsecured creditors as his competitors. Thus, the relevant race generally is not one-on-one, but pits the secured creditor against numerous unsecured creditors. If any one of the unsecured creditors obtains a lien or perfected security interest first, the unperfected secured creditor loses his priority. Across the

---

out an act of notoriety. *See, e.g.,* U.C.C. § 9-302(1)(d). A justification for at least some of these exceptions is developed in Baird & Jackson, *supra* note 22, at 190-94.

24. U.C.C. §§ 9-301(1)(b), 9-302, 9-304, 9-305 (1972).

25. If the creditor takes and perfects a consensual security interest in the property before the competing security interest is perfected, he can prevail under the first-to-file-or-perfect rule. *Id.* § 9-312(5). If the creditor obtains an execution lien before the competing security interest is perfected, he can also prevail. *Id.* § 9-301(1)(b).

26. Even this may not be certain, however, as it is likely that the unperfected secured creditor will not know he is unperfected. *See* note 27 *infra.*

Case 1:07-cv-06597-AKH    Document 27-21    Filed 01/11/2008    Page 12 of 19

pool of unsecured creditors, some of who may be close to judgments or attachments, an unperfected secured creditor faces a substantial danger of being trumped. Evaluating the outcome of the unfinished race thus becomes problematic. Because, prior to the debtor's bankruptcy, neither the unperfected secured creditor nor any of his unsecured counterparts have in fact taken the ultimate step that assures priority, they stand at that moment, for purposes of valuation, in relative positions of equality, at least for purposes of fashioning a rule instead of a costly case-by-case standard. In "avoiding" the secured party's unperfected interest, the trustee does not confer victory upon the unsecured creditors; rather, he assures a tie. This tie reflects the position one would expect the parties to have reached if they were able to bargain with each other before the race began because it spares them an unproductive or destructive race.[27]

The trustee, then, wields the power of a hypothetical lien creditor to assure that creditors who generally have an equal chance to win the hypothetical race at the moment of bankruptcy will be treated as equals once the collective proceeding commences. Yet that rationale also indicates the limits on that avoiding power. The trustee's power as a hypothetical lien creditor ultimately rests on nonbankruptcy entitlements—the state law definitions of lien creditor rights; it measures the values of the relative rights of competing claimants to the debtor's property by the yardstick of nonbankruptcy rights existing the moment before bankruptcy.[28] Once those rights are fixed outside

---

27. Jackson, *supra* note 1, at 860–68. Prebankruptcy races implicate the preference section, discussed at notes 92–165 *infra* and accompanying text. The "race" presumes a model of secured creditors who unwittingly have failed to perfect their interests and then, as bankruptcy approaches, either re-evaluate their paperwork or attempt to take possession of the collateral. *See, e.g., In re* J.A. Thompson & Son, 665 F.2d 941 (9th Cir. 1982) (attempted repossession 20 minutes before bankruptcy filing). Another paradigm, suggested to me by Professor Schwartz, would be the secured creditor who deliberately fails to take the perfecting step of notoriety. While such a paradigm would make the rule of § 544(a) easier to justify, I doubt it is the correct paradigm. Creditors have little to gain—directly—by withholding perfection, so such cases are almost certainly motivated by the debtor. I would analyze such cases as fraudulent conveyances, reachable wholly apart from bankruptcy or § 544(a). *See* notes 166–194 *infra* and accompanying text. In any event, that paradigm does not *contradict* the discussion here.

