From the perspective of a creditors' bargain model of bankruptcy, the notion that the trustee may assert the rights of an existing un-

---

in "diverting a potential asset inuring to the benefit of [a junior secured creditor], into an asset for the benefit of the general creditors," something not contemplated by the Bankruptcy Act of 1898. *Id.* at 547–48; *see also* First Nat'l Bank of Baltimore v. Staake, 202 U.S. 141 (1906). Pursuant to the analysis in this article, deciding who should get the benefit of the avoiding of a property interest should turn, in the first instance, on the resolution of that question under nonbankruptcy law.

That resolution may be indeterminate in cases in which a trustee, but no individual creditor, can "avoid" the transfer. Consider a case where Creditor *A* loans Debtor $20,000 on January 1 and then takes and perfects a security interest on June 1. On July 1, Creditor *B* loans Debtor $10,000, taking and perfecting a security interest at that time. On August 1, Debtor files for bankruptcy. As will be developed later, *see* text accompanying notes 95–106 *infra,* preference law can be seen principally as a vehicle to deter creditors from "opting out" of an impending bankruptcy proceeding. For that reason, it strikes down "last minute grabs." Assuming preference law reaches Creditor *A*'s security interest, what should the consequence be? In theory, preference law may try to undo the "grab." This would put Creditor *A* in the same position as if he had never taken a security interest on June 1. Should the estate or Creditor *B* now move to the head of the line? It might seem that Creditor *B* should, but the result is in fact indeterminate: Creditor *B* may have loaned money on the basis of being second in line to Creditor *A*. In short, it may be impossible to put the world back to where it would have been had Creditor *A* not taken his security interest. In such a case, § 551 may be justified as providing the benefit for the group arguably harmed by Creditor *A*'s action. (Of course, what Creditor *B* charges—and hence whether or not he is harmed—will in part be dependent on what the bankruptcy rule is.)

But there are other cases in which, under at least one possible reading, § 551 seems to produce the *wrong* result. In the case just discussed, the trustee, but not the individual creditor, had an avoidance power. The nonbankruptcy result is more clearly on the side of Creditor *B,* however, where he also enjoys an avoidance power of his own. In those cases, any use of § 551 to prefer the trustee to Creditor *B* would be wrong. Consider the following: On January 1, Creditor *A* receives a security interest for a $20,000 debt. The receipt of the security interest is voidable under § 7 of the Uniform Fraudulent Conveyance Act and under § 548(a)(1) of the Bankruptcy Code. On March 1, Creditor *B* loans Debtor $10,000 and takes and perfects a security interest in the same assets securing Creditor *A*'s loan. On June 1, Debtor files for bankruptcy. In this case, the trustee can avoid Creditor *A*'s security interest as a fraudulent conveyance under either § 544(b) or § 548. But Creditor *B* also can avoid it using state fraudulent conveyance law. Outside bankruptcy, there would be a determinate winner: Creditor *B.* Nothing in bankruptcy's collectivizing proceeding calls for a different answer, and § 551 should not be interpreted as giving a different answer.

Finally, consider a case where, because of a defective filing, Creditor *A* would lose to a lien creditor without knowledge, but would defeat a subsequent secured creditor with knowledge, such as Creditor *B.* In that case, we may have a circular priority outside bankruptcy: Creditor *A* defeats Creditor *B* (because of Creditor *B*'s knowledge), Creditor *B* defeats subsequent lien creditors (because Creditor *B*'s interest is effectively perfected), and the subsequent lien creditors defeat Creditor *A* (because Creditor *A*'s filing is defective). Under § 544(a), the trustee can "defeat" Creditor *A*'s interest, considering *only* the conflict between Creditor *A* and the trustee. But before we can say whether or not the trustee should win over Creditor *A* or Creditor *B,* we still must resolve a circular priority whose resolution is a matter of state law. If state law says that Creditor *B* (or, indeed, Creditor *A*) wins this circular priority, § 551 should not affect that outcome.

The point of this is that the *automatic* nature of § 551, if broadly read, may not properly accommodate the relationship between bankruptcy law and nonbankruptcy law.

*STANFORD LAW REVIEW*

secured creditor is itself unobjectionable. In the collective proceeding, the trustee may, in the name of order and economy, act as agent for creditors in asserting their various rights, many of which may overlap. But the creditors' bargain model takes us no further. Section 544(b), in conjunction with section 551, goes considerably further, owing in large part to a one page opinion authored by Justice Holmes in 1931.

That opinion, from *Moore v. Bay,* has been widely criticized[51]— and occasionally defended[52]—for holding (as it is commonly read) that a trustee's power to avoid property interests, although derived from rights held by an existing creditor, can transcend those rights and avoid the interests totally.[53] In the rush to criticize that quantitative expansion of the avoiding power, the second, and clearer, holding of *Moore v. Bay*—that the "rights of the trustee by subrogation are to be enforced for the benefit of the estate"[54]— generally has been treated as if it were innocuous.[55] However, because it represents a

---

51. *See, e.g.,* J. MACLACHLAN, HANDBOOK OF THE LAW OF BANKRUPTCY 330-31 (1956). Professor MacLachlan, the principal draftsman of the 1938 and 1950 amendments to the Bankruptcy Act, *see* 2 G. GILMORE, *supra* note 14, at 1282 n.4, vented his frustration over *Moore v. Bay* as follows:

> The scope of section 70e [the predecessor to § 544(b)] is, however, clouded by one of the most glaring misconstructions to be encountered in the history of Anglo-American law. The result must be attributed in large part to the fact that the decision was made on reversing a judgment of the Circuit Court of Appeals without the benefit of argument on the part of the respondent. Mr. Justice Holmes, then over 90 years old, stated the facts in two sentences and the procedure below in one, and the law in five more. The opinion thoroughly concealed the critical point of the case. An examination of the record leads to the conclusion that the Court did not grasp the point and did not understand the effect of its decision.

J. MACLACHLAN, *supra,* at 330-31 (footnote omitted); *see also* Kennedy, *supra* note 47; Scott, *The Meaning of the Provisions for Recordation of a Transfer as Applicable to Preference Under the Bankruptcy Act and a Critique of the Decision of the United States Supreme Court in the Case of* Moore v. Bay, 18 VA. L. REV. 249 (1932). The Proposed Bankruptcy Act of 1973 favored overruling *Moore v. Bay. See* § 4-604, *reprinted in* BANKRUPTCY REPORT, *supra* note 1, pt. II, at 160; *see also id.* pt. I, at 18 (rule of *Moore v. Bay* "is unfair and unjustified").

52. *See, e.g.,* Schwartz, Moore v. Bay—*Should Its Rule Be Abolished?,* 29 REF. J. 67 (1955). Professor Countryman in particular has been a strong supporter of the rule, and apparently, *Moore v. Bay* has survived in § 544(b) largely through his efforts. *See* Letter from Vern Countryman to Senate Committee on the Judiciary (Dec. 19, 1975), *reprinted in Hearings on S. 235 & S. 236 Before the Subcomm. on Improvements in Judicial Machinery of the Senate Comm. on the Judiciary,* 94th Cong., 2d Sess., pt. III, at 4, 7 (1976).

53. *See* cases cited in note 49 *supra.* The statutory section involved, § 70e of the Bankruptcy Act of 1898, 11 U.S.C. § 110e (1975) (repealed prospectively Oct. 1, 1979), was the predecessor section to § 544(b).

54. 284 U.S. 4, 5 (1931).

55. Kennedy, *supra* note 47, at 1421 ("No question has ever been raised as to the correctness of the disposition of this latter issue."); *see also* MacLachlan, *The Impact of Bankruptcy on Secured Transactions,* 60 COLUM. L. REV. 593 (1960).

qualitative shift in the value of rights among unsecured creditors, the latter holding is no less troublesome.

