To fulfill this underlying role, what should an optimal preference section look like? And how well does the current preference provision, section 547 of the Bankruptcy Code, compare with an optimal section? In principle, a bankruptcy statute's section on voidable preferences should read something like this:

> If a creditor tries to change his position after the extension of credit in order to improve his lot in an anticipated bankruptcy (or other collective) proceeding, or if the debtor, at the behest of such creditor, so tries to change the position of such creditor in order to improve such creditor's lot in an anticipated bankruptcy (or other collective) proceeding, the creditor must return any advantage so obtained.

Such a section may perhaps express the underlying policies behind a preference section most accurately.

But to fit an underlying set of policies perfectly is not the only goal of statutes. Sometimes, a clear, easy-to-administer rule that does not perfectly fit the underlying policies better serves society than a less precise standard that fits the underlying policy perfectly.[118] The costs of a bright-line rule—in striking down transactions that the policies do not intend to strike down and in letting through transactions that the policies suggest should be struck down—may be less than the administrative costs of a better fitting, but fuzzier, standard. Like many other legal provisions, therefore, the Bankruptcy Code leans toward per se rules rather than loose standards in defining preferences. The idea of these rules is to pick up most of the transfers that are objectionable (i.e., creditors taking special action with respect to an insolvent debtor's property in anticipation of a collective proceeding) and to leave untouched most of the transactions that are unobjectionable.[119]

---

118. For a discussion of the roles of rules and standards, see Baird & Weisberg, *Rules, Standards, and the Battle of the Forms: A Reassessment of § 2-207*, 68 VA. L. REV. 1217 (1982); Erlich & Posner, *An Economic Analysis of Legal Rulemaking*, 3 J. LEGAL STUD. 257 (1974); Kennedy, *Form and Substance in Private Law Adjudication*, 89 HARV. L. REV. 1685, 1687–1713 (1976).

119. Section 547 does this sorting not only through the general categorization of § 547(b) but also through the provisions of § 547(c), which save from preferential attack transactions that § 547(b) presumptively declares preferential. *See* BANKRUPTCY REPORT, *supra* note 1, pt. I, at 201–02. Because of this rule-oriented approach, debtor-based actions—such as the voluntary payment by a debtor to a creditor—may be declared preferential in general since such actions often *may* involve creditor-induced misbehavior (e.g., creditor pressure) and since sorting out which actions are wholly debtor-based and which are partially creditor-based may not be cost-effective. *See* note 171 *infra*.

The Bankruptcy Code's principal step toward increasing the rule-oriented function of preference law was to eliminate the "reasonable cause to believe" test from § 547. Because of perceived inadequacies with the scope of the "safe-harbor" of § 547(c)(2), however, *see* Fortgang & King, *The 1978 Bankruptcy Code: Some Wrong Policy Decisions*, 56 N.Y.U. L. REV. 1148,

Even though the preference rules sacrifice theoretical purity for administrative economy, this discussion of bankruptcy policy in general and preference policy in particular provides a useful focus within which to examine preference law's various details. For example, one can use this focus to examine what sorts of transfers should be reached by the preference section. "Transfer," a term of art in preference law, is defined to include the late recording of a security interest.[120] This technical feature of preference law aids implementation of the anti-secret-lien policy, and explains why "transfer" should be defined in this nonintuitive way.

But other features of what a preference section should mean by "transfer" are not explicit in the definition but flow instead from preference law's policies. As an example, this discussion of bankruptcy policy explains why the return of goods within the preference period from a consignee debtor to a true consignor who never gave proper notoriety, as required by section 2-326(3) of the Uniform Commercial Code, should be viewed as a preferential transfer.[121] In the consignment case, the *debtor* technically has not transferred any of his property (since the consigned goods are owned at all times by the consignor). But such a technical response would miss the point of the transfer requirement, which is to shape behavior of creditors among themselves, not behavior between a creditor and a debtor. Because section 2-326(2) of the Uniform Commercial Code makes the rights of the true consignor with an uncured ostensible ownership problem subject to his consignee's "creditors,"[122] the return of consigned

---

1170–71 (1981), Congress has considered reinstating the requirement, *see* S. 445, 98th Cong., 1st Sess. (1983); S. REP. No. 65, 98th Cong., 1st Sess. 13–14 (1983). In 1984, in a change of similar import, § 547(c)(2) was rewritten to drop its 45-day-from-recurrence test. Because of that change, it is now open for any creditor to argue that a transfer was not preferential because it was made in the ordinary course of business.

120. *See* Bankruptcy Code § 547(e).

121. *See In re* A.J. Nichols, Ltd., 21 Bankr. 612 (Bankr. N.D. Ga. 1982). Case law prior to the enactment of the Uniform Commercial Code, which imposed a notoriety requirement on consignors as a condition of priority over creditors of the consignee, had held that the return of consigned goods was not preferential. *See* Kemp-Booth Co. v. Calvin, 84 F.2d 377 (9th Cir. 1936); Dwight v. Horn, 215 Iowa 31, 244 N.W. 702 (1932). The Ninth Circuit Bankruptcy Appellate Panel may recently have confused preference policy with state labels of ownership, in holding that the filing of a *lis pendens* was not preferential because § 547(b) only reaches transfers of interests in the debtor's property, not "act[s] that perfect[] . . . a claim of *ownership.*" *In re* Gurs, 34 Bankr. 755, 757 (Bankr. 9th Cir. 1983) (emphasis in original).

122. Under some courts' reading of U.C.C. § 2-326 (1972), true consignments are made subject to the rule of § 2-326(2) only if they fall within the scope of § 2-326(3). *See, e.g,* American Nat'l Bank of Denver v. First Nat'l Bank of Glenwood Springs, 28 Colo. App. 486, 476 P.2d 304 (1970). Under this reading, some true consignments may escape the clutches of § 2-

goods comes within the rationale of the preference section, notwith-
standing state law labels of ownership.

Conversely, a transfer of the debtor's property that does not di-
minish the property that the remaining creditors have to enjoy
should not be avoided as a preference, at least without introduction
of an independent policy—that of the "fresh start." For example,
contrary to the view expressed by the Commission on the Bank-
ruptcy Laws of the United States, a debtor's transfer to a creditor of
exempt property does not fit under the preference rationale.[123] To be
sure, in such a case, the benefitted creditor has "opted out" of bank-
ruptcy's collective proceeding, but he has not done so at the expense
of other creditors, absent further activity by the debtor (such as re-
purchasing the exempt property with nonexempt property[124]). In-
deed, the other creditors have one less competitor for the nonexempt
assets of the debtor and, presumably, are better off as a result of the
transfer than they would have been had the transfer not been
made.[125] From the other creditors' perspective, this transaction is

---

326(2). *Cf. In re* Mincow Bag Co., 29 A.D.2d 400, 288 N.Y.S.2d 364 (1968), *aff'd mem.,* 24
N.Y.2d 776, 248 N.E.2d 216, 300 N.Y.S.2d 115 (1969).

123. The Commission on the Bankruptcy Laws of the United States thought that the
decisions of courts under the Bankruptcy Act of 1898 deeming the transfer of exempt prop-
erty not to be preferential, *see, e.g.,* Smith v. Idaho State Bank, 366 F. Supp. 1213 (Bankr. D.
Idaho 1973), were not supportable. The Commission wrote:

> There is no valid reason supporting the case law that is being overruled; the mere
> fact that the property used to prefer a creditor may be claimed as exempt does not
> establish a reason why preference attack is not appropriate. The goals of equality
> and avoidance of unwise extension of credit would be furthered by allowing prefer-
> ence attack. The only rationale for the cases is that other creditors are not hurt
> since they are not entitled to expect payment or security from exempt property.