28. *See In re* Harms, 7 Bankr. 398, 399 (Bankr. D. Colo. 1980) (noting that the answer to the question of the trustee's rights "is a matter of state law"). This principle was expressed by a House Report accompanying a 1910 amendment to the Bankruptcy Act of 1898 that gave the trustee, for the first time, "better" title to property than the bankrupt had:

> It is evident that in the proposed amendment attempt is made to give effect to two ideas quite distinct: First, that as to the property in the custody of the bankruptcy court the bankruptcy trustee shall be considered to have the same title that a creditor holding an execution or other lien by legal or equitable proceedings levied upon

bankruptcy, however, nothing in the collectivizing nature of bankruptcy calls for the reallocation of their value inside bankruptcy.[29]

This point, although simple, has a number of implications respecting the shape and direction of Bankruptcy Code section 544(a). Consider first section 544(a)(3), which permits the trustee to avoid any transfer of property of the debtor that is "voidable by . . . a bona fide purchaser of real property from the debtor, against whom applicable law permits such transfer to be perfected, that obtains the status of a bona fide purchaser and has perfected such transfer at the time of the commencement of the case, whether or not such a pur-

---

that property would have under state law; and, second, that as to property not in the custody of the bankruptcy court the trustee should stand in the position of a judgment creditor holding an execution returned unsatisfied, thus entitling him to proceed precisely as an individual creditor might have done to subject assets. *In this way, in effect, proceedings in bankruptcy will give to creditors all the rights that creditors under the state law might have had had there been no bankruptcy and from which they are debarred by the bankruptcy*—certainly a very desirable and eminently fair position to be granted to the trustee.

H.R. REP. NO. 511, 61st Cong., 2d Sess. 7 (1910) (emphasis added). *But cf.* Countryman, *Justice Douglas: Expositor of the Bankruptcy Law*, 16 UCLA L. REV. 773, 782–87 (1969) (suggesting that was a rationalization of the power, not a definition or limitation on it).

29. Whether the rights that are fixed are sensible is not a *bankruptcy*-related issue. *See* notes 17–19 *supra* and accompanying text. If the entitlements are sensible, then the creditors' bargain model would suggest that the creditors would view having the rights recognized both inside and outside of bankruptcy as in their interest. Jackson, *supra* note 1, at 905. If the rights are *not* sensible, then they should not exist at all, and Congress should face the issue squarely and eliminate them. *See* note 19 *supra*; *see also* Eisenberg, *supra* note 19, at 970–71; note 37 *infra*.

A recent article asserts that if Congress, acting pursuant to its bankruptcy power, wanted to "impair"—that is, change—the rights of holders of security interests prospectively, it would not violate the fifth amendment by doing so. *See* Rogers, *The Impairment of Secured Creditors' Rights in Reorganization: A Study of the Relationship Between the Fifth Amendment and the Bankruptcy Clause*, 96 HARV. L. REV. 973 (1983). The thesis seems obvious, if one considers it outside the bankruptcy context; Congress has previously limited the creation of state property rights in the debtor-creditor field. *See, e.g.,* Consumer Credit Protection Act, 15 U.S.C. §§ 1671–1677 (restricting garnishment of wages); *see also* note 18 *supra*. It would be odd to find that the fifth amendment placed a greater restriction on Congress when it acts pursuant to its bankruptcy power than when it acts pursuant to some other power. *Cf. In re* Anchorage International Inn, 718 F.2d 1446, 1451 (9th Cir. 1983) (pursuant to the bankruptcy clause, Congress "might invalidate in bankruptcy any or all prebankruptcy entitlements encumbering the debtor's assets," although Congress has not chosen to do so).

Professor Rogers' article did not address the much more interesting question—whether Congress *should* restrict or limit the rights of secured creditors. The resolution of that question turns on the efficiency or fairness of secured credit. *See* Schwartz, *supra* note 19. Those concerns, however, have nothing to do with the reason for *bankruptcy* (apart, perhaps, from the question of the individual's "fresh start"). *See* D. BAIRD & T. JACKSON, CASES, PROBLEMS, AND MATERIALS ON SECURITY INTERESTS IN PERSONAL PROPERTY 501–617 (1984); Note, *Compensation for Time Value as Part of Adequate Protection During the Automatic Stay in Bankruptcy*, 50 U. CHI. L. REV. 305 (1983). It blurs the issues to bring the subject up in the context of *bankruptcy* reform.

chaser exists."[30] The syllogism that presumably resulted in the promulgation of this section is understandable but, under a creditors' bargain analysis, wrong.