To explore why this is so, it is worth setting out the somewhat murky context surrounding the case. The Supreme Court decided *Moore v. Bay* on certiorari from a Ninth Circuit case, *In re Sassard & Kimball, Inc.*[56] *Sassard* involved a chattel mortgage recorded some time after being granted. The Ninth Circuit noted, and the parties agreed, that, under California law as it existed at that time,[57] the delay in recording rendered the chattel mortgage ineffective against claims that came into existence *before* the chattel mortgage arose, as well as against claims that came into existence during the "gap" between the time the chattel mortgage arose and the time it was recorded. The chattel mortgage was effective, however, against claims that came into existence after it was recorded.[58]

The Ninth Circuit considered two issues in *Sassard.* The first involved the *extent to which* the trustee could avoid the chattel mortgage.[59] The second issue, arising only if in disposing of the first issue the court limited the power of the trustee to avoid the chattel mortgage, asked: *Who would gain the benefits* of the trustee's ability to so avoid the chattel mortgage?[60] To aid in understanding the Ninth Circuit's treatment of these issues, assume that the chattel mortgage in question secured a debt of $10,000 on property worth at least that amount. Apart from the debt secured by that chattel mortgage, the debtor was subject to unsecured claims of $100,000 at the time he filed for bankruptcy. Of these unsecured claims, $3000 arose before the chattel mortgage came into existence, another $2000 arose during the "gap" between the time the chattel mortgage was taken and the time it was recorded, and the remaining $95,000 arose after the recording of the chattel mortgage.

The Ninth Circuit resolved the first issue clearly: The trustee

---

56. 45 F.2d 449 (9th Cir. 1930), *rev'd,* 284 U.S. 4 (1931).

57. CAL. CIV. CODE § 3440 (West 1930); *see also id.* § 2957.

58. The Ninth Circuit noted:

> It is clear that the mortgage, by reason of the provisions of the statute, is void as to creditors of the first class, and it is conceded it is also void as to those of the second class. As held by decisions of the Supreme Court of California, the mortgage would be valid as against creditors of the third class.

45 F.2d at 450.

59. *Id.* ("It is the contention of appellant that . . . the mortgage in question, being void as to one creditor or class of creditors, is void in toto at the suit of the trustee.") (citations omitted).

60. *See* J. MACLACHLAN, *supra* note 51, at 331; *see also* Appellant's Opening Brief, *In re Sassard & Kimball Co.,* 45 F.2d 449 (9th Cir. 1930).

could avoid the chattel mortgage only to the extent of $5000—the amount by which actual pre-existing and "gap" unsecured creditors could have avoided it outside of bankruptcy.[61] On the second issue, however, the opinion of the Ninth Circuit was somewhat less clear. This ambiguity apparently has produced the misreading that, according to the Ninth Circuit, the trustee held the recovered $5000 for the benefit of *all* unsecured creditors (the original unsecured creditors holding claims of $100,000 plus, presumably, the creditor who held the chattel mortgage and was now unsecured to the extent of the avoided $5000).[62] That reading, however, is not compelled either by the opinion or by precedent. Rather, a review of the record suggests that the *Sassard* court, as had some courts quite clearly before it,[63] intended the nonbankruptcy result provided by state law to be followed in full in bankruptcy. State law dictated that the avoided $5000 be preserved for the benefit of the earlier and gap unsecured creditors but not for the benefit of subsequent creditors.[64] This would preserve the relative value of nonbankruptcy rights among the unsecured creditors.

If this latter interpretation was the holding of the Ninth Circuit in *Sassard,* as seems to be the case,[65] then the reversal by the Supreme

---

61. 45 F.2d at 450.

62. *See, e.g.,* J. MacLachlan, *supra* note 51, at 331–32.

63. *See* cases cited in note 64 *infra.*

64. The opinion states:

> There is no express language in this section which specifically gives to *any unsecured creditor* of a bankrupt any greater rights or any secured creditor any less right than he had before adjudication in bankruptcy. The rights of a trustee in bankruptcy to "avoid any transfer" are no greater than those of a creditor or particular class of creditors. It is clear, we think, that a trustee in bankruptcy is limited in his control *and disposition of* the estate of the bankrupt to the rights of creditors as such rights existed and could be enforced under the state law prior to the time proceedings in bankruptcy were instituted.

45 F.2d, at 450 (emphasis added). The Ninth Circuit continued by quoting from the District Court opinion:

> The Trustee indeed represents all creditors, but only as their respective interests in the property under administration were fixed by local law when the bankruptcy proceedings intervened, and it is his duty to administer and distribute accordingly as he finds at that time liens or inferiorities of respective creditors were established.

*Id.* Prior case law had focused, and split, on the issue of who gained the benefit of the trustee's recovery. *Compare In re* Moore, 11 F.2d 62 (4th Cir. 1926) (recovery of the trustee becomes a general asset of the estate) *with* American Trust & Sav. Bank v. Duncan, 254 F. 780, 782 (5th Cir. 1918) (when the trustee succeeds to a right possessed by only some of a bankrupt's creditors, "other creditors have no right to share in the amount so recovered").

65. The District Court opinion, which the Ninth Circuit affirmed, had concluded by directing the entry of "an order . . . giving the mortgagee priority over the creditors of the 3d class," Transcript of Record, Wm. H. Moore, Jr., Trustee in Bankruptcy for the Estate of Sassard & Kimball, Inc., Bankrupt, vs. O.S. Bay, No. 6147 (9th Cir. 1930), at 18 (mem.)

Court, and hence Justice Holmes' cryptic opinion in *Moore v. Bay,* may have been intended simply to reverse the Ninth Circuit on the second issue of who was to share in any proceeds. In other words, Justice Holmes decreed the avoided $5000 to be "for the benefit of the estate." The virtually universal reading of *Moore v. Bay,* however, is that the Supreme Court held that the trustee could avoid the chattel mortgage entirely and that the $10,000 so recovered was an asset of the estate to be shared by all unsecured creditors.[66]

While the latter reading is the one that has generated widespread criticism of *Moore v. Bay,* it is important to note that both versions of

---

(Killits, J.), Moore v. Bay, 284 U.S. 4 (1931); *see also id.* at 17 (theory of Referee clearly wrong in holding that 1910 amendments to Bankruptcy Act of 1898 placed each of these classes "on the same level of superiority"); *id.* at 40 (Assignment of Errors filed by Wm. H. Moore, Jr., before the Ninth Circuit) (Second Assignment: District Court erred in "declaring such chattel mortgage to be valid in so far as it affected creditors whose claims accrued subsequently to the recordation thereof"; Fourth Assignment: District Court "erred in dividing the unsecured creditors . . . into three different classes and granting priority of payment to creditors of the first and second classes of creditors over the third class").

66. *See* sources cited in notes 49, 51 *supra.* Both issues were clearly raised by the trustee, as petitioner. *See* Brief for Appellant, Moore v. Bay, 284 U.S. 4 (1931); *see also* 45 HARV. L. REV. 579 (1932) (noting *Moore v. Bay* clearly decided distributional issue). The cases cited by Justice Holmes suggest that *Moore v. Bay* decided only the distributional issue in favor of Moore. Among the cases cited, only Cambell v. Dalbey, 23 F.2d 229, 230 (5th Cir. 1927), suggests that the trustee can strike an entire transaction down, and it is cited following the statement that "what thus is recovered for the benefit of the estate is to be distributed in 'dividends of an equal percentum on all allowed claims, except such as have priority or are secured.'" *Moore v. Bay,* 284 U.S. at 5. Two other cases cited in the same place by Justice Holmes, moreover, quite clearly deal only with the question of distribution, not with the question of the scope of the avoidance. *See* Cohen v. Schultz, 43 F.2d 340, 342 (3d Cir. 1930) (question is not whether settlement by trustee was wise or unwise; rather, "the question is whether it should be distributed pro rata among the general creditors including the appellee, or whether [the appellee] has a prior claim against it."); *In re* Moore, 11 F.2d 62, 63–64 (4th Cir. 1926) (in an opinion that contains many of the phrases later used by Justice Holmes, Judge Parker concluded that "[t]he Bankruptcy Act contemplates an equal division among the bankrupt's creditors with no preferences except those specially designated in the statute." Therefore, "the trustee shall be subrogated to and enforce the right of such creditor for the benefit of the estate. . . . Consequently the recovery by the trustee is held for distribution in accordance with section 65 of the act, which makes no distinction between antecedent and subsequent creditors, but provides that 'dividends of an equal per centum shall be declared and paid on all allowed claims.'") (citation omitted). Both *Cohen* and *In re Moore* relied on Globe Bank v. Martin, 236 U.S. 288 (1915), the one Supreme Court case cited by Justice Holmes. *Globe Bank* quite clearly discusses only the distributional question and, indeed, cites favorably First Nat'l Bank v. Staake, 202 U.S. 141 (1906), for the proposition that "so much of the value of the property attached as was represented by the attachment passed to the Trustee for the benefit of the entire body of creditors . . . ." 236 U.S. at 299. Justice Holmes, moreover, cites page 305 of the *Globe Bank* opinion, which states only, "We find no error in the decree of the Circuit Court of Appeals, directing the distribution of the proceeds of the sale for the benefit of all the creditors of the estate." In light of this, it is quite remarkable that the other reading of *Moore v. Bay* has predominated.

the holding upset the value of fixed nonbankruptcy rights. Both results violate the normative principles of a collective bankruptcy process, as neither outcome is necessary to assure the advantages of substituting collective remedies for individual remedies. Instead, under either reading, *Moore v. Bay* simply upsets the value of nonbankruptcy rights in bankruptcy and thus benefits some creditors but not the group of creditors collectively.