BANKRUPTCY REPORT, *supra* note 1, pt. I, at 204. The "only rationale" supporting the rule
that transfers of exempt property are not preferential, however, is the one rationale offered by
a consideration of the intercreditor role of preference law in bankruptcy. It is odd to see it
dismissed so lightly. *Cf. In re* Hale, 15 Bankr. 565 (Bankr. S.D. Ohio 1981). If the trustee is
able to recover the conveyed property, Bankruptcy Code § 522(g)(1) will not allow the debtor
to reclaim it as exempt. Unless § 522(g)(2) applies, the net effect is that the creditors will
have picked up an asset that they could not have had but for the transfer.

124. The repurchase, moreover, would constitute debtor misbehavior against creditors,
perhaps reachable by a fraudulent conveyance rationale. *Cf. In re* Reed, 700 F.2d 986 (5th
Cir. 1983) (debtor who converted nonexempt property to exempt homestead, with intent to
defraud creditors, granted exemption but denied discharge in bankruptcy). If other property
were to become exempt automatically—for example, if the debtor had two automobiles and
could only exempt one—the transfer of one of the automobiles might harm the other credi-
tors. But in that case, it is possible to say that the debtor did not transfer exempt property in
the first place.

125. This assumes that the debtor would have declared the property exempt. Under
the Bankruptcy Code, exempt property becomes property of the estate in the first instance
and must be affirmatively removed by the debtor. *See* Bankruptcy Code §§ 541, 522. Note

*STANFORD LAW REVIEW* [Vol. 36:725

similar to the voluntary payment of the creditor's claim by a friend of the debtor.[126] Putting aside discrete problems the transaction poses for an individual debtor's welfare reflected by exemption law and the fresh start policy,[127] the transfer of exempt property to a creditor is not within the scope of the preference rationale, which encompasses only intracreditor concerns.

## VI. PREFERENCE LAW AND SECURED CREDITORS

Focusing on the role of preference law as it relates to the goals of bankruptcy illuminates the relationship between preference law and secured creditors. It is a commonplace that preference law exempts fully-secured creditors from its grasp. Accordingly, payments to such creditors are not considered preferential.[128] In light of the underly-

---

that there is one manipulation which will not work. If a creditor induces a debtor to convey away his state-law exempt property and then to select his bankruptcy exemptions, Bankruptcy Code § 522(b), (d), the trustee could recover transferred property (unless it was also exempt under § 522(d)) as a preference.

126. *See generally* National Bank of Newport v. National Herkimer County Bank, 225 U.S. 178 (1912) (no preference unless estate of debtor is diminished); I-T-E Circuit Breaker Co. v. Holtzman, 354 F.2d 102 (9th Cir. 1965) (same). Conceivably, a friend's willingness to pay could be viewed as an asset that otherwise would have been available to the creditors generally, but the nexus seems uncertain enough to justify a flat rule leaving such transfers outside the scope of the preference section.

127. Allowing such transactions might be thought to give creditors incentives to place pressure on individuals to pay them with exempt property, thereby interfering with the "fresh start" policy underlying the exemption. *See* Harris, *A Reply to Theodore Eisenberg's Bankruptcy Law in Perspective,* 30 UCLA L. REV. 327, 340–45 (1982). Congress therefore may decide that some of these transfers should be avoidable by the debtor, and Bankruptcy Code § 522(f)–(h) already permits some such interests to be avoided. But the reason for allowing avoidance is fundamentally different from the justifications for avoidance by the trustee under §§ 544–547: It is related to the individual debtor's exemption rights, not to intercreditor equality. *See, e.g.,* Deel Rent-a-Car, Inc., v. Levine, 721 F.2d 750, 758 (11th Cir. 1983) ("The availability of assets to the creditors cannot be relevant to an action by the debtor to avoid a preference pursuant to sections 522(h) and 547. Section 522(h) is designed to protect the debtor alone."); *In re* Riddervold, 647 F.2d 342, 345 n.5 (2d Cir. 1981) ("In view of the accepted learning that '[a] preference is not an act evil in itself but one prohibited by the Bankruptcy Act in the interest of equality of division,' . . . it is not clear why the 1978 Code extended the power to avoid preferences to bankrupts."); *see also In re* Berry, 10 Bankr. 512, 517 n.3 (Bankr. D.S.C. 1980). Because the rationale for allowing the debtor to avoid interests that impair exemptions is related to the social policy concerning the fresh start for debtors who are individuals, it is beyond the scope of this article.

128. *See, e.g, In re* Conn, 9 Bankr. 431 (Bankr. N.D. Ohio 1981); *In re* Castillo, 7 Bankr. 135, 137 (Bankr. S.D.N.Y. 1980). As a matter of the statutory provision, this is commonly thought to be the result of the requirement of § 547(b)(5) that a transfer is preferential only if, *inter alia,* it enables the "creditor to receive more than such creditor would receive if (A) the case were a case under chapter 7 of this title; (B) the transfer had not been made; and (C) such creditor received payment of such debt to the extent provided by the provisions of this title."

Case 1:07-cv-06597-AKH    Document 27-23    Filed 01/11/2008    Page 5 of 23

ing role of preference law in preventing "opt-out" behavior designed to benefit the individual creditor, such an exclusion is entirely proper in normative bankruptcy theory. Under this theory, bankruptcy law should say nothing about the value of relative allocations to the extent those allocational rights were fixed before bankruptcy. And to the extent that judges fully respect the *value* of a secured creditor's entitlements in bankruptcy, there is no reason to believe that opt-out motives underlie a fully-secured creditor's receipt of payment on the eve of bankruptcy.

Notwithstanding that normative answer, bankruptcy law reflects an odd practical tension. It has long been widely suspected that, as a result of inflated asset valuations, secured creditors are systematically undercompensated in bankruptcy reorganizations, even though courts pay lip service to the bankruptcy principle that secured creditors are entitled to be paid in full first.[129] Moreover, *during* bankruptcy proceedings, some judges have explicitly advocated undercompensating secured creditors by denying them compensation for the "time value" of money.[130] Professor Baird and I have criticized the normative undesirability of this trend elsewhere.[131] For present purposes, the point is that, as long as bankruptcy judges persist in undercompensating secured creditors in bankruptcy, it is not true that secured creditors are wholly outside the rationale of the preference section; a tension will remain between that undercompensation and the doctrine that declares fully-secured creditors outside the reach of the preference section.

To this point, I have only focused on the secured creditor who receives payment on the eve of bankruptcy. When a secured creditor repossesses collateral before the commencement of the bankruptcy proceeding, the issue is somewhat different. The asset may be worth more to the debtor (as part of an ongoing enterprise) than it is to a third party.[132] In such a case, returning the asset to the debtor can make the creditors as a group better off without harming the secured creditor. In *United States v. Whiting Pools, Inc.*,[133] the Supreme Court

---

129. *See, e.g.,* sources cited in Jackson, *supra* note 1, at 875 n.80.

130. *See, e.g., In re* Cantrup, 32 Bankr. 1004 (Bankr. D. Colo. 1983); *In re* South Village, Inc., 25 Bankr. 987 (Bankr. D. Utah 1982). *But see In re* American Mariner Indus., 734 F.2d 426 (9th Cir. 1984); *In re* Monroe Park, 17 Bankr. 934 (D. Del. 1982); *In re* Virginia Foundry Co., 9 Bankr. 493 (W.D. Va. 1981); *In re* Anchorage Boat Sales, 4 Bankr. 635, 643 (Bankr. E.D.N.Y. 1980).

131. *See* Baird & Jackson, *supra* note 12.