Although legislative history is nonexistent,[31] section 544(a)(3) almost certainly reflects the straightforward observation that the trustee's hypothetical lien creditor power principally served to avoid rights in property (such as security interests) with uncured ostensible ownership problems.[32] Not surprisingly, as they lacked a coherent theory of avoiding powers, the drafters of the Bankruptcy Code concluded that the trustee's strong-arm power principally addressed the evil of property interests with ostensible ownership problems that remained despite available curative measures under nonbankruptcy law.[33] The problem was—or seemed—obvious: A lien creditor

---

30. Bankruptcy Code § 544(a)(3). Use of the "bona fide purchaser test" with respect to the trustee's strong-arm power is new with the Bankruptcy Code. *See* H.R. REP. NO. 595, 95th Cong., 1st Sess. 370 (1977), *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5963, 6138. It has existed for a longer time under the trustee's preference power. *See* Bankruptcy Act of 1898, § 60a(2), 11 U.S.C. § 96a(2) (1975) (repealed prospectively Oct. 1, 1979); note 110 *infra*. Its use there raises the same questions.

31. The legislative history notes only that Bankruptcy Code § 544(a)(3) does not require the impossible—namely, a filing or recording when state law does not provide for it at all. 124 CONG. REC. 32,400 (1978) (statement of Congressman Edwards); *see In re* Elin, 20 Bankr. 1012 (D.N.J. 1982) (legislative history to § 544(a)(3) is "scant and sheds little light" on it).

32. *See* S. RIESENFELD, CASES AND MATERIALS ON CREDITORS' REMEDIES AND DEBTORS' PROTECTION 626 (3d ed. 1979) ("The main applications of 11 U.S.C.A. § 544(a) are the cases in which the trustee seeks priority under U.C.C. § 9-301 over a security interest which was not properly perfected at the time of the commencement of the case or in which he seeks to avoid a prior conveyance of realty by the debtor where the grantee had not recorded such conveyance at the time of the transfer."); *see also In re* Great Plains W. Ranch Co., 38 Bankr. 899 (Bankr. S.D. Cal. 1984).

33. *See* Kennedy, *Secured Creditors Under the Bankruptcy Reform Act*, 15 IND. L. REV. 477, 483 (1982) ("strong-arm" power grew out of "a recognition that secret liens offend bankruptcy policy."); Rendleman, *Liquidation in Bankruptcy Under the '78 Code*, 21 WM. & MARY L. REV. 575, 610 (1980) (§ 544(a) "combats 'the evil of secret liens' by encouraging creditors to record security interests so that the debtor's appearance plus the filing system will fairly represent to others how the debtor stands. Debtors should own what they appear to own; the amendment discourages debtors from appearing to be good credit risks on secretly mortgaged property."); *see also* BANKRUPTCY REPORT, *supra* note 1, pt. I, at 18 ("One of the essential features of any bankruptcy law is the inclusion of provisions designed to invalidate secret transfers made by the bankrupt . . . ."); H.R. REP. NO. 511, 61st Cong., 2d Sess. 8-9 (1910) (notoriety problem is "the bottom principle of the right to legislate against secret liens"); Countryman, *The Use of State Law in Bankruptcy Cases* pt. 1, 47 N.Y.U. L. REV. 631 (1972).

Congress added a bona fide purchaser test (along with a lien creditor test) to the preference section's definition of transfer at the time of the amendments made by the Chandler Act of 1938. That addition was a reaction against "equitable lien" cases such as Sexton v. Kessler, 225 U.S. 90 (1912). Congress explicitly added this test on the ground that "secret liens" were evil. *See, e.g.*, ANALYSIS OF H.R. 12889, 74th Cong., 2d Sess. 188 (1936) ("The purpose of the test is to strike down secret transfers, and thus the transfer is to be deemed made when it becomes known and not when it was actually made."). After Congress discovered that the

power alone would not enable the trustee to trump all interests with uncured ostensible ownership problems. But this limitation was susceptible to a simple correction. Where applicable law prescribed a form of notoriety as a condition for "full" protection against competing claims, and where such notoriety of a particular interest had not been given prior to bankruptcy, that interest should be invalid against the trustee.