The two ways of interpreting *Moore v. Bay* differ only in the group that each harms. If—to continue the example—the opinion in *Moore v. Bay* limited the avoidance to $5000 and simply redistributed it among the unsecured creditors as a group (the result seemingly favored by most commentators), the costs imposed by the shift from nonbankruptcy rights would fall on pre-existing and gap unsecured creditors, not on the holder of the chattel mortgage. The group of creditors thereby harmed, however, seems entirely blameless under any theory of entitlements.[67] Ironically, this result makes the holder of the chattel mortgage, who created the ostensible ownership problem in the first place, slightly better off than he would have been outside bankruptcy because he can participate, pro rata, in the $5000 so avoided.[68] In general, changing the relative ordering inside bank-

---

67. *See* Comment, *The Trustee in Bankruptcy and the Secured Creditor*, 17 ARK. L. REV. 46, 56 (1962) (criticisms ignore unfairness of pro tanto rule to creditor whose rights are being asserted for benefit of entire estate).

68. To see that this is so, consider an extension of the hypothetical developed in the text. Assume that, in addition to the asset worth $10,000 that is subject to the $10,000 chattel mortgage, the debtor has assets worth $50,000. Outside bankruptcy, holders of the $5000 of claims that can defeat the holder of the chattel mortgage, will get paid in full. The holder of the chattel mortgage will get the $5000 that remains of the $10,000 asset. His remaining $5000 claim will be unsecured, and added to the $95,000 of remaining unsecured claims. Since there are $50,000 of assets remaining, these unsecured creditors will receive, on average (assuming no collective proceeding) 50 cents on the dollar. The holder of the chattel mortgage, accordingly, will expect to receive $7500— $5000 from his "unavoided" chattel mortgage and $2500 from a distribution made on his unsecured claim.

Under the usual reading of the Ninth Circuit opinion in *Sassard,* the $5000 that is avoided would not go in bankruptcy to the holders of the $5000 of claims that could avoid it outside bankruptcy. Instead, the $5000 would become an asset of the estate, available to the unsecured creditors generally—the other unsecured creditors holding claims of $95,000, plus the unsecured creditors holding claims of $5000 whose rights measured the avoiding rights of the trustee, plus the holder of the $5000 avoided interest in the chattel mortgage. This makes the pool of unsecured claims grow to $105,000. The pool of assets has also grown, however, by the same amount, as it is now $55,000, not $50,000. Each unsecured claimant, therefore, will get slightly over 50 cents on the dollar (52.38 cents), so the holder of the chattel mortgage will end up with slightly more ($7619) than his nonbankruptcy expectancy of $7500.

Section 4-604(b)(1) of the Proposed Bankruptcy Act of 1973 not only would have reversed *Moore v. Bay* on the issue of the amount that could be avoided in bankruptcy, but also would have limited the beneficiaries of that recovery to those whose interests the trustee succeeded to. *See* BANKRUPTCY REPORT, *supra* note 1, pt. I, at 20 (recommending that "[t]he

ruptcy vis-a-vis the ordering outside bankruptcy when such a change is not justified by the *nature* of a collective proceeding is, as noted earlier,[69] the wrong way to improve nonbankruptcy rules thought to be deficient.

The Bankruptcy Code's embodiment in section 544(b) of the holding (as commonly understood) of *Moore v. Bay* is unfortunate from the perspective of bankruptcy as a creditors' bargain.[70] In addition, however, this line of reasoning leads to the less obvious point

---

rights of the trustee as successor to any creditor to invalidate a prior transfer by the debtor be limited to the value of the claims of the creditor or creditors against whom the transfer is invalid and that the property be recoverable for the benefit of those creditors only"); *see also* J. MacLachlan, *supra* note 51, at 332 ("It is preferable to hold that [the trustee] recovers for the direct benefit of the estate, although it would not be stultifying for him to recover a substantial interest for a large creditor when there are other assets in the estate, for the resulting diminution of that creditor's claim would go to increase dividends for all other creditors.").

The National Bankruptcy Conference attacked this proposal of the Commission on the Bankruptcy Laws. The Conference, speaking through Professor Countryman, asserted:

[The National Bankruptcy Conference] sees no reason for casting the bankruptcy trustee in the role of a private attorney in this transaction solely for the benefit of vindicating the rights of 1 or 2 or 3 creditors which they would have had outside the bankruptcy proceeding.

All of the other avoiding powers of the trustee . . . are exercised for the benefit of the entire estate, which is to say for all of the creditors. And our proposal is that this avoiding power . . . also be exercised by the trustee for the benefit of the entire estate.

*Hearings on S. 235 & S. 236 Before the Subcomm. on Improvements in Judicial Machinery of the Comm. on the Judiciary of the United States Senate,* 94th Cong., 1st Sess., Part II, at 984 (1975).

69. *See* notes 14–17 *supra* and accompanying text; *see also* notes 19, 29 *supra*.

70. The impact of the doctrine of *Moore v. Bay* is substantially less today than it was earlier because of a change in state law and a clarification of the avoiding power. The Uniform Commercial Code provides that tardily-perfected security interests are subordinated only to those creditors who cure the ostensible ownership problem themselves—by acquiring a lien or making a public filing—during the "gap." U.C.C. §§ 9-301(1)(b), 9-312(5) (1972). Under that rule, any creditor who can defeat an unperfected security interest must have a property interest in his own right. Therefore, the trustee may not succeed to the rights of that creditor because § 544(b) only allows him to succeed to the rights of unsecured creditors. *See* Hawkland, *The Impact of the Commercial Code on the Doctrine of* Moore v. Bay, 67 Com. L.J. 359, 363 (1962). *Moore v. Bay,* however, may still affect transactions that, although avoidable by *some* unsecured creditors under state law, are not avoidable by *all* unsecured creditors on the date of bankruptcy. *See, e.g.,* Unif. Fraudulent Conveyance Act §§ 4–6 (1919) (actions fraudulent as to *existing* creditors, unlike § 7 fraudulent conveyances, which are fraudulent "as to both present and future creditors"); U.C.C. § 6-109 (1972) (noncomplying bulk transfers are avoidable by those creditors "holding claims based on transactions or events occurring before the bulk transfer"). *Cf. In re* Verco Indus., 704 F.2d 1134 (9th Cir. 1983) (trustee takes over right of creditors to set aside a defective bulk transfer under § 544(b); and, using § 541(a), trustee may also recover from buyer on promissory note, but buyer may also have set-off claim against debtor for losses suffered when the transfer was set aside). *See generally* McLaughlin, *Application of the Uniform Fraudulent Conveyance Act,* 46 Harv. L. Rev. 404, 430 (1933).

that the general thrust of section 544(b) is unprincipled to the extent that it forces a particular creditor to share the valuable right to avoid a property interest with the entire class of unsecured creditors.[71] Thus, section 544(b) creates incentives for individual creditors to resort to bankruptcy not for collective reasons but to achieve individual advantage. The costs imposed by such incentives do not even proceed from a careful consideration of the inequities of the nonbankruptcy rule; to the contrary, the commentary gives no indication that any given nonbankruptcy property law is particularly unwise.

## IV.  THE CREDITORS BENEFITTED:  A RETURN TO SECTION 544(a)

This discussion of *Moore v. Bay* applies not only to Bankruptcy Code section 544(b) but also to section 544(a), the strong-arm provision. Historically, at least, the extent of the trustee's strong-arm power has been shrouded in mystery and has prompted several notable rounds of litigation. Interpretive problems, raised by cases such as *Constance v. Harvey,*[72] *Lewis v. Manufacturers National Bank,*[73] and *Pacific Finance Corp. v. Edwards,*[74] recurred and were analyzed inconsistently. This uncertainty, however, flowed primarily from the failure of judges and legislators to appreciate the integral relationship between bankruptcy avoiding powers and nonbankruptcy law. The creditors' bargain model, which provides a framework for analyzing that relationship, suggests that using nonbankruptcy entitlements, valued at the date of bankruptcy, should constitute the normative baseline for valuing bankruptcy entitlements and that a collective proceeding must upset only those rules that work to the detriment of the creditors as a group.