132. This is likely to be the case when the "going concern" value of assets exceeds the "liquidation" value of those assets. *Id.*

133. 103 S. Ct. 442 (1983).

analyzed this issue in terms of section 542 of the Bankruptcy Code.[134] Under *Whiting Pools,* a secured creditor must return repossessed collateral to the debtor. In return, the debtor must provide "adequate protection."[135] The Court's resolution, as a normative matter, seems proper. Assuming that adequate protection is intended to compensate the creditor fully for his nonbankruptcy rights, this requirement provides the proper incentive: The debtor requests the return of the property if, but only if, its value to the debtor exceeds its value to a third party—on which adequate protection is (or should be) based.[136]

Although analyzed in terms of section 542, the issue in *Whiting Pools* in fact has several facets, at least one of which involves a nascent preference-type issue. Until these different facets are understood, the *Whiting Pools* issue carries the potential for mischief.

Consider, first, a fully-secured creditor who, following default, repossesses the collateral. Following repossession, but before final disposition, the debtor enjoys a state law right to redeem the collateral "by tendering fulfillment of all obligations secured by the collateral . . . ."[137] If the collateral is worth more in the hands of the debtor than in the hands of a third party, and if the third-party value of the collateral is greater than the debt to the creditor, it follows that it is in the interest of the debtor (and his creditors) to redeem.

In these circumstances, it may seem odd that the debtor defaulted in the first place. When a debtor is insolvent, however, his default may be explained, at least partly, by the fact that he simply does not have a sufficient incentive to keep the assets together because the beneficiaries have in effect become his other creditors.[138] And the other creditors, acting individually, are too dispersed to implement effectively a consensual solution that does not involve free-riders and holdouts. Bankruptcy proceedings are designed to solve that problem by providing a mechanism for properly deciding what to do with the assets—including keeping assets that are worth more in the hands

---

134. Section 542(a) requires turnover to the estate "of property that the trustee may use, sell, or lease under section 363 of this title . . . ."

135. Bankruptcy Code §§ 361, 362, 363; *see Whiting Pools,* 103 S. Ct. at 442.

136. Conceptually, adequate protection asks what the secured party could receive by repossessing and selling his collateral under U.C.C. § 9-504 (1972). That sale would be to a third party; hence the price a third party would be willing to pay would measure what the secured creditor was entitled to have "adequately" protected. *See* Baird & Jackson, *supra* note 12; *see also* note 141 *infra.*

137. U.C.C. § 9-506 (1972).

138. *See* text accompanying note 176 *infra.*

of the debtor than in the hands of a third party. Although the creditor's repossession may not reflect opt-out behavior, it is likely to be a consequence in part of debtor passivity, and it is an action that is destructive of the interests of the creditors as a group. That a creditor repossessed in the face of debtor passivity should not bind the remaining creditors in bankruptcy, who should be able to return to the status quo by having the collateral returned and the debt treated as secured. Seen another way, requiring turnover upon the receipt of adequate compensation is, in effect, equivalent to redeeming the collateral. What is different, however, is that the *value* of the redemption right is preserved, in place of the actual *right* itself. As such, requiring turnover is similar to taking away a secured creditor's right to repossess and sell the collateral in traditional automatic stay cases; in both situations, a *right* is taken away in the name of bankruptcy policy, but the *value* of that right is adequately protected.[139]

There is, however, another facet of *Whiting Pools,* which can be analyzed by focusing on repossession by the *under*secured creditor. There are two ways in which such a repossession may reflect opt-out behavior of the preferential type.[140] First, an undersecured creditor who repossesses collateral may be attempting to "skim off" a portion of the difference between the value of the collateral in the hands of the debtor and its value in the hands of a third party. Assuming that a creditor who acquires a security interest legitimately obtains only the right to sell the collateral to a third party,[141] this attempt to gain more, by virtue of the collateral's "extra" value to the debtor, may be viewed as a species of misbehavior by the undersecured creditor

---

139. Baird & Jackson, *supra* note 12.

140. In addition, it continues to be possible to view these cases as a variant on the automatic stay, which stops creditors from exercising their rights, but protects the value of those rights. *See* text accompanying note 129 *supra.*

141. This is a crucial assumption, but it seems to comport with the thrust of U.C.C. § 9-504 (1972). One could argue that the secured creditor's nonbankruptcy entitlement *includes* the extra leverage he acquires over the debtor by repossession—the ability to extract a portion of the excess value of the collateral to the debtor over its value to a third party. The difficulty with this analysis, however, is that if a debtor is solvent repossession is unlikely; the debtor could block the secured creditor's acquisition of that leverage in the first place. But when a debtor is insolvent, his indifference about the disposition of the assets may allow such repossession, even though his creditors as a group are thereby hurt.

Another subtle question also lurks in this analysis. If the asset is more valuable in the hands of the debtor than in the hands of a third party, why doesn't the price at which the asset can be sold simply reflect the third party's ability to sell the asset at the enhanced price to the debtor? Without delving too deeply, the answer to this question seems to be tied to informational and transactional costs. As for the ability of the debtor to buy the asset at the repossession sale, the answer tracks the discussion in text: the substitution (via adequate protection) of the value of the right for the right itself.

against the debtor (and, in bankruptcy, against the debtor's other creditors). Alternatively, the undersecured creditor may be trying to improve his position in bankruptcy through redemption. After repossession, the only way a debtor can reacquire the collateral directly is through redemption. Under Article 9, however, redemption requires paying the *entire* debt.[142] To the extent the debt is undercollateralized, any such payment before bankruptcy would be preferential.[143] Requiring redemption in bankruptcy as a prerequisite to the return of the collateral would, likewise, reward opt-out behavior by allowing the undersecured creditor to receive indirectly what he could not receive directly, to the detriment of the bankruptcy proceeding itself.

When the debtor is solvent, this species of misbehavior normally is not a worry, both because the debtor can prevent such behavior by avoiding default and because the payment of the whole debt itself does not harm the interests of any other group. But when the debtor is insolvent, the debtor may not care enough to stop the repossession,[144] in which case the other creditors suffer resulting harms.

Secured creditors are properly constrained in their efforts to repossess once a bankruptcy proceeding has commenced;[145] it is therefore possible to view such repossession as opt-out activity designed to obtain even more for the undersecured creditor than he could otherwise obtain in the bankruptcy proceeding. Since this ability to obtain more lasts only as long as the creditor holds the property,[146] *Whiting Pools* may accurately reflect the contours of the problem. But so viewed, *Whiting Pools* might more appropriately be viewed as a resolution of two separate problems—a redemption problem for fully-secured creditors and an opt-out problem for undersecured creditors—than as a resolution of a "property of the estate" problem, a line of analysis that seems formalistic and troublesome.[147]

---

142. U.C.C. § 9-506 (1972).

143. Redemption would enable the creditor to receive more (on account of the unsecured portion of his claim) than he would have received in bankruptcy. Bankruptcy Code § 547(b)(5); *see* Barash v. Public Fin. Corp., 658 F.2d 504 (7th Cir. 1981).

144. *See* notes 175–177 *infra* and accompanying text.

145. Bankruptcy Code § 362(a).

146. If the secured creditor has already sold the property pursuant to U.C.C. § 9-504 (1972), he cannot be trying to use the property as a lever to exact more than the price a third party would be willing to pay for the property.

147. *See, e.g,* Cross Elec. Co. v. United States, 664 F.2d 1218 (4th Cir. 1981) (debtor's "rights" after repossession are those of surplus, redemption, and required disposition; these rights are not sufficient to constitute property of a type the debtor can sell or use to support a turnover under § 542). The Supreme Court avoided the troubling language of § 542 by mak-

Moreover, considering preference law from the perspective of the creditors' bargain model allows us to consider one of the most warmly debated issues of the past generation in commercial law: The extent to which Article 9's floating lien should be recognized in bankruptcy.[148] When a secured party takes a security interest that "floats" over after-acquired collateral (usually inventory or accounts),[149] should courts deem the attachment of the security interest to new collateral acquired by the debtor during the preference period to be a voidable preference?