A number of states permitted various interests in real property that could be, but had not yet been, recorded to be effective against nonconsensual claimants, such as holders of judgment liens. But these unrecorded interests were not effective against most consensual claimants, such as subsequent purchasers of interests in the property who had neither actual nor constructive notice of the earlier unrecorded interest at the time of purchase.[34] To overcome these unrecorded interests and to cure the attendant ostensible ownership problem, the drafters found that they had to give the trustee the power of a bona fide purchaser in order to give him the same power against interests in realty, under the laws of many states, that the lien creditor power gave him against interests in personal property.[35]

That syllogism, as simple as it may seem, fundamentally misconceives the reason that bankruptcy policy calls for a strong-arm avoiding power. From the perspective of creditors as a group, the reasons for a bankruptcy process do not justify revaluing rights among credi-

---

bona fide purchaser test jeopardized all nonnotification accounts receivable financing, *see* Corn Exch. Nat'l Bank & Trust Co. v. Klauder, 318 U.S. 434 (1943), it limited the bona fide purchaser test in the preference section to transfers of real estate. *See generally* 2 G. GILMORE, *supra* note 14, at 1300–05. One can safely assume that the same animus against "secret transfers" motivated the draftsmen in 1978 in promulgating § 544(a)(3). *See* Morris, *Bankruptcy Law Reform: Preferences, Secret Liens and Floating Liens*, 54 MINN. L. REV. 737, 759–60 & n.61 (1970) (suggesting the need to revise strong-arm power to include a bona fide purchaser test).

34. *See, e.g.,* CALIF. CIV. CODE § 1214 (West 1982); IND. CODE ANN. § 32-1-2-16 (West 1979), *construed in* Hutchison v. First Nat'l Bank, 133 Ind. 271, 30 N.E. 952 (1892); N.Y. REAL PROPERTY LAW § 291 (McKinney 1968). The general common law rule is similarly to the effect that a creditor is not protected against latent equities against the judgment debtor, but rather stands in the shoes of the judgment debtor. *See, e.g.,* Davis v. Johnson, 241 Ga. 436, 246 S.E.2d 297 (1978). *See generally In re* Elin, 20 Bankr. 1012 (D.N.J. 1982); Teofan & Creel, *The Trustee's Avoiding Powers Under the Bankruptcy Act and the New Code: A Comparative Analysis*, 11 ST. MARY'S L.J. 311 (1979). A number of jurisdictions, however, have extended their recording acts to protect creditors who obtain a lien on real property by attachment, judgment, or execution, against prior, unrecorded conveyances. *See, e.g.,* ILL. ANN. STAT. c. 30 § 29 (Smith-Hurd 1969). In those jurisdictions, the trustee can prevail under his lien (or execution) creditor power.

35. Section 544(a)(3) was modified in 1984 to explicitly state that the trustee has the status of a bona fide purchaser *whose deed is recorded* as of the date of the petition. *See In re* Harms, 7 Bankr. 398 (Bankr. D. Colo. 1980).

tors unless that readjustment serves to preserve the advantages of a collective proceeding. Ostensible ownership may—and often does—create problems,[36] but it does not do so in any way that harms a collective proceeding relative to a system of individual remedies.[37] Accordingly, no bankruptcy-related reason requires an "anti-secret-lien" principle in bankruptcy where nonbankruptcy law says that general unsecured creditors can do nothing about it.[38]

Deciding the issue of whether section 544(a)(3) correctly furthers bankruptcy's collectivizing goal requires an examination of the values of various creditors' rights the moment before bankruptcy instead of an incantation about the generalized evils of secret liens. In short, to the extent that they based the enactment of section 544(a)(3) on an anti-secret-lien principle, the drafters misperceived the inquiry, for they ignored the vitally important fact that real property law