Bankruptcy avoiding powers ought to facilitate the substitution of a collective proceeding for individual remedies when it is collectively optimal to do so. Such powers lose their anchor in bankruptcy policy when they do anything else. The history of the trustee's strong-arm power clearly unfolds against the backdrop of this tension.

For example, consider the fate accorded *Pacific Finance Corp. v. Ed-*

---

71. If the costs of distinguishing between the two classes of unsecured creditors is high, the analysis is more complex. *See* note 86 *infra.*

72. 215 F.2d 571 (2d Cir. 1954), *cert. denied,* 348 U.S. 913 (1955).

73. 364 U.S. 603 (1961).

74. 304 F.2d 224 (9th Cir. 1962).

wards.[75] This case followed on the heels of *Lewis v. Manufacturers National Bank*,[76] in which Justice Douglas construed the statutory phrase, "the rights . . . of a creditor then holding a lien," to refer to "the date of bankruptcy," not to "an anterior point of time."[77] Justice Douglas, going beyond the language itself, reasoned that this construction best fit the "scheme" of the bankruptcy statute to the case before the Court (involving a delayed recording, but no "gap" creditors—the only ones who could attack the interest under state law):

> The construction of § 70c which petitioner urges would give the trustee power to set aside transactions which no creditor could void and which injured no creditor. That construction would enrich unsecured creditors at the expense of secured creditors, creating a windfall merely by reason of the happenstance of bankruptcy.[78]

In *Pacific Finance*, a Washington statute provided that a conditional sales contract that remained unrecorded for more than ten days was "void" against subsequent creditors, even against creditors whose claims did not come into existence during the "gap."[79] No evidence indicated, however, that any of the creditors' claims in *Pacific Finance* arose "subsequent" to the conditional sales contract and, hence, that any individual creditor had the power to avoid the conditional sales contract under Washington law.[80] The Ninth Circuit held that because no existing creditor could have avoided the interest the trustee could not either. The court reasoned that since "[t]here was no creditor of the bankrupt who was injured" there was no reason "to penalize the security holder by giving to the trustee the status of a hypothetical creditor holding a lien at the date of bankruptcy in instances where there existed no actual creditor who could have ob-

---

75. *Id.*

76. 364 U.S. 603 (1961).

77. *Id.* at 607. Justice Douglas was construing § 70c of the Bankruptcy Act of 1898, 11 U.S.C. § 110c (1975) (repealed prospectively Oct. 1, 1979), the predecessor to Bankruptcy Code § 544(a).

78. 364 U.S. at 608–09.

79. As then in force, WASH. REV. CODE § 63.12.010 (1961) provided,

conditional sales of personal property . . . where the property is placed in the possession of the vendee, shall be absolute as to all bona fide purchasers, pledgees, mortgagees, encumbrancers and subsequent creditors, whether or not such creditors have or claim a lien upon such property, unless within twenty days after the taking of possession by the vendee a memorandum of such sale . . . shall be filed in the auditor's office of the county, wherein, at the date of the vendee's taking possession of the property, the vendee resides.

The statute, then, protected essentially the *opposite* group—subsequent creditors—from that protected by *Lewis* or, for that matter, by *Moore v. Bay*.

80. 304 F.2d at 228–29.

tained a lien on the property of the bankrupt . . . at such date."[81]

Although it applied the principle of *Lewis,* commentators have criticized *Pacific Finance* for ignoring the actual holding of *Lewis* that the rights of the trustee as hypothetical lien creditor were to be measured as of "the date of bankruptcy."[82] At a policy level, however, *Pacific Finance* recognized and apparently responded to the nonbankruptcy nature of the creditors' rights and the potential for inefficient manipulation that arises if bankruptcy benefits one set of creditors at the expense of another. So viewed, the result in *Pacific Finance* follows from the court's underlying policy concern, as well as from the concern of Justice Douglas in *Lewis.*

But this underlying policy—to conserve the nonbankruptcy ordering in bankruptcy in order to eliminate strategic manipulation of the bankruptcy process—does not prevail, even under the *Pacific Finance* rule, when applied to a normal set of facts. Had but one "subsequent" creditor existed, *Pacific Finance* would have allowed the trustee, using his "strong-arm" power, to avoid the sales contract entirely.[83] Such a construction allows the incidental presence of one creditor to determine whether an interest withstands the strong-arm avoiding power. This presents in the context of the strong-arm power the same problem *Moore v. Bay* raised in the context of the subrogation power. Indeed, Washington law at the time of *Public Finance* held the interest void against subsequent creditors "whether or not such creditors have or claim a lien upon the property." Thus, had one such creditor existed, the trustee also could have used his *Moore v. Bay* power to achieve the same result.[84]

Today, however, much less uncertainty surrounds the trustee's strong-arm power and normatively undesirable results are much less likely. But this is due, at least in substantial part, to a change in nonbankruptcy law. Article 9 of the Uniform Commercial Code now provides that only a creditor who obtains a lien before an unperfected security interest is perfected may prevail over that inter-

---

81. *Id.* at 228–29.

82. *See* King, Pacific Finance Corporation v. Edwards: *Another Misreading of Section 70c of the Bankruptcy Act,* 63 COLUM. L. REV. 232 (1963); *see also* Countryman, *supra* note 28, at 782–87.

83. *See* 304 F.2d at 228 ("Under our construction of § 70, sub. c the Trustee is empowered to exercise the powers given him even if no actual creditor has obtained a lien, but he cannot do so if no actual creditor could have obtained a lien.").

84. Under the trustee's "successor" rights and *Moore v. Bay,* if the trustee could have found one unsecured creditor able to "avoid" a transfer, the transfer at issue in *Pacific Finance* would have been avoidable in toto vis-a-vis the trustee. *See* Treister, *The Rise and Fall of Constance v. Harvey,* 36 CALIF. ST. B.J. 194, 202–03 (1961).

est.[85] This provision has eliminated many of the questions that could—and historically did—arise over which creditors should benefit by the trustee's hypothetical lien creditor power.

The advent of Article 9 harmonized nonbankruptcy creditor policy with bankruptcy's collectivist approach. It did so by providing that, at the moment of bankruptcy, *all* unsecured creditors could potentially defeat an unperfected security interest and, conversely, that any security interest perfected before bankruptcy would defeat any unsecured creditor, whether earlier, gap, or subsequent. Happily, the concurrent operation of Article 9 and Bankruptcy Code section 544(a), providing that the date of bankruptcy fixes the respective rights of these various creditors, has resolved the interpretive problems raised by *Lewis* and *Pacific Finance* in a way that is consonant with the creditors' bargain model of bankruptcy.

One unexplored problem, however, remains.[86] Assuming that

---

85. *See* U.C.C. § 9-301(1)(b) (1972).

86. A further problem, not discussed in the text, also remains. In § 544(a), the drafters rewrote the "strong-arm" power to give the trustee the enumerated powers "without regard to any knowledge of the trustee or of any creditor." They did so in large part to ensure that the trustee could avoid unperfected Article 9 security interests, notwithstanding the provision in the 1962 version of Article 9 that unperfected security interests were subordinate only to "a person who becomes a lien creditor without knowledge of the security interest and before it is perfected." U.C.C. § 9-301(1)(b) (1962); *see also In re* Douglas Lumber Co., 2 F.2d 985, 986 (D. Wyo. 1924) (notice to all creditors constitutes notice to the trustee, who cannot avoid lien). This change followed a recommendation of Professor Countryman. *See* Countryman, *supra* note 33, at 652-56; Proposed Bankruptcy Act of 1973 § 4-604(a) & note, *reprinted in* BANKRUPTCY REPORT, *supra* note 1, pt. II, at 160-61; *see also* Fifth Third Trust Co. v. Kennedy, 185 F.2d 833 (2d Cir. 1950); Hoffman v. Cream-O-Products, 180 F.2d 649, 650 (2d Cir.), *cert. denied*, 340 U.S. 815 (1950).