In the most famous of the opinions on the subject, Judge Hufstedler, in *DuBay v. Williams*,[150] identified two policies embodied in Section 60, the old Bankruptcy Act's preference section: the anti-last-minute-grab policy and the anti-secret-lien policy.[151] She then observed that the floating lien itself violated neither of those policies. The creditor had properly noted the security interest in question in a public filing long before the advent of bankruptcy, and from that moment on, the interest could not have deceived other creditors. And since the new collateral automatically became subject to the security agreement, its receipt during the preference period could not be presumed to be attributable to last-minute preferential activity on the part of either the creditor or the debtor.[152]

This is not to say, however, that no preferential activity could occur under the auspices of a floating lien; as Judge Hufstedler recog-

---

ing meaningless comment that § 542 was a "definition," not a "limitation." *See* United States v. Whiting Pools, Inc., 103 S. Ct. 442 (1983).

148. This debate is recounted in Kronman, *The Treatment of Security Interests in After-Acquired Property Under the Proposed Bankruptcy Act,* 124 U. PA. L. REV. 110 (1975).

149. *See* U.C.C. §§ 9-203(3), 9-204(1), 9-204(3), 9-205, 9-206, 9-306(2) (1972).

150. 417 F.2d 1277 (9th Cir. 1969); *see also In re* King-Porter Co., 446 F.2d 722 (5th Cir. 1971); Grain Merchants v. Union Bank & Savings Co., 408 F.2d 209 (7th Cir.), *cert. denied,* 396 U.S. 827 (1969).

151. Congress intended to achieve two aims: (1) to prevent an insistent creditor from harvesting more than his fair share of the insolvent's assets by obtaining transfers from the debtor on the eve of bankruptcy, and (2) to discourage extension of credit to debtors under circumstances which concealed from general creditors the precarious financial condition of the debtor.

417 F.2d at 1288.

152. Rose City's floating lien on accounts receivable was easily ascertainable by any creditor who cared to look at the financing statement. After the financing statement was filed, no creditor could reasonably have been misled into believing that Rose City's receivables would provide assets to which he could look to satisfy debts incurred for subsequent extensions of credit. Neither the Bankrupt nor Rose City took any affirmative action to obtain for Rose City a favored position over other creditors of its class during the four months before bankruptcy.

*Id.* at 1289.

nized, it could. But the policy reasoning of *DuBay* was fundamentally correct. One cannot *presume* that, merely by having a floating lien, a creditor has engaged in opt-out activity at the expense of other creditors. Section 9-108 of the Uniform Commercial Code, which clumsily attempted to define "transfer," ironically may have gotten preference policy essentially right by limiting Article 9 protection to situations where "the debtor acquires his rights in [after-acquired] collateral either in the ordinary course of his business or under a contract of purchase made pursuant to the security agreement within a reasonable time after new value is given."[153]

The ultimate statutory response to *DuBay* is the "two-point net improvement" test in section 547(c)(5) of the Bankruptcy Code. Under that test, a security interest in inventory or receivables otherwise falling prey to the avoiding power of the trustee pursuant to the preference section (as modified to reach the attachment of security interests to after-acquired collateral[154]) is protected to the extent that the secured party either does not improve his position during the preference period or can show that his improvement in position was not "to the prejudice of other creditors holding unsecured claims."[155]

This provision is generally considered a compromise between the two sides who battled over floating lien theories in the 1960's and early 1970's.[156] Like most compromises, it seems to express no clear principle of its own. But another, more satisfying way to view section 547(c)(5) is as a presumptive rule that implements the preference section's anti-last-minute-grab policy. So viewed, the two-point net improvement test creates a presumption that improvements in position within the preference period by a secured creditor holding a security interest in inventory or in accounts, because unusual, result from a last-minute grab by the secured creditor.[157] That creditor may de-

---

153. U.C.C. § 9-108 (1972); *see* Eisenberg, *Bankruptcy Law in Perspective: A Rejoinder*, 30 UCLA L. REV. 617, 633–34 (1983).

154. Congress modified the preference section to reach the attachment of security interests to after-acquired collateral. *See* Bankruptcy Code § 547(e)(3).

155. Bankruptcy Code § 547(c)(5). The requirement that the improvement in position is avoidable only if it is "to the prejudice of other creditors holding unsecured claims" comes from a suggestion Professor Kripke made, based on an allocation formula in Meinhard, Greeff & Co. v. Edens, 189 F.2d 792 (4th Cir. 1951), which was adopted in § 4-607 of the Proposed Bankruptcy Act of 1973. *See* BANKRUPTCY REPORT, *supra* note 1, pt. I, at 209–10.

156. *See, e.g.,* Kronman, *supra* note 148.

157. *See* NATIONAL BANKRUPTCY CONFERENCE, REPORT OF THE COMM. ON COORDINATION OF THE BANKRUPTCY ACT AND THE UNIFORM COMMERCIAL CODE (1970), *reprinted in* H.R. REP. No. 595, 95th Cong., 1st Sess. 204 (1977). That report, from the so-called "Gilmore Committee," stated that the two-point test

seeks to catch in the preference net particularly those situations in which the trans-

feat the presumption, however, by showing that the improvements did not result from a last-minute grab—in the language of the statute, that they did not prejudice other creditors holding unsecured claims. A bright-line rule thus has supplanted a standard requiring a case-by-case analysis. Far from being a compromise, the rule can be viewed as implementing an established, if inelegantly understood, policy.[158]

Because the process that led to section 547(c)(5) was not informed by a consensus as to the role of preference law—or even by any clear theory of how preference law should relate to nonbankruptcy interests such as the "floating lien"—this justification of the two-point net improvement test may be a retrospective revision rather than an elaboration of the drafting motivations that produced it.[159] Certainly, the two-point net improvement test does not tailor the presumption to the policy in a fully lucid way. For example, the presumption, assuming administrative costs suggest it should be rebuttable at all, logically should be rebuttable both ways: The trustee should be able to show that deliberate preferential behavior occurred during the 90 day period preceding bankruptcy, even when that behavior does not produce an improvement in position as measured by the two-point net improvement test.[160]

Other features in the Bankruptcy Code suggest that the drafters implemented developments such as the two-point net improvement test without an awareness of the justification for a preference rule. However well the two-point net improvement test succeeds in dealing with the transactions the drafter's had in mind, the changes that implement it may fail to resolve other problems in accordance with proper preference theory. This is the almost inevitable result of stat-

---

feree (as by crash sales of inventory below cost to feed the receivables) has sought to manipulate the prebankruptcy situation to his own advantage. (In the normal course of a business declining into bankruptcy the position of an inventory or receivables lender, far from improving, will almost certainly deteriorate).
*Id.* at 216.

158. *Cf.* Harris, *supra* note 127, at 336 ("This choice [of a rule instead of case-by-case determination] is consistent with the Code's policy of reducing litigation over difficult questions of fact at the risk of catching unobjectionable transactions in the preference net.").

159. *See, e.g.,* Eisenberg, *supra* note 153, at 631 ("A more natural reading . . . seems to be that the writers were concerned that secured parties, whether or not they had engaged in manipulative behavior, were simply able to get too large a share of the debtor's assets.").

160. This is essentially the result in Bankruptcy Code § 553(a)(3), which permits the trustee to reach the incurrence of debts by a creditor "for the purpose of obtaining a right of set-off against the debtor," notwithstanding a comparable two-point net improvement test in § 553(b).

utory tinkering to deal with a perceived problem when no coherent normative theory of the purposes of the statute is first articulated.