---

36. *See generally* Baird & Jackson, *supra* note 22 (criticizing Article 9 for allowing substantial ostensible ownership problems to remain outside its scope). The ostensible ownership problem seems fundamentally an offspring of fraudulent conveyance law, not collective proceeding law. *See* notes 166-194 *infra* and accompanying text; *see also* Clow v. Woods, 5 Serg. & Rawle 275, 9 Am. Dec. 346 (Pa. 1819); CAL. CIV. CODE § 3440 (West 1970) ("[e]very transfer of personal property and every lien on personal property made by a person having at the time the possession or control of the property, and not accompanied by an immediate delivery followed by an actual and continued change of possession of the things transferred" is fraudulent).

37. This suggests that insofar as the problem is with ostensible ownership itself, the solution should be general and not bankruptcy-specific. *See* Eisenberg, *supra* note 19, at 970-71. If Congress were to change the rule, of course, it would need to rely on a power other than its constitutional power to enact "uniform Laws on the subject of Bankruptcies . . . ." U.S. CONST. art. I, § 8, cl. 4, such as its power to regulate commerce. *See* Eisenberg, *supra* note 19, at 971 n.58; note 18 *supra*. If such a power were not present, so that Congress had available only its bankruptcy power, there would be appropriate circumstances under which Congress should enact the change, even though it would only apply in bankruptcy. *See* note 19 *supra*. Given the breadth of Congress' commerce power (not to mention other powers), however, it is unlikely Congress would need to rely on the bankruptcy power. Moreover, if Congress does not have the power to change the current rule across the board, Congress should not still pretend that changing the rule in bankruptcy only was bankruptcy-related. Rather, Congress should state that the change stems from general dissatisfaction with the rule and note the reasons so that the states could consider the merits of changing the rule on their own.

38. Professor Countryman apparently disagrees, asserting that bankruptcy law should impose a disclosure requirement on those who take transfers from the debtor. *See* Letter from Vern Countryman to Senate Committee of the Judiciary (Dec. 19, 1975), *reprinted in Hearings on S.235 and S.236 Before the Subcomm. on Improvements in Judicial Machinery of the Comm. on the Judiciary of the United States Senate*, 94th Cong., 1st Sess., Part II, at 1040-41 (1975); *see also* Countryman, *supra* note 33. *But see* Eisenberg, *supra* note 19, at 971 ("Unsecured creditors may be misled by delayed perfection even in the absence of a bankruptcy proceeding."); notes 19, 29 *supra*; text accompanying notes 17-19 *supra*. Delayed recording may involve misbehavior, but it is proper to view such misbehavior as originating in the *debtor*, not as creditor behavior directed at opting out of a collective proceeding.

often *is* different from personal property law.[39] It is the value of those differences among creditors that should be the focus of bankruptcy law. At first glance, this comparison is unfavorable to the existence of section 544(a)(3). In states that have a bona fide purchaser rule, unsecured creditors are unable, outside of bankruptcy, to defeat the holder of an unrecorded real estate interest directly.[40]

It is possible, however, that this first glance undervalues the rights of general creditors. At a sale pursuant to a judgment creditor's execution, a third party may purchase the real property in question. If that purchaser is without knowledge of the unrecorded interest, and if the notice given in connection with the sale has not caught the attention of the holder of that unrecorded interest, many states may permit the lien creditor to keep the proceeds and, in that fashion, to defeat (albeit indirectly) the claim of the holder of the unrecorded interest.[41] As a matter of state law, it may be difficult to value the comparative rights of the judgment creditor and the holder of the unrecorded interest under such a scheme because the comparative values depend on the likelihood that the holder of the unrecorded interest would come forward before disbursement of the sale proceeds. In such a case, section 544(a)(3) might be justified as a pre-