While a knowledge requirement in sorting out priorities is perhaps unwise, *see* Baird & Jackson, *Information, Uncertainty, and the Transfer of Property*, 13 J. LEGAL STUD. 299 (1984) (criticizing use of knowledge as a factor in determining priorities), this again simply restates the inquiry of nonbankruptcy law, which is where the focus should be. There is nothing related to the *bankruptcy* process that suggests a different rule needs to be adopted to fulfill the purposes of bankruptcy. Even an assertion that knowledge will be difficult to prove across the board (because it is fact-specific and likely to vary from creditor to creditor) does not *necessarily* justify ignoring the nonbankruptcy knowledge requirement in bankruptcy, for exactly the same is true outside of bankruptcy. To the extent that assertion is correct, it is a reason for discarding the rule entirely; it is not a justification for discarding it in bankruptcy only. *See* note 19 *supra*.

The change in bankruptcy might be justified if knowledge were being applied to a percentage of the nonbankruptcy recovery. For example, even if the knowledge rule makes sense outside bankruptcy (where the general recovery averages, say, $1000), if proving knowledge entails a fixed cost (say $100 per claimant), it might not be worth that fixed cost where the general recovery, on an individual creditor basis, is substantially less. To the extent that bankruptcy collectivizes the recovery process, it is possible that using knowledge may be too costly inside bankruptcy even if its use is cost-justified outside bankruptcy. This inquiry is substantially different, however, and it depends on showing that collectivizing the recovery

section 544(a) preserves the advantages of a collective proceeding for existing creditors by equalizing the value of nonbankruptcy entitlements in bankruptcy, what does one do with unidentifiable claimants that, at the date of bankruptcy, possess only latent claims? Nonbankruptcy law may treat these claims as too contingent or too conditional to deserve judicial remedies as of the date of bankruptcy.

For example, consider tort victims who, at the time of the tortfeasor's bankruptcy, do not yet know that they have been injured due to a prebankruptcy act.[87] These victims share one attribute in common: It is unlikely that they were able, on the date of bankruptcy, to "trump" unperfected secured creditors by obtaining a judgment lien.[88] Should these tort victims be entitled to the benefit

---

procedure does not lead to a pro tanto reduction in the pro rata cost of proving knowledge. (Because he is simply a collection agent, the *trustee's* knowledge is irrelevant to this collective-creditor-based inquiry and is properly ignored. *See* Commercial Credit Co. v. Davidson, 112 F.2d 54, 56 (5th Cir. 1940); *In re* Lindsey, 131 F. Supp. 11, 13 (D.N.J. 1955).)

   Insofar as personal property security interests are concerned, the addition of the "without regard to knowledge" standard to § 544(a) makes little difference because, in 1972, the drafters of the Uniform Commercial Code changed the nonbankruptcy rule by dropping the knowledge language from U.C.C. § 9-301(1)(b) (1972). *See id.* Reasons for 1972 Change ("Knowledge of the security interest will no longer subordinate the lien creditor to the unfiled security interest."). *But see id.* § 9-401(2) (knowledge relevant for misfilings); *In re* Johnson, 28 Bankr. 292 (Bankr. N.D. Ill. 1983) (knowledge relevant if trustee seeks recovery in order to turn property over to another secured creditor). This override of the nonbankruptcy rule respecting the role of knowledge does matter in the case of many real estate systems—those that are not pure "race" systems. *Cf.* McCannon v. Marston, 679 F.2d 13 (3d Cir. 1982) (trustee subject to constructive knowledge based on purchaser's possession of real estate).

   87. An example of this is the filing of claims by asbestos victims in the bankruptcies of companies such as Manville or UNR Industries.

   88. In most states, one must hold a "matured" claim in order to obtain a judgment lien. Indeed, for execution liens, a judgment is usually necessary. *See, e.g.,* Jackson v. Sears, Roebuck & Co., 83 Ariz. 20, 315 P.2d 871 (1957). *See generally* Riesenfeld, *Collection of Money Judgements in American Law—A Historical Inventory and a Prospectus,* 42 IOWA L. REV. 155 (1957). Moreover, prejudgment remedies, such as attachment, are often limited to certain types of claims, such as those that arise *ex contractu. See, e.g.,* CAL. CIV. PROC. CODE app. § 483.010 (West 1982 & Supp. 1984) (attachment limited to claims for money that are of a "fixed or readily ascertainable amount," are "based upon a contract, express or implied," are unsecured, and arise, in the case of an individual, "out of the conduct . . . of a trade, business, or profession"). *See generally* Note, *Attachment in California: A New Look at an Old Writ,* 22 STAN. L. REV. 1254 (1970). Moreover, attachment may still require noncontingent claims, *see, e.g.,* Trunkey v. Johnson, 154 Kan. 725, 730, 121 P.2d 247, 250 (1942), or matured claims, *see, e.g.,* Levie v. Levie, 361 Pa. 214, 221–22, 64 A.2d 792, 796 (1949). Claimants holding contingent, unmatured, or unliquidated claims as of the date of bankruptcy, however, may be able to take an Article 9 security interest as of that date. *See* U.C.C. §§ 9-203(1)(b), 1-201(44) (1972).

   Claimants who do not even know yet that they have a claim arising out of some activity connected with the debtor's past are, accordingly, not the only claimants to whom the discussion in the text is applicable. Because of the broad definition of "creditor" in Bankruptcy Code § 101(9) and of "claim" in Bankruptcy Code § 101(4), many people who hold claims that indisputably *will* be subject to the bankruptcy process, including discharge, may be un-

of the interests the trustee avoids under section 544(a)?

From the preceding discussion, the answer to this might appear to be no. But that answer probably would be wrong. The reasons for this relate to a much broader conception of the proper scope of bankruptcy. For any decision regarding the use of a debtor's assets to be economically optimal, all latent claimants must be included in the bankruptcy process and their claims discharged.[89] The role of latent claimants in bankruptcy raises for the purposes of this article not the question of its inherent difficulties but, rather, its ramifications for section 544(a).

In fact, on the date of bankruptcy, these latent tort claimants are unable to trump either defective *property* claims[90] or the claims of *any other* existing creditor. However, these latent claimants should enjoy the same rights as "existing" unsecured creditors in all respects—including the protections of section 544(a)—not because, at the moment before bankruptcy they hold rights identical to those held by the class of "existing" creditors under nonbankruptcy law, but because the failure to treat them similarly will distort, in an economically undesirable way, the decision of what to do with the debtor's

---

able to obtain an execution or attachment lien on the date of bankruptcy because their claims are unmatured or contingent. These people will be unable to use the judicial process to obtain a property interest on the date of bankruptcy. *See generally In re Covey*, 650 F.2d 877 (7th Cir. 1981).

89. This issue is detailed and complex, and this article is not the place to explore it in detail. For fuller treatment, see Roe, *Bankruptcy and Tort*, 84 COLUM. L. REV. 846 (1984); Note *Mass Tort Claims and the Corporate Tortfeasor: Bankruptcy Reorganization and Legislative Compensation Versus the Common-Law Tort System*, 61 TEX. L. REV. 1297 (1983); Note, *Allowability and Treatment of Contingent Tort Liabilities Under the Bankruptcy Reform Act of 1978*, — U. CHI. L. REV. — (1984) (forthcoming); *see also* Baird & Jackson, *supra* note 12 (discussing process for choosing between liquidation and reorganization); Note, *The Manville Bankruptcy: Treating Mass Tort Claims in Chapter 11 Proceedings*, 96 HARV. L. REV. 1121, 1128 (1983) (if insolvent, Manville's filing is necessary for "the protection of future claimants and the protection of jobs."). Most of the cases to have confronted the issue, however, have held that the Bankruptcy Code does not include or bind such claimants. *See In re* UNR Indus., 29 Bankr. 741 (Bankr. N.D. Ill. 1983), *appeal dismissed*, 725 F.2d 1111 (7th Cir. 1984) (with dicta questioning the district court decision); *see also In re* Amatex Corp., 30 Bankr. 309 (Bankr. E.D. Pa.), *aff'd*, 37 Bankr. 613 (E.D. Pa. 1983); *In re* Gladding Corp., 20 Bankr. 566 (Bankr. D. Mass. 1982); *but see In re* Johns-Manville Corp., 36 Bankr. 743 (Bankr. S.D.N.Y. 1984).