Consider the definition of "transfer" found in the preference section. To avoid the statutory reasoning of *DuBay,* section 547(e) redefines the date of a transfer.[161] This redefinition, however, may strike down activity that does not interfere with the goals of a preference section. For example, are wages or rents paid to creditors inside the preference period pursuant to garnishments or assignments that predate the period preferential? The newly-fashioned definition of "transfer" states that, for purposes of the preference section, no transfer occurs until the debtor has "rights in the property transferred."[162] Read literally, this definition would mean that no "transfer" of rents or of wages takes place until they are paid or earned and thus that any payment of such rents or wages to the assignee or garnishee within the preference period is potentially preferential.[163]

Yet neither the garnishment of wages nor the assignment of rents outside the preference period or the accrual of wages or rents within the preference period violates the "opt-out" proscription that animates the preference section. The activity is not manipulative as among creditors: It represents neither a secret lien (as it was fully publicized) nor a last-minute grab (as the "grab," if any, took place ab initio).[164] Moreover, unlike floating liens on inventory or accounts, where the quantity or timing of the acquisition of new collat-

---

161. Section 547(e) provides in particular that, for purposes of preference attack, "a transfer is not made until the debtor has acquired rights in the property transferred." Bankruptcy Code § 547(e)(3). The House Report notes that this subsection, "more than any other," overrules *DuBay.* H.R. REP. NO. 595, 95th Cong., 1st Sess. 374 (1977) *reprinted in* 1978 U.S. CODE CONG. & AD. NEWS 5963, 6330.

162. *See* Bankruptcy Code § 547(e)(3).

163. *See, e.g., In re* Diversified World Invs., 12 Bankr. 517 (Bankr. S.D. Tex. 1981). The preference problems of an assignment of rents arising out of a lease of personal property probably can be avoided by taking a security interest in the right to rents, which is an Article 9 "account." *See* U.C.C. § 9-106 (1972). The payment of the rents themselves would be "proceeds," protected by Bankruptcy Code § 547(c)(5), if not by § 547(b)(5). Similarly, a security interest in real estate rentals, if properly perfected, *see In re* Bristol Assocs., 505 F.2d 1056 (3d Cir. 1974), should be protected, because of the definition of "receivables" in § 547(a)(3). The garnishment of wages, however, would not seem to fit in the safe-harbor of § 547(c)(5), even if the transaction were restructured.

164. *Cf. In re* Riddervold, 647 F.2d 342, 346 (2d Cir. 1981) (under New York law, "after the sheriff has taken the steps described in [the garnishment statute], the debtor has no property or interest in property subject to the levy which can be transferred."). Most other courts have disagreed with *Riddervold,* holding that wages earned and garnished during preference period are avoidable preferential transfers. *See, e.g., In re* Larson, 21 Bankr. 264 (Bankr. D. Utah 1982); *In re* Eggleston, 19 Bankr. 280 (Bankr. M.D. Tenn. 1982); *In re* Mayo, 19 Bankr. 630 (Bankr. E.D. Va. 1981). *But see In re* Coppie, 728 F.2d 951 (7th Cir. 1984).

eral is conceivably subject to manipulation, garnishments and
assignments afford little room for deliberate preferential behavior be-
cause no substitution occurs that can be manipulated.

While section 547(c)(5) may continue the objectification of pref-
erence law into presumptive categories—a trend that is not objec-
tionable in itself—it would be unfortunate if this objectification were
to obscure the policies that animate the preference section. By inten-
tionally or unintentionally pursuing goals other than the preserva-
tion of the collective proceeding, reformers may well sabotage the
collective proceeding instead.[165] A firm notion of the reasons for
bankruptcy, and hence for a preference section, is necessary in order
to apply preference law successfully to specific cases.

## VII.  Fraudulent Conveyances:  Protections Against Debtor Misbehavior

Fraudulent conveyance law, unlike preference law, applies both
inside and outside a collective proceeding such as bankruptcy.[166]
This nonbankruptcy application expresses a great deal about the
conceptual difference between the roles of preference law and of
fraudulent conveyance law in sorting out legal rights. While prefer-
ence law enforces the bargain among the creditors themselves, fraud-
ulent conveyance law enforces the bargain between the *debtor* and his
creditors.[167] That is to say, preference law, like most other trustee
avoiding powers, is designed to preserve the ability of creditors as a
group to resort to a collective proceeding when it is advantageous to
them. Conversely, fraudulent conveyance law protects creditors
against misbehavior by their debtor. As such, it is a debtor/creditor
misbehavior rule, not a creditor/creditor misbehavior rule,[168] and ac-
cordingly, it is not related to the creditor-oriented collective justifica-
tion for a bankruptcy proceeding.

Many of the difficulties associated with fraudulent conveyance

---

165. *See* notes 14–17 *supra* and accompanying text.

166. *See* Unif. Fraudulent Conveyance Act (1919).

167. Clark, *supra* note 106; McLaughlin, *supra* note 70. The classic work on fraudulent
conveyance law remains G. Glenn, Fraudulent Conveyances and Preferences (rev.
ed. 1940). Professor Glenn started that work by noting that "[t]he preference materially dif-
fers from the fraudulent conveyance, because it sins, not against the single creditor's right of
realization, but only against the collective right, of the creditors as a class, that arises when
their debtor becomes insolvent." 1 *id.* at 1.

168. *See* Michel v. J's Foods, 99 N.M. 547, 661 P.2d 474, 476 (1983) ("The purpose of
[the Uniform Fraudulent Conveyance] Act is to protect creditors when a *debtor* has made a
conveyance of his property which diminishes the creditor's assets to the detriment of the rights
of the creditor.").

law arise from the failure to distinguish the general role of fraudulent conveyance law from the bankruptcy-oriented role of preference law. The presence of two fraudulent conveyance sections in the Bankruptcy Code has exacerbated these difficulties. The Code applies fraudulent conveyance law not only through section 544(b), which incorporates state fraudulent conveyance law, but also through section 548, which establishes a related, but ultimately distinct, bankruptcy law of fraudulent conveyances. Bankruptcy-tailored fraudulent conveyance rules, such as those in section 548, would be justified if fraudulent conveyance law, like the trustee's other avoiding powers, was related to the reasons for a collective proceeding. But since fraudulent conveyance law springs from an entirely different source, its separate existence in a bankruptcy statute is more problematic.

The rough contours of fraudulent conveyance law are easy to establish. Classic fraudulent conveyance law is concerned with a debtor who manipulates his assets so as to keep them from his creditors.[169] When a debtor is insolvent and must hand his assets over to his creditors, he has an incentive to hide his assets, to gamble them away, or to cut the best possible deal with a friend (whether or not the friend is a creditor). These types of action form the core behavior that classic fraudulent conveyance law is designed to prevent. Actions taken to "hinder, delay, or defraud" one's creditors are, therefore, fraudulent.[170]

Since here, as elsewhere, proving intent is difficult, fraudulent conveyance law not surprisingly contains an objective element in the form of a rule to supplement the standard: Actions taken by a debtor while insolvent (and hence while having little to lose) are presumed to be fraudulently motivated, unless those actions substitute one asset for another of equal value. Fraudulent conveyance law thus attacks these transactions without inquiry into intent through the alternative, and objectivized, approach of deeming fraudulent those transactions for less than fair consideration made while the debtor was insolvent.[171]

---

169. Clark, *supra* note 106.

170. *See* UNIF. FRAUDULENT CONVEYANCE ACT § 7 (1919). Transfers that appear preferential (because paying a bona fide debt) were historically sometimes considered to be fraudulent conveyances, if they were the intentional result of an act by the debtor in contemplation of immediate bankruptcy. *See, e.g.,* Worseley v. DeMattos & Slader, 97 Eng. Rep. 407 (K.B. 1758) (Mansfield, J.); 1 W. COOKE, THE BANKRUPT LAWS 376 (London 1785).