---

39. *But see* Morris, *supra* note 33, at 759 & n.60 (bona fide purchaser test is necessary because "both transferees are equally blameworthy; there is no reason to treat them differently"; dismisses notion that "this anomaly is one of state law, not bankruptcy law," on ground that "there has been a policy of preventing this difference in state recording acts from spilling over into bankruptcy."). Bankruptcy law does not override state-created ostensible ownership problems where state law allows those problems to exist without any public notoriety at all. For example, leases or bailments of goods are effective against people claiming through a debtor despite the ostensible ownership problems those interests create. *See, e.g., In re* Sitkin Smelting & Refining, 639 F.2d 1213 (5th Cir. 1981); Manger v. Davis, 619 P.2d 687 (Utah 1980). Similarly, trust rights are permitted to exist notwithstanding notoriety problems. *See, e.g.,* Selby v. Ford Motor Co., 590 F.2d 642 (6th Cir. 1979); *In re* Independence Land Title Corp., 18 Bankr. 673 (Bankr. N.D. Ill. 1982). As long as these interests are not vulnerable to attack from anyone claiming through the debtor—other than perhaps a buyer in ordinary course—bankruptcy law respects them. The fact that state law has permitted certain unrecorded interests to be defeated by other purchasers itself changes nothing with respect to unsecured creditors. As a result, suggesting that bankruptcy law embodies a disclosure requirement is disingenuous; it does not, at least where state law has no procedure at all for giving notoriety. Moreover, nothing in the creditors' bargain model suggests that such a requirement should be imposed because of anything special about a bankruptcy proceeding. The desirability of curing ostensible ownership is general, not bankruptcy-specific.

40. The unsecured creditor could trump the holder of the unrecorded real estate interest by becoming a bona fide purchaser. To do this, however, the unsecured creditor would have to give *new* value and would only prevail to the extent of that value.

41. This requires finding that the bona fide purchaser takes free of the unrecorded interest, *see, e.g.,* Hugh v. Williams, 218 Mass. 448, 105 N.E. 1056 (1914); S. RIESENFELD, *supra* note 32, at 137, and that the judgment creditor has priority as to the proceeds.

sumptive valuation rule. But the value being presumed still springs from state law, and if having a presumptive valuation rule were the goal, the section should be drafted so as to accommodate states that do not protect bona fide purchasers in execution sales[42] or the recipients of proceeds.

Whether or not section 544(a)(3) is desirable, in short, still depends on the relative attributes of unrecorded real estate mortgagees and unsecured creditors under state law. Focusing on ostensible ownership itself is, as a matter of bankruptcy law, a red herring; the issue derives instead from state law and requires, in the first instance, a comparison of the relative value of entitlements under state law. In fact, Congress left untouched many nonbankruptcy ostensible ownership problems that constitute more of a practical problem than unrecorded realty interests.[43]

This point is related to a more fundamental insight about the relationship between the avoiding powers of the trustee and the rights of creditors under nonbankruptcy law. In a creditors' bargain model of bankruptcy, the trustee acts simply as an agent charged with implementing a collective proceeding for the benefit of all similarly-situated unsecured creditors. If none of the unsecured creditors could have upset a transfer outside bankruptcy, the trustee as their agent should not be able to upset that transfer inside bankruptcy.[44] Enabling him to do so would shift the expected distribution of assets among creditors upon the commencement of bankruptcy. The concern here, however, is not simply distributional—that some creditors would win and some would lose—but that the creditors as a group would suffer a net loss because the incentives for strategic use of bankruptcy by individual creditors would increase. Curing nonbankruptcy problems in bankruptcy may be preferable to not

---

42. *See* Note, *Title Obtained by Judicial Sale in Florida*, 8 U. FLA. L. REV. 269, 302-03 (1955); Note, *Execution Sales—Rights of Bona Fide Purchasers*, 24 MINN. L. REV. 805 (1940); *cf.* Sander v. Wells, 71 Wash. 2d 25, 426 P.2d 481 (1967) (judgment creditor who purchased at her own execution sale took only the interest of the judgment debtor).