The problem stems, at least in part, from the nonbankruptcy rule of successor liability in tort law. Because of that rule, it may not be possible, outside bankruptcy, to keep the business together and yet terminate liability on such claims. The successor liability doctrine may reduce the benefits of keeping the assets together. Therefore, this nonbankruptcy rule may be inappropriate, and changing the rule may be desirable. *See* notes 17, 19 *supra*. Because of its relation to the decision regarding the collectively-optimal use of assets, however, bankruptcy may be appropriate as a vehicle to include and discharge such future claims.

90. To defeat a property claim, unascertained tort claimants would need to obtain a lien, a step they are, by hypothesis, unable to take.

assets. Once a corporation is discovered to be insolvent (in the sense that the present value of all its claims, including unasserted latent claims, is less than the present value of the corporation's assets), the "existing" creditors will want to grab the assets for themselves; they may only be able to accomplish this by disposing of the corporation's assets in a nonoptimal way. For instance, even though the corporation might be worth more as a going concern, the existing creditors can only sell this going concern, under tort doctrines of successor liability, net of the expected future liability represented by the latent claims. But by disposing of the corporation piecemeal, existing creditors can altogether thwart the latent claimants by leaving no tortfeasor to sue. The piecemeal division of assets may yield more to the existing creditors than the sale of the going concern net of future claims (thus giving existing creditors an incentive to pursue this path), but yield less than the full value of the going concern to existing and latent claimants combined. Thus, assuming we include latent creditors in the creditors' bargain, in order to make diverse owners act in a way that does not undermine incentives to reach a collectively optimal decision, we must find some mechanism to include and bind these latent tort claimants.

For this reason, bankruptcy law should treat latent claimants on a par with existing unsecured claimants. Equality of treatment demands that these claimants receive the benefits of the trustee's hypothetical lien creditor avoiding power. Latent claimants do in fact differ from existing claimants who have already lost the race. Were it not for bankruptcy, these unmatured or contingent claims might have matured in time to win the nonbankruptcy race.[91] That possibility justifies treating these claimants the same as other participants in the uncompleted race.

## V. PREFERENCES: THE TRANSITIONAL AVOIDING POWER

Preference law, which has long captured the fancy of the bankruptcy world, is reasonably well understood at its core.[92] Its exact

---

91. These claimants may not have to wait until the maturation of their claims if the debtor is willing to give them a consensual property interest. *See* note 88 *supra.*

92. *See, e.g.,* Seligson, *The Code and the Bankruptcy Act,* 42 N.Y.U. L. REV. 292 (1967) ("A cornerstone of the bankruptcy structure is the principle that equal treatment for those similarly situated must be achieved. It would be highly inequitable to disregard what transpires prior to the filing of the bankruptcy petition; to do so would encourage a race among creditors, engender favoritism by the debtor, and result in inequality of distribution. At bankruptcy, the bankrupt would be left . . . with only tag ends and remnants of unencumbered assets."); *see also* Eisenberg, *supra* note 19, at 963; Morris, *supra* note 33, at 738.

scope is less well understood, however, because preference law's integral relation to bankruptcy's core functions has not been completely explored.[93]

In their simplest form, preferences are transfers that favor one existing creditor over another. Debtor prefers Creditor $A$ to Creditor $B$ if Debtor pays Creditor $A$ before he pays Creditor $B$. Such behavior is not conventionally thought to be a fraudulent conveyance—assuming Debtor is not motivated by an actual desire to delay, hinder, or defraud Creditor $B$—because Debtor's antecedent debt to Creditor $A$ is considered fair consideration for the transfer (presumably of cash) that Debtor makes to him.[94] In other words, Debtor plans to pay Creditor $B$ eventually, but prefers to pay Creditor $A$ first.

This can be stated in a more illuminating way. Preference law, unlike fraudulent conveyance law,[95] is not a part of the arsenal of rights and remedies between a *debtor* and his *creditors*. Rather, preferences differ from fraudulent conveyances precisely because preference law focuses on relationships *among creditors* in light of the advantages of a collective proceeding, not on relationships *between creditors and their debtor*. So stated, it is easy to see that preferences generally are permitted outside bankruptcy because the relationships of creditors among themselves are inherently collective in nature; preferences are a source of concern only when the creditors perceive there may not be enough to go around. Not surprisingly, no conflict exists among creditors absent that worry.

The justification sometimes given for permitting preferences outside bankruptcy is that one cannot undo one creditor's preference at the behest of another creditor without creating a new preference.[96] Given the possibility of a collective system, however, such an explanation is at best only partially correct. Upon undoing a preference,

---

93. The discussion of and justification for preference law developed in this article reflect a change in my views since writing Jackson & Kronman, *Voidable Preferences and Protection of the Expectation Interest,* 60 MINN. L. REV. 971, 982–90 (1976).

94. *See* UNIF. FRAUDULENT CONVEYANCE ACT § 3(a) (1919).

95. At bottom, fraudulent conveyance law reaches actions taken by a debtor to hinder, delay, or defraud his creditors irrespective of the advent of a collective proceeding. Fraudulent conveyance law is discussed at notes 166–194 *infra.* The line between fraudulent conveyances and preferences is not always easy to draw in practice, but as this article will develop, the theoretical line is clear. *See, e.g.,* note 171 *infra.*

96. *See, e.g.,* Smith v. Whitman, 39 N.J. 397, 402, 189 A.2d 15, 18 (1963) ("True, a creditor who collects from an insolvent debtor fares better than other claimants. Yet if the transfer were set aside in favor of another creditor, there would be but a substitution of one preference for another.").

one could divide the assets retrieved among the creditors as a group. This practice, however, would inevitably require a collective proceeding for collection and disbursement of assets. Any system that prevented preferences, therefore, would necessarily be a collective system in which creditors could not recover from their debtor without accounting for the interests of other creditors. For this reason, preferences do not seem inherently objectionable outside bankruptcy (or other collective proceeding).[97] Preference law is part and parcel of the substitution of collective remedies for individual remedies.

The essence of a collective proceeding such as bankruptcy is ratable distribution among those similarly situated. Creditors share in the property of a debtor according to the priorities they agreed to when they initially entered into their transactions with the debtor. Creditors view this as desirable ex ante because collectivizing the disbursement of assets after insolvency brings gains to the creditors as a group.[98]

Yet while the creditors would agree to this system before they lent money, they face the usual problems of policing a deal after it is struck.[99] Each creditor has incentives to advance his individual interests, even though doing so might work against the greater collective benefit. Once his debtor becomes insolvent, and without collective enforcement of the creditors' bargain, each creditor must race for assets, not necessarily just to grab more than his share but also simply to avoid being left with nothing.[100] Accordingly, creditors need a mechanism to bind them to their presumptive ex ante

---

97. *See, e.g.,* Shelley v. Boothe, 73 Mo. 74 (1880).

98. Jackson, *supra* note 1, at 860–71.

99. "Monitoring" to prevent misbehavior after a deal is struck is a well-known phenomenon and deals, *inter alia,* with the propensities of a contracting party, after a deal has been struck, to stack things in his favor, despite his existing agreement to the contrary. *See, e.g.,* R. POSNER, ECONOMIC ANALYSIS OF LAW 293–94 (2d ed. 1977); Jackson & Kronman, *Secured Financing and Priorities Among Creditors,* 88 YALE L.J. 1143 (1979); Jensen & Meckling, *Theory of the Firm: Managerial Behavior, Agency Costs and Ownership Structure,* 3 J. FIN. ECON. 305 (1976); Levmore, *Monitors and Freeriders in Commercial and Corporate Settings,* 92 YALE L.J. 49 (1982); Scott, *Corporation Law and the American Law Institute Corporate Governance Project,* 35 STAN. L. REV. 927 (1983).

100. Jackson, *supra* note 1, at 861–68. Recent work in game theory suggests that the prisoners' dilemma model of noncooperative behavior may not present an optimal strategy when a game is repetitive so that the terminal horizon is infinite. *See* R. AXELROD, THE EVOLUTION OF COOPERATION (1984); Hirshleifer, *Evolutionary Models in Economics and Law: Cooperation Versus Conflict Strategies,* 4 RESEARCH L. & ECON. 1 (1982). Noncooperative behavior is still optimal in "final period" games (as well as in games with finite horizons), *id.,* and bankruptcy may share many of the attributes of a final period game. For a proposal to change the state law rule of race-of-the-diligent, see Sturges, *A Proposed State Collection Act,* 43 YALE L.J. 1055 (1934); *see also* GA. CODE ANN. § 9-12-90 (1982) (For judgments gained in

agreement and to foil the attempts of each creditor to welsh on the agreement for individual gain.