171. UNIF. FRAUDULENT CONVEYANCE ACT §§ 4–6 (1919); *see* Irving Trust Co. v. Finance Serv. Co., 63 F.2d 694, 695–96 (2d Cir. 1933) (L. Hand, J.). Other types of transactions

Fraudulent conveyance law generally comes into play only if a debtor becomes insolvent and is unable to pay all his creditors. This is true even when the law serves a prophylactic function, such as deterring actions by a debtor to "gamble" at the expense of his creditors—to risk insolvency for the prospect of a large upside gain from which he alone will benefit. Though fraudulent conveyance law is generally necessary only if a debtor becomes insolvent, that does not mean that it is essentially related to the justifications for a bankruptcy process. Of course, activities covered by fraudulent conveyance law are not entirely unrelated to bankruptcy. For example, a debtor's dissipation or concealment of assets may frustrate the realization of the assets' higher going concern value as much as grabs by creditors. But such transactions are undesirable when a debtor is insolvent even in the absence of any interference with a collective proceeding. Hence, the justification for fraudulent conveyance law is fundamentally broader than are the reasons for a bankruptcy proceeding.[172]

Fraudulent conveyance law, then, is distinctly less collectivist in its justification. Moreover, both the fact-specific and the rule-oriented branches of fraudulent conveyance law focus, at their core, on activities by a debtor that harm his creditors.[173] The essence of

bear enough indicia of "sweetheart" deals or "kickbacks," which favor the debtor (and his friends) at the expense of the creditors, that special rules have grown out of the same source as fraudulent conveyance law to reach them. *See, e.g.,* U.C.C. art. 6 (1972) (regulating bulk sales). One also may relate other types of legal rules to fraudulent conveyance law, but these rules lessen the fact-specific orientation of that law. *See, e.g.,* Bankruptcy Code § 510(c) (applying doctrine of equitable subordination in bankruptcy); *see also* Pepper v. Litton, 308 U.S. 295 (1939). *See generally* Clark, *supra* note 106 (identifying corporate veil-piercing and statutes imposing restrictions on dividends and other corporate distributions).

172. Had states not adopted fraudulent conveyance laws, a fraudulent conveyance rule in bankruptcy probably would have been preferable to no rule at all, given the inherently insolvency-directed nature of fraudulent conveyance law. Since general fraudulent conveyance laws are a standard feature of all jurisdictions, however, the wisdom of a separate bankruptcy rule is substantially more dubious because of the bankruptcy incentives it creates. *See generally* Eisenberg, *supra* note 19. Section 548 of the Bankruptcy Code borrows from fraudulent conveyance law, but tinkers with it in a fashion that is often inexplicable. *Compare* UNIF. FRAUDULENT CONVEYANCE ACT § 1 (1919) (definition of "conveyance") *with* Bankruptcy Code § 548(d) (definition of "transfer"). *Compare* UNIF. FRAUDULENT CONVEYANCE ACT § 9(1) (1919) (a wronged creditor cannot recover from a "purchaser for fair consideration without knowledge of the fraud at the time of purchase") *with* Bankruptcy Code § 548(c) (transferee "that takes for value and in good faith has a lien on any interest transferred . . . to the extent that [he] gave value to the debtor"). This process has accelerated with the 1984 amendment. *See* notes 175 and 193 *infra.*

173. *See* note 168 *supra.* Courts have considered fraudulent conveyances to be evil without regard to the advent of a bankruptcy proceeding. *See* Van Iderstine v. National Discount Co., 227 U.S. 575, 582 (1913) ("One [the intent to defraud] is inherently and always vicious;

fraudulent conveyance law, therefore, is to prevent manipulative activities by the debtor. If the activity in question is, at best, a manipulation by a *creditor* vis-a-vis other creditors, then it should succumb, if at all, to a preference-type rationale rather than a fraudulent-conveyance-type rationale.[174]

One of the more perplexing recent additions to fraudulent conveyance case law poses this distinction in the context of the trustee's attack on a mortgage foreclosure sale.[175] These cases typically involve fact situations like the following: Bank loans $60,000 to Debtor and secures this loan by taking and recording a mortgage on Blackacre, which is owned by Debtor. Later, Debtor defaults on the loan, and Bank forecloses on the property. Following state procedures, Bank holds a foreclosure sale of the property at which it, or a third party, buys the property for $60,000. Within a year of that foreclosure sale, Debtor files for bankruptcy, whereupon the trustee asserts that the foreclosure sale was a fraudulent conveyance because Blackacre was not sold for a fair consideration (being worth, the trustee asserts, more than $75,000 at the time of the sale) and because it was sold at a time when Debtor was insolvent.

The facts of these cases do not support a presumption of debtor-induced misbehavior. Indeed, to the extent that misbehavior appears, the cases suggest the possibility of misbehavior by the creditor against the debtor. Unlike preference-type behavior, however, where the "misbehavior" involves the creditor seeking his "just due" at the expense of other creditors in an impending collective proceeding, the misbehavior in these cases involves the creditor trying to get *more* than his just due. As such, the creditor wrongs the debtor generally,

---

the other [the intent to prefer] innocent and valid, except when made in violation of the express provisions of a statute. One is *malum per se* and the other *malum prohibitum.*").

174. For this reason, true involuntary transfers should not be considered fraudulent conveyances. *See* note 193 *infra,*

175. *Compare* Abramson v. Lakewood Bank & Trust Co., 647 F.2d 547 (5th Cir. 1981), *cert. denied,* 454 U.S. 1164 (1982) (nonjudicial foreclosure sales may be considered transfers and thus will be considered fraudulent if the purchase price does not represent the fair equivalent of market value) *and* Durrett v. Washington Nat'l Ins. Co., 621 F.2d 201 (5th Cir. 1980) (same) *and In re* Berge, 33 Bankr. 642 (Bankr. W.D. Wis. 1983) (same) *and In re* Richardson, 23 Bankr. 434 (Bankr. D. Utah 1982) (same) *with In re* Madrid, 725 F.2d 1197 (9th Cir. 1984) (for purposes of § 548, transfer occurs when security interest is perfected, not when property was sold at foreclosure sale) *and In re* Alsop, 14 Bankr. 982 (Bankr. D. Alaska 1981), *aff'd,* 22 Bankr. 1017 (D. Alaska 1982) (same). One court has recently extended the rationale of *Abramson* to the involuntary sale of personal property. *See In re* Ewing, 33 Bankr. 288 (Bankr. W.D. Pa. 1983). As this article went to press, Congress amended the definition of "transfer" in § 101(48) and § 548(a) to side with the *Abramson* and *Durrett* cases. *See also* note 193 *infra.*

not just other creditors in cases when there are not enough assets to go around.

This account, however, may over-simplify the setting in which foreclosure sales take place. Any debtor that permits a foreclosure to proceed is likely to be insolvent. Accordingly, the debtor may have an insufficient incentive to resist a foreclosing creditor's efforts to purchase an asset at a foreclosure sale for less than fair value. The debtor will lose his assets anyway, and because he expects a "fresh start," he may not particularly care who gets them. For that reason, the transaction may suggest a transfer by a debtor, made while insolvent, for less than fair consideration, which would be prey to fraudulent conveyance law's rule-oriented branch.[176]

This characterization, however, seems wrong. While the debtor may offer insufficient resistance to a creditor's attempt to buy the asset at the foreclosure sale for less than market value, this transaction does not bear the *presumptive* elements of fraud by the *debtor* against his creditors. The presumption, if any, is of debtor-passivity, not of active debtor concealment or dissipation of assets. The activity's impetus comes from the creditor, not from the debtor. The creditor can succeed because the debtor is insolvent and relatively uninterested in maximizing value and because the debtor's other creditors, who are the people ultimately to be harmed, may be sufficiently numerous or diverse to be unable to effectively counter this passivity. This description, however, depicts the paradigmatic violation of preference principles—creditor misbehavior directed against other creditors when a debtor is insolvent—*not* a violation of fraudulent conveyance principles.