43. If a transaction is deemed to be a true lease or bailment, for example, it defeats the claims of a trustee notwithstanding an ostensible ownership problem. *See, e.g., In re* Marhoefer Packing Co., 674 F.2d 1139 (7th Cir. 1982) (true lease); *In re* Medomak Canning Co., 25 U.C.C. Rep. Serv. (Callaghan) 437 (Bankr. D. Me. 1977), *aff'd by unreported decision*, (D. Me. Apr. 21, 1978), *aff'd*, 588 F.2d 818 (1st Cir. 1978). *See generally* Baird & Jackson, *supra* note 22 (noting examples of ostensible ownership problems outside of Article 9).

44. The point is that upsetting such entitlements, when creditors could not, redistributes entitlements but does nothing to protect the advantages of a collective proceeding. Other avoiding powers—such as preference law—give the trustee a power no creditor enjoys precisely *because* of the reasons for a collective proceeding. *See* notes 92-127 *infra* and accompanying text.

curing them at all, but curing these problems across the board is unquestionably the best approach. Implementing such reform through bankruptcy law obscures the underlying issues.

### III. *MOORE V. BAY* AND SECTION 544(b)

For the reasons mentioned above, the ability of a trustee in bankruptcy to upset a property interest created under nonbankruptcy law should be both measured by the ability of creditors who had the potential nonbankruptcy power to do so and exercised solely for such creditors' benefit. Examination of section 544(b) of the Bankruptcy Code[45] and the famous—or infamous—case of *Moore v. Bay*[46] illustrates the consequences of extending the trustee's power beyond these bounds. Section 544(b) gives the trustee the rights of any existing unsecured creditor.[47] The trustee thus may avoid interests that an identified unsecured creditor could have avoided. Moreover, under the doctrine supposedly enunciated by *Moore v. Bay*, which Congress codified in section 544(b),[48] the trustee may avoid interests in their entirety that the "subrogated" creditor could have avoided only to the amount of his claim.[49] Under section 551, moreover, the trustee takes over such avoided interests for the general benefit of the unsecured creditors.[50]

---

45. The trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title or that is not allowable only under section 502(e) of this title.
Bankruptcy Code § 544(b).

46. 284 U.S. 4 (1931).

47. The Bankruptcy Code revisions make clear that the trustee cannot succeed to the rights of secured creditors. Bankruptcy Code § 544(b); *see* Kennedy, *The Trustee in Bankruptcy as a Secured Creditor Under the Uniform Commercial Code*, 65 MICH. L. REV. 1419 (1967).

48. *See* H.R. REP. NO. 595, 95th Cong., 1st Sess. 370 (1977), *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5963, 6326.

49. *See, e.g., In re* Plonta, 311 F.2d 44, 48 (6th Cir. 1962) (conditional sales interest of seller, "being invalid under Michigan statute as to [an] interim creditor . . . was null and void as against the Trustee"; the amount of credit extended to the debtor "is immaterial"); Mercantile Trust Co. v. Kahn, 203 F.2d 449 (8th Cir. 1953); City of New York v. Rassner, 127 F.2d 703, 707 (2d Cir. 1942) ("[E]ver since Moore v. Bay, it has been considered proper to invalidate a mortgage in toto even though the only creditor entitled to invalidate has an insignificant claim . . . .") (citations omitted).

50. Section 551 provides that any transfer avoided "is preserved for the benefit of the estate but only with respect to property of the estate." The justification is that this section "prevents junior lienors from improving their position at the expense of the estate when a senior lien is avoided." H.R. REP. NO. 595, 95th Cong., 1st Sess. 376 (1977), *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS, 5963, 6332. This section overrules cases such as *In re* Arrington Lumber, 180 F. Supp. 543 (E.D. Va. 1960), which thought that preserving an avoided transfer "merely for the purpose of displacing or defeating another lawful lien," would result

HeinOnline -- 36 Stan. L. Rev. 742 1984