Providing such an enforcement mechanism would not be a problem if a debtor's insolvency became manifest at a single, unanticipated point in time, followed immediately by a collective proceeding. In practice, of course, the point of insolvency almost never can be identified with precision. Moreover, creditors usually can see a debtor's insolvency—or, more accurately, a collective proceeding—coming, some before others. Some of the creditors who know that the collective proceeding is imminent predictably will attempt to satisfy their own claims and thereby to opt out of the collective proceeding altogether. Also, debtors, knowing that bankruptcy is imminent, may pay first the creditors whom they like or whom they think they will need in the future.[101] By the time a bankruptcy petition is actually filed, and without reach-back provisions, those creditors that remained would have to share equally in "tag ends and remnants" of assets.[102]

Such eve-of-bankruptcy asset-grabbing may be detrimental to the collective interest of the creditors. By reaching back to undo the actions of individual creditors, preference law deters such potential grabbing, thereby protecting the creditors' bargain. Therefore, preference law essentially prevents individual creditors from opting out of the collective proceeding during the transitional period before bankruptcy.[103] It enforces the hypothetical creditors' bargain that justifies a collective proceeding in the first place.

When considering preference law, one should keep in mind that its purpose is to prevent a creditor from changing, alone or with the debtor's help, his existing position vis-a-vis other creditors in anticipation of a bankruptcy proceeding.[104] The purpose of preference law is not to prevent a creditor from obtaining a preferred position at the time he makes the original loan by, for example, taking a security interest. In that event, the advantages gained by a particular creditor are recognized from the start and, presumptively, are paid for (in

---

actions filed within 12 months of the happening of a common disaster or occurrence, resulting liens "shall be equal in rank or priority.").

101. For discussion of why this fits in a preference rationale, see note 119 *infra.*

102. 3 COLLIER ON BANKRUPTCY ¶ 60.01 (14th ed. 1977).

103. *See* Note, *supra* note 2; *see also* McCoid, *supra* note 2. To the extent preference law is successful, it also will deter expenditures made by creditors solely for the purpose of discovering, and racing against, an incipient insolvency and related collective proceeding.

104. *See* note 119 *infra.*

the form of a lower interest rate).[105] Postagreement creditor misbe-
havior in anticipation of bankruptcy plays no part in such a case.
Therefore, these "contemporaneous preferences" do not offend the
reasons for a collective proceeding. Rather, they reflect a particular
set of nonbankruptcy entitlements, and questions of their desirability
are general and not bankruptcy-specific. Nor should preference law
strike down *all* postagreement activity that positions one creditor
ahead of another, for such behavior may properly implement indi-
vidual creditor remedies. Preference law is concerned instead with
creditors' postloan attempts to collect from a languishing debtor, and
thereby to escape from the class of unsecured creditors into a class of
paid (or secured) creditors, made with an eye to opt out of the incipi-
ent collective proceeding.[106]

Creditors' attempts to opt out of the collective proceeding take
two ostensibly different forms, both of which modern preference law
addresses. The first is the last-minute grab that preference law
reaches by what can be denominated the "anti-last-minute-grab"
policy. Imagine that Debtor has assets worth $100 and owes two
creditors, Bank and Finance Company, $100 each. Debtor is con-
templating filing for bankruptcy. In bankruptcy, under the collec-
tive rule, each creditor would receive $50. If, in light of the
impending bankruptcy, Debtor "prefers" Bank by paying Bank's
debt in full or by granting Bank a security interest in all of his prop-

---

105. Jackson & Kronman, *supra* note 99, at 1147–48.

106. BANKRUPTCY REPORT, *supra* note 1, pt. I, at 202, identified three goals of a prefer-
ence section: "First, it lessens the possibility of a scramble among creditors for advantage;
second, it promotes equality; and third, it eliminates the incentive to make unwise loans in
order to obtain a preferential payment or security." Of these reasons, the first restates the
advantages to a collective proceeding and is similar to the core notion of the evil of prefer-
ences in relation to the bankruptcy process. The second reason is related to a bankruptcy
process only insofar as it restates the first by describing an advantage of a collective proceed-
ing over the use of individual remedies. The third reason is difficult to discern; to the extent it
refers to making a new loan as a condition of securing an old loan, it seems to state no in-
dependent principle. Moreover, present preference law would protect such activity pro tanto
if the new loan was unsecured. *See* Bankruptcy Code § 547(c)(4).

Since preference law is a *creditor* misbehavior rule directed at actions creditors take
among themselves, activities that necessarily represent *debtor* misbehavior against creditors
and do not, even inferentially, represent intercreditor misbehavior are not preferential, al-
though they may be subject to fraudulent conveyance attack. A gift by an insolvent debtor
to a relative, for example, is not preferential, *see* Bankruptcy Code § 547(b)(1), even though the
harm imposed on creditors will be greater than the harm caused by a comparable payment to
a creditor on account of an antecedent debt. Likewise, dividends to stockholders of an insol-
vent company may be fraudulent conveyances (and may violate state corporation laws), but
they are not voidable as preferences. *See, e.g.*, MODEL BUSINESS CORP. ACT §§ 2(n), 6, 45,
46(a), 66 (1969); Clark, *The Duties of the Corporate Debtor to Its Creditors*, 90 HARV. L. REV. 505,
554–60 (1977).

erty or if Bank acts to prefer itself by acquiring a judicial lien, the
"anti-last-minute-grab" policy may well allow the trustee to set aside
any of these transactions as preferences.[107] If the trustee does recover
the $100, both Finance Company and Bank will receive $50 in the
bankruptcy proceeding.[108]

The second form of opt-out behavior is to provide prescribed
public notice of property interests that a claimant had previously
taken "in secret." This is reached by a second policy contained in
modern preference law that may be labelled, somewhat misleadingly,
as we shall see, the "anti-secret-lien" policy. Suppose that Finance
Company entered into an agreement with Debtor a year or two prior
to bankruptcy to secure Finance Company's loan with a security in-

---

107. *See* Bankruptcy Code § 547(b).

108. The "anti-last-minute grab" policy of the preference section also informs the ques-
tion of valuation and its timing. Section 547(b)(5) requires that the preferential transfer must
enable the creditor to do better than he would have done had the transfer not been made and
the creditor received a distribution under Chapter 7. The thrust of the section is clear, but its
literal timing seems misdirected. For example, consider a case where Debtor owes Creditor
$10,000. On January 1, Debtor pays Creditor $6000 in full satisfaction of his claim. If
Debtor were to file for bankruptcy on that date, his unsecured creditors would expect to
receive payments of 60%. As it turns out, Debtor does not file for bankruptcy until March 1,
at which time his unsecured creditors can expect to receive payments of 50% of their claims.
After the bankruptcy proceeding is finished, and the actual distribution is made, on Novem-
ber 1, Debtor's unsecured creditors actually receive 40% of their claims. Which date is proper
to base the comparison on? Section 547(b)(5) suggests it is November 1, the date of the actual
distribution, but the policies underlying the preference section suggest the relevant compari-
son should be made using expected values as of the date of transfer, or January 1. This
suggests that the resolution in Palmer Clay Prods. v. Brown, 297 U.S. 227, 229 (1936), is, as a
normative matter, wrong. In that case, the Supreme Court stated that whether there was a
preference was determined "not by what the situation would have been if the debtor's assets
had been liquidated and distributed among his creditors at the time the alleged preferential
payment was made, but by the actual effect of the payment as determined when bankruptcy
results." More recently, cases have recognized that it is appropriate to determine the value of
the asset that is transferred as of the time of the transfer, *see, e.g., In re* Abramson, 715 F.2d
934, 939 n.9 (5th Cir. 1983), notwithstanding that the asset actually increases or decreases in
value later. Expected values include both upside and downside potential. Therefore, if the
expected value of the transfer and the expected value of the claim are equal on the date of the
transfer, opt-out behavior presumably has not taken place.