Foreclosure sales therefore seem better analyzed, presumptively at least, as a part of preference law, not fraudulent conveyance law. Even preference law, however, may not properly apply to these circumstances. First of all, preference law would not reach purchases of the property by a third party at the foreclosure sale, the proceeds of which exceed the amount of the secured indebtedness. In those cases, there appears to be no opt-out behavior by the foreclosing creditor.[177]

---

176. *See* Unif. Fraudulent Conveyance Act § 4 (1919); Alden, Gross & Borowitz, *Real Property Foreclosure as a Fraudulent Conveyance: Proposals for Solving the Durrett Problem*, 38 Bus. Law. 1624, 1625 (1983); note 171 *supra* and accompanying text.

177. *See* note 181 *infra*. A secured party has few incentives to allow the sale of collateral to third parties for *less* than the amount of the indebtedness, for that leaves the creditor with an unsecured deficiency. *See* Schwartz, *The Enforceability of Security Interests in Consumer Goods*, 26 J. L. & Econ. 117 (1983). A secured creditor may purchase the collateral himself for less than fair value, even if that sale is for less than the indebtedness, because the sum of the

Second, even when the purchaser is the foreclosing creditor, foreclosure sale procedures provide a degree of notoriety, owing to nonbankruptcy foreclosure rules that historically have regulated sales.[178] Under these rules, such misbehavior is wrongful when a debtor is *solvent*. Third, if their problem is debtor passivity, the creditors have a mechanism for acting together in place of the debtor. In many cases at least, they can commence an involuntary petition in bankruptcy,[179] thereby stopping the foreclosure proceeding[180] and supplementing it with a sale under the direction of the bankruptcy process.[181] If the creditors do not take such an action prior to the foreclosure sale, an additional 90-day period of vulnerability may be unwarranted.[182]

Whatever the proper resolution of this point may be, foreclosure sales seem more a problem of creditor misbehavior than of debtor misbehavior. As such, they should be regulated either by nonbankruptcy foreclosure rules or by preference-like rules in bankruptcy. The preference approach would be justified by a presumption of debtor passivity that occurs upon insolvency and that allows a credi-

---

deficiency claim and the "capture" of the excess value may exceed the value to him of attributing the fair market value of the property against the indebtedness. *Cf. In re* Fountain, 32 Bankr. 965 (Bankr. W.D. Mo. 1983). Alden, Gross & Borowitz, *supra* note 176, who favor use of § 548, argue that reasonable value should be irrebuttably presumed when the collateral is sold to a third party but not when the mortgagee buys the property.

178. *See In re* Madrid, 725 F.2d 1197 (9th Cir. 1984).

179. Bankruptcy Code § 303. Section 303(h) may require the petitioning creditors to show that the debtor is "generally not paying debtor's debts . . . as such debts become due." This test, in the abstract, is not as appropriate as an insolvency test, such as is found in § 101(26). Jackson, *supra* note 1, at 892 & n.161. Thus a debtor could be insolvent and yet paying his debts (other than the mortgage in foreclosure) and hence, he would not be subject to an involuntary petition. Whether the creditors commence an involuntary petition will also depend on whether they have sufficient information regarding the foreclosure sale and on whether they are then willing to take that step.

180. *See* Bankruptcy Code § 362.

181. *See id.* § 363. Cases where the third-party buyer pays less than "fair value" but more than the amount of the secured indebtedness may present a special problem, as here the *buyer* may be benefitting from the debtor's passivity at the expense of the creditors. Again, however, this problem may be one of the reasons for state rules regulating foreclosure sales in the first place.

182. The Ninth Circuit recently made this point in *In re* Madrid, 725 F.2d 1197 (9th Cir. 1984), albeit in the context of discussing § 548:

> First, ample protections were afforded . . . under Nevada's statutory system prior to the actual time of the foreclosure sale. . . . Second, if the debtor is unable or unwilling to pursue state statutory methods to protect his or her equity during the notice period, a voluntary bankruptcy petition may be filed which would automatically stay any foreclosure sale. . . . If the debtor fails to file a voluntary bankruptcy petition, then creditors may file an involuntary petition . . . .

*Id.* at 1202.

tor to grab assets from the pool, leaving less for the others. Thus conceived, the misbehavior threatens the bankruptcy process and enters the domain of preference law. Neither nonbankruptcy foreclosure rules nor preference rules, however, suggest misbehavior by the debtor; application of the rule-oriented provisions of fraudulent conveyance law, in or out of bankruptcy, therefore, appears unwarranted.[183]

Moreover, using existing fraudulent conveyance law to deal with that form of creditor misbehavior is objectionable on another ground. Existing fraudulent conveyance statutes grant remedies only to *creditors*.[184] Current fraudulent conveyance law does not regulate creditor misbehavior against debtors (although other rules do), and such misbehavior is not related to the reasons for a collective proceeding in any case, unless it fits squarely within a preference rationale as well. To be sure, the reach-back period of the preference section is only 90 days,[185] but if that period has passed, it is because of the rule-oriented nature of the preference section. To the extent it provides a stratagem to circumvent the preference section's time limitation, the use of fraudulent conveyance law to reach such behavior in bankruptcy is troublesome.

Such misuse of fraudulent conveyance law stems from an incomplete understanding of its role. When debtor misbehavior against his creditors is not the issue, fraudulent conveyance law appears to be

---

183. The debtor may be actively involved, because of some sort of implicit kickback agreement with the foreclosing creditor. Consequently, a foreclosure sale may involve a fraudulent conveyance. *See, e.g.,* Sheffield Progressive, Inc. v. Kingston Tool Co., 10 Mass. App. Ct. 47, 405 N.E.2d 985 (1980). *See generally* 1 G. GLENN, *supra* note 167, § 214a, at 366–68 (discussion of "collusive" foreclosure). But this situation is more appropriately analyzed under the fact-specific approach of UNIF. FRAUDULENT CONVEYANCE ACT § 7 (1919) or of Bankruptcy Code § 548(a)(1), not the rule-oriented approach of UNIF. FRAUDULENT CONVEYANCE ACT §§ 4–6 or of Bankruptcy Code § 548(a)(2). *See generally* 1 G. GLENN, *supra* note 167, § 214, at 366 (inaction of debtor may result in a fraudulent conveyance if debtor's passivity was a "connivance" designed to keep assets out of estate).

184. *See* UNIF. FRAUDULENT CONVEYANCE ACT §§ 9–10 (1919). Moreover, the statutes generally focus on conveyances *by* the debtor, not on unilateral actions taken by creditors (such as foreclosure sales). *See id.* § 4. Several cases applying Bankruptcy Code § 548 have dismissed this concern by noting that § 548 reaches involuntary "transfers," a conclusion Congress made explicit by amendment to § 548(a) in 1984. *See In re* Richardson, 23 Bankr. 434 (Bankr. D. Utah 1982). But that answer masks a more troubling problem: Why is bankruptcy law redefining state law regulating debtor misbehavior? It may, of course, be doing so on a preference rationale—that is, the activity it regulates is creditor misbehavior against other creditors—but then, as discussed in text, § 547 would have been the appropriate focus. Involuntary transfers do not bear the earmarks of a fraudulent conveyance. *See* note 193 *infra.*

185. Bankruptcy Code § 547(b)(4).

*STANFORD LAW REVIEW*                 [Vol. 36:725

the wrong vehicle. For example, consider the facts of *Kindom Uranium Corp. v. Vance.* [186] In that case, Cole, who was an officer and a director of Kindom Uranium, transferred to Kindom Uranium, on April 10, 1956, a quitclaim deed to her residence in exchange for 4000 shares of 50 cents par value stock and cancellation of a $1000 indebtedness. After transferring the deed, Cole injured Campbell in an automobile accident. Campbell brought suit against Cole. During the course of the ensuing trial, Kindom Uranium recorded the deed. After the deed was recorded, Campbell won his lawsuit and received a judgment for $5000 in his favor. Cole then filed for bankruptcy.