In theory, the proper values are those subjective values of a creditor. But as discussed in
text, the difficulties of proof may justify using marketplace expected values, as a rule in place
of a standard. (A particular manifestation of this may be that the liquidating of an uncertain
value may be of benefit to a risk-averse creditor, thereby motivating opt-out behavior, but the
difficulties of ascertaining the force and extent of this factor, coupled with its disappearance
in the case of diversification, again, counsels against considering it.) Of course, because valua-
tions—even market valuations—at the date of the transfer may be difficult to ascertain after-
the-fact, presuming that the values determined in bankruptcy are the proper ones may be
appropriate. But in that case, it is important to remember that such values are being used as
an easily-ascertained surrogate for something else and not because they are correct in their
own right.

terest in all of Debtor's personal property. Finance Company neither took possession of Debtor's property nor filed a financing statement, however, until ten days prior to Debtor's bankruptcy petition. If Finance Company filed its financing statement before Bank obtained an execution lien, Finance Company would be entitled under Article 9 to be paid ahead of Bank, even though Finance Company was exceedingly slow in perfecting its security interest.[109] Section 547(e) of the Bankruptcy Code changes that outcome, however, by manipulating the time of the transfer of the security interest: By delaying its filing, Finance Company is said to have received a transfer at the moment of the filing which, because it is on account of an antecedent debt, is subject to avoidance by the trustee in bankruptcy.[110]

Are both the "anti-last-minute-grab" and the "anti-secret-lien" policies appropriately related to the goals of a preference section? According to common wisdom, the first is. Most commentators recognize that by striking down "last-minute grabs" by individual creditors the preference section preserves the advantages of a collective proceeding.[111] Even here, however, one must be careful to distinguish (as few have done) "grabs" that involve payments of cash or the taking of other tangible property on the one hand and "grabs" that involve taking security interests or liens on the other. Only the

---

109. *See* U.C.C. § 9-301(1)(b) (1972).

110. Section 547(e)(1)(B) provides, in the case of personal property, that a transfer "is perfected when a creditor on a simple contract cannot acquire a judicial lien that is superior to the interest of the transferee." Section 547(e)(2) provides that a transfer is "made" "at the time such transfer is perfected," unless the transfer is perfected within ten days of when it "takes effect." Under § 547(e)(1)(A), a transfer of real property (other than fixtures) is perfected "when a bona fide purchaser of such property from the debtor against whom applicable law permits such transfer to be perfected cannot acquire an interest that is superior to the interest of the transferee . . . ." For the reasons outlined in the discussion of § 544(a)(3), use of a bona fide purchaser test does not inexorably follow from any bankruptcy policy. *See* notes 30–43 *supra* and accompanying text. The bona fide purchaser test was added by the Chandler Act in 1938 and was limited, in 1950, to transfers of real property. *See* note 33 *supra. See generally* J. MACLACHLAN, *supra* note 51, at 295–301 (discussing Chandler Act amendments and their causes and effects).

111. Note, *supra* note 2. Professor McCoid recognizes this role of preference law, but questions whether it deters enough to serve that goal or is worth its costs. McCoid, *supra* note 2. He is correct that, because it does not penalize, preference law may not act as a total deterrent. Yet any rule that reduces the expected benefit of an action, as preference law surely does, will reduce the incidence of the behavior. Moreover, as Professor McCoid notes, a more deterrent-designed preference section may have costs that exceed its benefits. Because of the rule-oriented nature of preference law, *see* note 118 *infra* and accompanying text, preference law often categorizes behavior by result rather than by intent. A more punitive preference section may be unacceptably harsh on those who are trapped, without preferential intent, in the preference web.

former seems, at first glance, directly detrimental to the collectivizing nature of bankruptcy.

Since at bottom, bankruptcy is designed to maximize a pool of assets for the collective good, bankruptcy seeks, at its core, to prevent individual actions directed towards removing assets from that pool. But the taking of liens or security interests (although they too are property rights) does not physically remove assets from the pool. Rather, the effect of these liens is simply to redistribute the value of the assets in the pool among the various claimants. Nonetheless, if taken on account of pre-existing debts with an eye towards an impending bankruptcy, last minute liens or security interests also undermine the goals of bankruptcy without offering any countervailing benefit that otherwise might justify them. Although such actions do not physically remove assets from the pool, permitting creditors to take security interests or liens on account of existing debts on the eve of bankruptcy encourages a wasteful "race" either to take property from the debtor or to obtain these security interests or liens before other creditors. This race would impose on the creditors additional costs, generated both by the race itself and by the dispersion of outcomes,[112] that reduce the *net* collective value of the assets in the pool, even though at first glance, the pool seems to be the same as before.[113] Therefore, both physical grabs of property and grabs of security interests or liens amount to individual actions designed to avoid a collective proceeding that undermine the advantages of such a proceeding.

Few people have ever had much problem with the basic thrust of the anti-last-minute-grab policy. The anti-secret-lien policy, however, is commonly viewed as unrelated to preference law.[114] The reason for this is that, at first glance, the anti-secret-lien policy has little to do with the anti-last-minute-grab policy. In the case of delayed perfection of a security interest, for example, the property right (i.e., the security interest) itself was granted well before the preference pe-

---

112. These costs are explored in Jackson, *supra* note 1, at 860–66.

113. Nor is it likely that any such costs are justified on any theory of offsetting benefits. Whether or not security interests can be explained on efficiency grounds, *compare* Levmore, *supra* note 99 (offers monitoring justification for secured credit) *and* Jackson & Kronman, *supra* note 99 (same) *with* Schwartz, *supra* note 19 (there is no existing efficiency theory sufficiently powerful to explain the variety of secured credit that exists), it is unlikely that any such explanations will cover post-loan security interests taken on the eve of bankruptcy.

114. *See* R. JORDAN & W. WARREN, COMMERCIAL LAW 229 (1983) ("[T]he evil addressed by [§ 547(e)(2)] is not a problem of preferences but a problem of secret liens."); Morris, *supra* note 33, at 759–61 ("Such a transaction is not factually a preference and the law of preferences is not the appropriate vehicle for handling secret liens in bankruptcy.").

riod; this seems to present a problem of "ostensible ownership," not of a last-minute grab. And as noted earlier,[115] ostensible ownership itself is not a problem particularly related to bankruptcy.

The bifurcation of the two policies is unwarranted, however, at least insofar as the anti-secret-lien policy serves to upset property interests that, although invulnerable to attack on the date of bankruptcy, were vulnerable to attack by unsecured creditors—perhaps through the obtaining of a lien—sometime during the preference period.[116] Both the anti-last-minute-grab policy and the anti-secret-lien policy, as limited, function to substitute a collective procedure for individual remedies in allocating assets among creditors. At bottom, both are designed to deter opt-out behavior that interferes with the goals of bankruptcy. The anti-secret-lien policy accordingly displaces the applicable nonbankruptcy rule to protect the collective proceeding. For during the time that the anti-last-minute-grab policy prevents the general creditors from upping themselves to lien creditors, the anti-secret-lien policy restricts unperfected *secured* creditors from improving their positions vis-a-vis general creditors by imposing a similar limitation.[117]

Properly understood and limited, therefore, both polices grow out of the reasons for a bankruptcy process in the first place. Together, they provide a transitional rule that preserves the benefits of a collective proceeding notwithstanding the fact that such proceedings rarely commence contemporaneously with the discovery of information about the pending need for them.

---

115. *See* notes 36–37 *supra* and accompanying text.

116. The discussion in text justifies only the execution creditor test of Bankruptcy Code § 547(e)(1)(B), as the "anti-secret-lien" test is a shorthand phrase for the opt-out problem. That opt-out problem occurs when a creditor takes a step, after extending credit, that improves his relative position among creditors. If the creditors could not attack the delay in providing notoriety—by, say, obtaining a lien or a consensual security interest—then the notoriety problem is not related to the *bankruptcy* process problem of opt-out. For that reason, the discussion in text does not itself justify the existence of the bona fide purchaser test of § 547(e)(1)(A). *Cf.* notes 30–37 *supra* and accompanying text (criticism of Bankruptcy Code § 544(a)(3), which permits the trustee to avoid transfers of property by the debtor that are voidable by bona fide purchasers of real property from the debtor).

117. Absent such a rule, the resulting situation would seem perverse and unfair. If the preference section permitted perfection of existing liens, unperfected secured creditors would be playing with a stacked deck, as secured creditors could still avoid the "tie" implicit in the rule of Bankruptcy Code § 544(a), *see* notes 24–27 *supra* and accompanying text, while the unsecured creditors were unable to move. Even though many, if not most, "secret liens" are created through creditor inadvertence, a creditor with a defective (or nonexistent) filing may nonetheless reassess his paperwork in light of an impending collective proceeding. *See, e.g., In re* J.A. Thompson & Son, 665 F.2d 941 (9th Cir. 1982) (creditor attempted repossession 20 minutes before bankruptcy filing).