One issue in the bankruptcy proceeding was whether the trustee could avoid the transfer of the house to Kindom Uranium. Since the actual transfer of the deed took place outside the one-year fraudulent conveyance period found in Section 67d of the old Bankruptcy Act,[187] the court focused on the recording of the deed. Relying on a definition of transfer similar to that now found in the preference section—a transfer takes place when it is "so far perfected" that no bona fide purchaser could prevail—the court deemed the "transfer" of the deed to occur on the date of its recording, which had taken place inside the fraudulent conveyance period at a time when, because of the automobile lawsuit, Cole was, or had a strong possibility of becoming, insolvent. Finding the consideration given for the deed to be inadequate, the court declared that the transfer was a fraudulent conveyance, avoidable by the trustee in bankruptcy.

Two odd things exist in this case. First, the activity under attack technically was not the actual transfer of property of the debtor within the temporal reach of the fraudulent conveyance law but the curing, by Kindom Uranium's recording, of the attendant ostensible ownership problem within that time.[188] Yet the problem raised by that delayed recording is inherently one of preference law, not fraudulent conveyance law. Seeing that Cole was, or was likely to become, insolvent, Kindom Uranium improved its position in anticipation of a collective proceeding by recording the deed. But to say that such activity is contrary to the goals of bankruptcy suggests that the rationale under which such activity can be reached is that of preference

---

186. 269 F.2d 104 (10th Cir. 1959).

187. 11 U.S.C. § 107d (1975) (repealed prospectively Oct. 1, 1979).

188. The unrecorded conveyance apparently could have been avoided by a judgment creditor, and not just by bona fide purchasers, for the court noted that "[t]he recordation, undoubtedly, was effectuated for the purpose of establishing a safeguard against the potentiality of a judgment adverse to Mrs. Cole . . . ." 269 F.2d at 105.

law, not fraudulent conveyance law.[189]  The undesirable activity involved a "grab" by Kindom Uranium at the expense of other creditors.  Nothing in the facts of the case indicated that Cole—the debtor—did anything within the fraudulent conveyance period; only Kindom Uranium— the creditor—did something.

In other words, the facts indicate not a fraudulent conveyance but rather a classic preference which presumably the preference section would have reached, but for the fact that the four month preference period had already run.[190]  State fraudulent conveyance law generally would not have reached this late recording of the deed, as the recording was not a "conveyance" within the meaning of statutes such as the Uniform Fraudulent Conveyance Act.[191]  Rather, a bankruptcy-created modification in fraudulent conveyance law that redefined "transfer" to include the late recording of property interests[192] captured the recording of the deed.  This provision, however, imports preference logic, properly an exclusive feature of bankruptcy, into fraudulent conveyance law, where bankruptcy has no independent role to play.[193]  The result is to undermine the carefully designed lim-

---

189. *See also* Bullard v. Aluminum Co. of America, 468 F.2d 11 (7th Cir. 1972). *Bullard* involved a classic preference. Alcoa settled with Kritzer Radiant, its debtor. The transaction displayed all the attributes of a preference. In view of the fact that Alcoa settled for 50 cents on a legitimate one dollar debt, however, application of fraudulent conveyance law to reach the transaction appears unwarranted. *See* W. WARREN & W. HOGAN, CASES AND MATERIALS ON DEBTOR-CREDITOR LAW 407 (2d ed. 1981).

190. As analyzed in this article, the question is whether the delayed recording was defective against lien creditors, not bona fide purchasers. *See* notes 30–43 *supra* and accompanying text.

191. UNIF. FRAUDULENT CONVEYANCE ACT § 1 (1919) defines "conveyances" as including "every payment of money, assignment, release, transfer, lease, mortgage or pledge of tangible or intangible property, and also the creation of any lien or encumbrance."

192. At the time of *Kindom Uranium*, § 67d(5) of the Bankruptcy Act of 1898, 11 U.S.C. § 107d(5) (1975) (repealed prospectively Oct. 1, 1979), provided that "a transfer shall be deemed to have been made at the time when it became so far perfected that no bona fide purchaser from the debtor could thereafter have acquired any rights in the property so transferred superior to the rights of the transferee therein . . . ." In the Bankruptcy Code, a comparable definition is found at § 548(d)(1).

193. In the context of fraudulent conveyance law, true involuntary transfers contradict the notion of debtor-based wrongdoing. Involuntary transfers may well be preferential, but they are not fraudulent conveyances. *See In re* Madrid, 725 F.2d 1197, 1203–04 (9th Cir. 1984) (Farris, J., concurring) ("One cannot presume fraud by the debtor in a transaction where the debtor was not a party. . . . I would therefore hold that only transfers where the bankrupt was a participant can be set aside for absence of 'reasonably equivalent value.'"); Abramson v. Lakewood Bank & Trust Co., 647 F.2d 547 (5th Cir. 1981) (Clark, J., dissenting), *cert. denied*, 454 U.S. 1164 (1982); Sheffield Progressive Inc. v. Kingston Tool Co., 10 Mass. App. Ct. 47, 405 N.E.2d 985 (1980). For this reason, the 1984 amendment to § 548(a), making clear that it covers involuntary transfers, seems misdirected. Also, transfers of exempt property may not be fraudulent (unless other property thereupon becomes exempt). *See In re*

itations of preference law and to distort the nonbankruptcy ordering of fraudulent conveyance law.

There is a second odd feature in the case. The underlying transaction may have been fraudulent as well, a probability that appears likely given the relationship between Cole and Kindom Uranium. Cole and Kindom Uranium may well have conspired together not to record the deed for the purpose of allowing Cole to obtain false credit. But this would be the exception across the range of delayed-recording cases. Thus, the rule-oriented branch of fraudulent conveyance law used in the case was inappropriate. The proper approach would have been to address the fact-specific question of whether Cole had the actual intent to "hinder, delay, or defraud," at the time the parties set up the original transaction and Kindom Uranium failed to record. The reason *that* question was not addressed, at least using the Bankruptcy Act's fraudulent conveyance provision, is the one-year temporal limit of fraudulent conveyance law itself.[194]

## CONCLUSION

Approached individually, the avoiding powers of the trustee in bankruptcy appear technical and confusing. But when armed with a theory as to why bankruptcy's collective process should exist, one can develop the concepts to explain what the role of avoiding powers should be. So viewed, avoiding powers of the trustee are of two separate types. On the one hand, there are those that act to implement the collective proceeding by preserving the reasons for the existence of the collective proceeding in the first place. As such, these powers inherently diverge from nonbankruptcy rights, for they are part and parcel of the substitution of a collective set of rights for the individualized rights that exist outside of bankruptcy. On the other hand, as represented by fraudulent conveyance law, there are those that act to protect against forms of misbehavior by a debtor against his creditors. In this form, they are but a part of a system of rights that exists—or should exist—both inside and outside bankruptcy. Here,

---

Treadwell, 699 F.2d 1050 (11th Cir. 1983); *see also* notes 123–124 *supra* (discussion of preferences and transfers of exempt property).

194. It is possible the transaction could have been captured by the longer reach-back provision of state fraudulent conveyance law, although Campbell had tried such a suit under state law and lost. The court observed "that neither the bankrupt nor the principal creditor, Campbell, could successfully set aside the subject conveyance," Kindom Uranium Corp. v. Vance, 269 F.2d 104, 106 (10th Cir. 1959), but considered that irrelevant when determining the scope of avoiding powers in bankruptcy.

unlike the situation presented by the other avoiding powers, the role of *bankruptcy* policy is virtually nonexistent.

Once these policies underlying the various avoiding powers of the trustee are illuminated, the natural contours of the sections can be seen in fairly stark form. So viewed, the sight is familiar but not always pretty. When appropriately limited to the bankruptcy-related justifications from whence they come, avoiding powers are an integral part of the bankruptcy process. When they depart from those justifications, however, so as to favor, relative to nonbankruptcy rights, one class of claimants over another, their use interferes with the collective bankruptcy proceeding that is the core reason for their existence.